UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

JAMIE SHIPPING INC., PUFFIN MARINE           :      08 CV _____
INVESTMENTS SA and BANK MANDIRI              :
(EUROPE) LTD. UK,                             :
                                              :
                        Plaintiffs,           :
                                              :
        - against -                           :
                                              :
OMAN INSURANCE CO.,                           :
                                              :
                        Defendant.            :
------------------------------------------------------X

## VERIFIED COMPLAINT

Plaintiffs, JAMIE SHIPPING INC. (hereafter referred to as "JAMIE"), PUFFIN

MARINE INVESTMENTS SA (hereafter referred to as "PUFFIN") and BANK MANDIRI

(EUROPE) LTD. UK (hereafter referred to as "BANK MANDIRI") by and through their

attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint against the

Defendant, OMAN INSURANCE CO. (hereafter referred to as "Defendant"), allege, upon

information and belief, as follows:

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333.  This matter also arises

under the Court's federal question jurisdiction within the meaning of 28 United States § 1331.

2.      At all times material to this action, Plaintiff JAMIE was, and still is, a foreign

corporation, or other business entity, organized under, and existing by virtue of the laws of

Liberia and was the registered owner of the M/V CANADIAN CHALLENGER.

3.      At all times material to this action, Plaintiff PUFFIN was, and still is, a foreign

corporation, or other business entity, organized under, and existing by virtue of the laws of Liberia and was the registered owner of the M/V AGATE ISLANDS.

4.    At all times material to this action, Plaintiff BANK MANDIRI was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law with a place of business at Cardinal Court, 23 Thomas More Street, London, E1W 144, and was the mortgagee of the M/V CANADIAN CHALLENGER and M/V AGATE ISLANDS.

5.    Upon information and belief, Defendant was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law with a place of business at Dubai, United Arab Emirates and was the hull insurer of the M/V CANADIAN CHALLENGER and M/V AGATE ISLANDS.

6.    Plaintiffs JAMIE and PUFFIN intended to tow their Vessels from Cuba to India for the Vessels there to be scrapped.

7.    Plaintiffs JAMIE, PUFFIN and BANK MANDIRI (collectively "Plaintiffs") contracted with the Defendant for marine hull insurance for purposes of making good to the Plaintiffs as Insureds, or to indemnify the Insureds against, any loss, damage or liability to the Vessels during the voyage from Cuba to India. Defendant issued to Plaintiffs an undated policy of marine hull insurance (no. DMHP200600000221), and an attached Schedule thereto, so insuring the Vessels. *See a copy of Oman Insurance Co. marine hull insurance policy attached hereto as Exhibit 1.*

8.    The Vessel M/V CANADIAN CHALLENGER was insured for the sum of $1,000,000.00. *See Exhibit 1.*

9.    The Vessel M/V AGATE ISLANDS was insured for the sum of $1,250,000.00. *See Exhibit 1.*

2

10.     An amendment was incorporated into the insurance policy effective March 16,

2006 which provided as follows:

> "The name of the insured is changed to M/S Jamie Shipping Inc (as
> owners) and/or Bank Mandiri (Europe) Ltd., UK (as mortgages)
> [sic] for their respective rights and interests IRO vessel
> "CANADIAN CHALLENGER".
>
> Puffin Marine Investments SA (as Owners) and/or Bank Mandiri
> (Europe) Ltd., UK (as mortgages) [sic] for their respective rights
> and interests IRO vessel "AGATE ISLNADS" [sic]."

11.     Subsequent to issuance of the aforesaid marine hull insurance policy, Plaintiffs

JAMIE and PUFFIN, after carrying out necessary Vessel surveys and required Vessel repairs or

modifications issued by surveyors following the surveys, commenced the towing of their Vessels

as part of a convoy by the tug vessel RIG DELIVERER.

12.     During the voyage from Cuba to India the convoy experienced heavy weather and

the Vessels drifted together and collided on or about July 18, 2006. Subsequently, the Vessels

continued to range alongside and make contact with one another causing considerable damage to

each Vessel. The damages incurred to each Vessel caused by an insured peril of the sea led to

the eventual sinking and complete loss of the M/V CANDADIAN CHALLENGER on

September 15, 2006.

13.     After the M/V CANADIAN CHALLENGER sank, RIG DELIVERER and M/V

AGATE ISLANDS put into Recife, where surveys were conducted and preparations made for

the onward tow of M/V AGATE ISLANDS. On November 9, 2007, RIG DELIVERER and

M/V AGATE ISLANDS departed from Recife, bound once more for Alang via South Africa.

During this voyage, due to the damages incurred in the July 18, 2006 collision caused by an

insured peril of the sea, the M/V AGATE ISLANDS sank and was completely lost off Durban on

February 25, 2007.

3

14.    Notwithstanding the obligation of Defendant OMAN as the marine hull insurer for the Vessels, OMAN has refused to issue payments to the Plaintiffs for the insured hull value of each Vessel.

15.    Despite due and repeated demands, OMAN refuses to carry out its obligations as insurer and issue payment of the $1,000,000.00 insured hull value of the M/V CANADIAN CHALLENGER and the $1,250,000.00 insured hull value of the M/V AGATE ISLANDS.

16.    Plaintiffs have complied with all terms and obligations as Insureds under the marine hull insurance policy.

17.    The aforesaid marine hull insurance policy calls for all disputes arising thereunder to be resolved at the High Court in London pursuant to English law.

18.    Plaintiffs JAMIE and BANK MANDIRI have commenced proceedings in the High Court of London against Defendant for recovery of the marine hull insurance proceeds due and payable for the sinking and complete loss of the M/V CANADIAN CHALLENGER. *See copy of Reply (Incorporating Particulars of Claim and Defence) attached hereto as Exhibit 2.* Such proceeds remain ongoing.

19.    Plaintiffs PUFFIN and BANK MANDIRI are preparing to commence proceedings in the High Court of London against Defendant for recovery of the marine hull insurance proceeds due and payable for the sinking and complete loss of the M/V AGATE ISLANDS.

20.    Plaintiffs PUFFIN and BANK MANDIRI specifically reserve their rights to resolve their dispute against Defendant in the High Court of London as per the marine hull insurance policy.

4

21.     As a result of Defendant's breach of the marine hull insurance policy, Plaintiff has incurred damages in the approximate amount of $2,250,000.00, exclusive of interest, costs and attorneys fees.

22.     This action is brought in order to obtain jurisdiction over Defendant and also to obtain security for Plaintiffs' claims and in aid of London High Court proceedings.

23.     Interest, costs and attorneys' fees are routinely awarded to the prevailing party under English Law. As best as can now be estimated, Plaintiffs expect to recover the following amounts as the prevailing parties in London High Court proceedings:

| | | |
|---|---|---|
| A. | Principal claim – | $2,250,000.00; |
| B. | Estimated interest on claim - | |
| | 3 years at 7.0% compounded quarterly: | $ 520,738.50; |
| C. | Estimated attorneys' fees and expenses: | $ 788,000.00; |
| Total: | | $ 3,558,738.50 |

24.     The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendant. *See Affidavit of Anne C. LeVasseur annexed hereto as Exhibit 3.*

25.     The Plaintiffs seek an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any assets of the

Defendant held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendant and to secure the Plaintiffs' claims as described above.

**WHEREFORE**, Plaintiffs pray:

A.    That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Complaint failing which default judgment be entered against it;

B.    That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of $ 3,558,738.50 belonging to, due or being transferred to, from, or for the benefit of the Defendant, including but not limited to such property as may be held, received or transferred in Defendant's name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

C.    That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

D.    That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court;

6

E.     That in the alternative, this Court enter Judgment against the Defendant on the

claims set forth herein;

G.     That this Court award Plaintiff the attorneys' fees and costs incurred in this

action; and

H.     That the Plaintiff has such other, further and different relief as the Court

may deem just and proper.

Dated:     July 30, 2008
           New York, NY

                                   The Plaintiffs,
                                   JAMIE SHIPPING INC
                                   PUFFIN MARINE INVESTMENTS SA
                                   BANK MANDIRI (EUROPE) LTD. UK

                              By: _Anne C. LeVasseur_

                                   Kevin J. Lennon
                                   Anne C. LeVasseur
                                   LENNON, MURPHY & LENNON, LLC
                                   420 Lexington Avenue, Suite 300
                                   New York, NY 10170
                                   (212) 490-6050 - phone
                                   (212) 490-6070 – facsimile
                                   kjl@lenmur.com
                                   acl@lenmur.com

## ATTORNEY'S VERIFICATION

State of New York    )
                     )    ss.:    City of New York
County of New York   )

1.    My name is Anne C. LeVasseur.

2.    I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

3.    I am an attorney in the firm of Lennon, Murphy & Lennon, LLC attorneys for the

Plaintiff.

4.    I have read the foregoing Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information

and belief.

5.    The reason why this Verification is being made by the deponent and not

by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now

within this District.

6.    The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiff and agents

and/or representatives of the Plaintiff.

7.    I am authorized to make this Verification on behalf of the Plaintiff.

Dated:    July 30, 2008
          New York, NY

_Anne C. LeVasseur_
Anne C. LeVasseur

8

EXHIBIT 1



شركة عُمـان للتـأمـين (ش.م.ع.)
# Oman Insurance Company (P.S.C.)

  

**Head Office:**
P.O. Box: 5209, Dubai - U.A.E
Cable Address: TAMINOMAN
Tel.: 2624000
Telefax: 2690119
E-mail: oicom@oicom.com
Website: www.oicom.com
Tol Free : 800 4746

تأسست عام ١٩٧٥
رأس المال المدفوع : ٩٧،٥٠٠،٠٠٠ درهم الامارات
Established 1975
Paid up Capital DH. 97,500,000.

المركز الرئيسي:
ص.ب: ٥٢٠٩ دبي - إ.ع.م
العنوان البرقي : تأمين عمان
هاتف : ٢٦٢٤٠٠٠
فاكس: ٢٦٩٠١١٩
البريد الإلكتروني : oicom@oicom.com
موقع الانترنت : www.oicom.com
تلفون مجاني : ٤٧٤٦ ٨٠٠

## MARINE HULL POLICY

**This Policy Insurance Witnesseth** that in consideration of the insured described in the Schedule hereto paying to the OMAN INSURANCE CO. hereinafter referred to as " the Company " for the insurance hereunder defined the sum specified as The Premium in the Schedule the company will subject to the terms conditions and limitations contained herein or attached hereto, pay or make good to the insured or to the Insured's executors or administrators or to indemnify him or them against all such loss damage or liability as herein provided.

The due observance and fulfillment of the terms provisions and conditions hereof or attached herein by the Insured insofar as they relate to anything to be done or complied with by the Insured and the truth of the statements and answers in the proposal shall be conditions precedent to any liability of the Company to make any payment under this policy. No waiver of any of the terms provisions or limitations contained in this policy or attached hereto shall be valid unless made in writing by the Company.

If the Insured shall make any claim knowing the same to be false or fraudulent as regards amount or otherwise this Policy shall become void and all claim hereunder shall be forfeited.

## SCHEDULE

| | |
|---|---|
| The Policy No. | DMHP2006000X122R |
| The Name and Address of the Insured | ADVANCED DISTRIBUTION AND/OR PHILIP BUSH FOR THEIR RESPECTIVE RIGHTS AND INTEREST. |
| The Premium | AS AGREED |
| Voyage | CUBA    To:   ALANG, INDIA UNDER DOUBLE TOW WEF 16/03/2006 |
| Vessel Name | "CANADIAN CHALLENGER" & "AGATE ISLANDS" |
| Interest | HULL, MATERIALS, MACHINERY ETC. AND EVERYTHING CONNECTED THERSWITH NOTHING EXCLUDED.. |
| Sum Insured | "CANADIAN CHALLENGER" - US$.1,000,000/- (US DOLLARS ONE MILLION ONLY) "AGATE ISLANDS" - US$. 1,250,000/- (US DOLLARS ONE MILLION TWO HUNDRED FIFTY THOUSAND ONLY) |



**Oman Insurance Company** (P.S.C.)    شركة عُمان للتأمين (ش.م.ع.)

## SCHEDULE ATTACHING TO AND FORMING PART OF
## HULL POLICY NO. DMHP2G0500000221

| | | |
|---|---|---|
| TYPE | : | MARINE HULL |
| ORIGINAL INSURED | : | ADVANCED DISTRIBUTION AND/OR PHILIP BUSH FOR THEIR RESPECTIVE RIGHTS AND INTEREST. |
| FIRST LOSS PAYEE | : | BANK MANDIRI (EUROPE) LTD., U.K. |
| VESSEL | : | 1. "CANADIAN CHALLENGER" (TYPE: GEN CARGO / BLT 1976 / GRT TBA / LDT 3.831 / DWT TBA) VALUED AT USS 1,200,000/- |
| | | 2. "AGATE ISLANDS" EX. AGATE (TYPE: GEN CARGO / BLT 1977 / GRT TBA / LDT 5,455 / DWT TBA) VALUED AT USS 1,700,000/- |
| INTEREST | : | HULL, MATERIALS, MACHINERY ETC. AND EVERYTHING CONNECTED THEREWITH. |
| VALUES INSURED HEREUNDER | : | 1. USS 1,000,000.00 |
| | | 2. USS 1,250,000.00 |
| VOYAGE / PERIOD | : | AT AND FROM CUBA UNTIL SAFE ARRIVAL AT ALANG UNDER DOUBLE TOW WEF 16/03/2006. |
| | | VESSELS TO BE TOWED BY ANY TACS CLASSED TUG. |
| | | COVERAGE UNDER THIS POLICY IS FOR THE ABOVE DESCRIBED VOYAGE ONLY BUT IN NO EVENT SHALL IT EXCEED 150 DAYS IN ALL. PORT RISKS ARE SUB LIMITED WITHIN THIS TO 30 DAYS IN TOTAL REVERSIBLE AT EITHER END. |
| CONDITIONS | : | INSTITUTE VOYAGE CLAUSES : HULLS CL. 295 (1/11/95) AMENDED TO DELETE CLAUSE 3 AND TO EXCLUDE CLAIMS ARISING FROM MACHINERY DAMAGES BUT SUBJECT TO COVERAGE GIVEN UNDER NECESSARY REPAIRS CLAUSE AND TO INCLUDE 4/4THS RDC/ FFO LIMITED TO HULL VALUE. CLAUSE 1.1 EXTENDED TO INCLUDE TOWS FOR BREAK-UP. |
| | | INSTITUTE PROTECTION AND INDEMNITY CLAUSES HULLS - TIME CL. 344 (20/7/87) (CL.1.3.16 DEEMED DELETED) WITH AMENDMENT CL.357 - LIMITED UP TO HULL VALUE BUT EXCLUDING POLLUTION, CREW AND CARGO LIABILITIES ABSOLUTELY WITH A DEDUCTIBLE SAME AS CL.12. |
| | | - INCLUDING LIABILITY FOR SEEPAGE AND POLLUTION AS PER 72 HOURS BUY BACK CLAUSE, LIMITED TO HULL VALUE O/A DISCLAIMER CLAUSE. |
| | | INSTITUTE PROTECTION AND INDEMNITY WAR AND STRIKES CLAUSES HULLS - TIME CL.345 (20/7/87) BUT PARAGRAPH 7 DELETED AND REPLACED BY THE INSTITUTE NOTICE OF CANCELLATION, AUTOMATIC TERMINATION OF COVER AND WAR AND NUCLEAR EXCLUSIONS CLAUSE - HULLS, ETC. CL.359 (1/11/95) BUT PARAGRAPH 3.2 TO 3.2.3 INCLUSIVE OF CL.359 IS DEEMED REPLACED BY THE CL.270. |
| | | INSTITUTE WAR & STRIKES CLAUSES HULLS - VOYAGE CL. 295 (1/11/95) |
| | | - INCLUDING TERRORISM AND SABOTAGE. |
| | | - LONDON BLOCKING & TRAPPING ADDENDUM LPO 444 LIMITED TO HULL VALUE. |
| | | PILOTS NON LIABILITY CLAUSE NMA062. |
| | | PORT OF REFUGE CLAUSE UNDER TOW. |

SUB - DEMO VOYAGE UST "CANADIAN CHALLENGER" & "AGATE ISLANDS"

**Oman Insurance Company** (P.S.C.)  شركة عُمَان للتأمين (ش.م.ع)

INSTITUTE RADIOACTIVE CONTAMINATION, CHEMICAL, BIOLOGICAL, BIO-CHEMICAL AND ELECTROMAGNETIC WEAPONS EXCLUSION CL.370 (10/11/03).
- MARINE HULL ELECTRONIC DATE RECOGNITION ENDORSEMENT.
- CONTRACTS (RIGHTS OF THIRD PARTIES) ACT 1999 EXCLUSION CLAUSE JH 2000/007.
- EXCLUDING DEMURRAGE AND ANY TUG DELAY PAYMENTS WHATSOEVER WHETHER UNDER THE TOWCON, GENERAL AVERAGE, SALVAGE, SUE & LABOUR OR ANY OTHER INSURED INTEREST,
- NECESSARY REPAIRS CLAUSE.
- EXCLUDING CLAIMS ARISING FROM VOLUNTARY BEACHING.
- ALL LIABILITY INTERESTS SUBJECT TO A COMBINED SINGLE LIMIT OF HULL VALUE.

EXPRESS WARRANTIES
- WARRANTED TUG, TOWAGE AND WEATHER ROUTING TO BE APPROVED BY STAFF SURVEYOR OF EITHER :
  LONDON OFFSHORE CONSULTANTS, FALCONER, BRYAN & ASSOCIATES, NOBLE, DENTON, MENTOR MARINE OR BUREAU VOGTSCHMIDT, SALVAGE ASSOCIATION (OR ANY OTHER UNDERWRITER'S APPROVED SURVEYORS) AND ALL OF THEIR RECOMMENDATIONS COMPLIED WITH PRIOR, DURING AND AFTER THE VOYAGE AT ASSURED'S EXPENSES.
- WARRANTED SURVEYOR TO APPROVE ANY PRE-VOYAGE PORT RISKS PRIOR TO ATTACHMENT
- WARRANTED UNDERWRITERS TO BE NOTIFIED OF WARRANTY SURVEYOR UPON APPOINTMENT.
- WARRANTED NO CARGO ONBOARD BUT IT IS AGREED THAT THE HEAVY FUEL OIL ON BOARD CANADIAN CHALLENGER WILL NOT PREJUDICE THIS INSURANCE SUBJECT TO SURVEYOR DETERMINING THE ALLOWED QUANTITY AND THE LOCATION ON BOARD UNDER AN ADVISE TO US
- WARRANTED WEATHER FORECAST TO BE OBTAINED CONTINUOUSLY, AT LEAST 48 HOURS PRIOR TO SAILING.
- WARRANTED TUGBOAT IACS CLASSED AND CLASS MAINTAINED DURING THE WHOLE PERIOD OF COVER.
- WARRANTED TUGBOAT TO REMAIN ON STATION UNTIL DELIVERY TO BREAKERS (NEW OWNERS).
- UNDERWRITERS SHALL BE DISCHARGED FROM ALL LIABILITY FROM THE DATE OF ANY BREACH OF WARRANTY,
- WARRANTED EXPERIENCED CREW ON BOARD THE TUGBOAT.

THE ABOVE WARRANTIES ARE ADDITIONAL TO ANY EXPLICIT OR IMPLIED WARRANTIES CONTAINED WITHIN THE CONDITIONS ABOVE OR ANY CLAUSES REFERRED TO THEREIN, OR THOSE IMPOSED BY STATUTE,

DEDUCTIBLE          :    CL.12 US$.150,000/- ANY ONE ACCIDENT OR OCCURRENCE.

RATE/PREMIUM        :    AS AGREED
                         PREMIUM PAYABLE AS FOLLOWS:
                         50% OF THE PREMIUM PAYABLE PRIOR TO ATTACHMENT - BALANCE OF
                         50% OF THE PREMIUM PAYABLE PRIOR TO SAILING OF THE CONVOY

JURISDICTION        :    THIS INSURANCE SHALL BE SUBJECT TO THE EXCLUSIVE JURISDICTION OF
                         THE ENGLISH COURTS, LAW AND PRACTICE EXCEPT AS MAY BE EXPRESSLY
                         PROVIDED HEREIN TO THE CONTRARY.

EXHIBIT 2



| In the | High Court of Justice Queen's Bench Division Commercial Court |
|---|---|
| | *for court use only* |
| Claim No. | 2008 Folio 6 |
| Issue date | 4th January 2008 |

**Claimant**

JAMIE SHIPPING INC.
80 BROAD STREET
MONROVIA
LIBERIA
BANK MANDIRI (EUROPE) LTD. UK
CARDINAL COURT
23 THOMAS MORE STREET
LONDON E1W 1YY

**Defendant(s)**

OMAN INSURANCE COMPANY

(SUPREME COURT OF JUDICATURE — ADMIRALTY & COMMERCIAL REGISTRY — SEAL — 4 JAN 2008)

**Brief details of claim**

The claim relates to a dispute under a Policy of Insurance between the Claimants and the Defendant and arises out of the loss of the vessel "CANADIAN CHALLENGER" Please refer to the attached Particulars of Claim for further detail.

**Value**

To be assessed but the "CANADIAN CHALLENGER" was insured for USD 1 million. Please refer to the attached Particulars of Claim for further detail.

| Oman Insurance Company P.S.C. PO Box 5209 Dubai UAE | Amount claimed | To be assessed |
|---|---|---|
| | Court fee | £1,530.00 |
| | Solicitor's costs | To be assessed |
| | Total amount | To be assessed |

The court office at

is open between 10 am and 4 pm Monday to Friday. When corresponding with the court, please address forms or letters to the Court Manager and quote the claim number.
N1 Claim form (CPR Part 7) (01.07)    *Printed on behalf of The Court Service*

Claim No.

Does, or will, your claim include any issues under the Human Rights Act 1998?  ☐ Yes  ☑ No

Particulars of Claim (attached)(to follow)

Please refer to the attached Particulars of Claim

Statement of Truth
*(I believe)(The Claimant believes) that the facts stated in these particulars of claim are true.
* I am duly authorised by the claimant to sign this statement.

Full name   James Christopher Gosling

Name of claimant's solicitor's firm   Holman Fenwick & Willan

signed _____ J. C. Gosling _____        position or office held  Partner
*(Claimant)(Litigation friend)(Claimant's solicitor)   (if signing on behalf of firm or company)
*delete as appropriate

Holman Fenwick & Willan
Marlow House
Lloyds Avenue
London
EC3N 3AL

Reference ACS/287/JCG

IN THE HIGH COURT OF JUSTICE          <u>2008 FOLIO 6</u>
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

BETWEEN:

(1) JAMIE SHIPPING INC.
(2) BANK MANDIRI (EUROPE) LTD. UK

<u>Claimants</u>

-and-

OMAN INSURANCE COMPANY

<u>Defendants</u>

REPLY[1]
(INCORPORATING PARTICULARS OF CLAIM[2]
AND DEFENCE[3])

D1.    Unless otherwise stated:

(1) Paragraphs in bold single spaced type are paragraphs from the Particulars of Claim.

(2) References to paragraph numbers are to the paragraphs of the Particulars of Claim;

(3) The terminology used in the Particulars of Claim is adopted.

R1.    Save insofar as the same consists of admission of the matters stated in the Particulars of Claim, and save insofar as appears from the matters stated below, the Claimants join issue with the Defendants on their Defence.

---

[1] Designated by "R" followed by the relevant paragraph number to which the Reply is addressed.
[2] Designated by "P" followed by the relevant paragraph number.
[3] Designated by "D" followed by the relevant paragraph number of the Defence.

P1.    By a Marine Hull Policy of insurance no. DMHP2006000022I contained in and/or evidenced by an undated policy and attached schedule ("the Policy"), the Defendants agreed (subject to the terms of the Policy) to make good to the "Insured" and/or to indemnify the "Insured" against all such loss, damage or liability relating *inter alia* to the vessel "CANADIAN CHALLENGER" ("the Vessel") as therein referred to.

D2.    Paragraph 1 is admitted.

D3.    The Policy was a contract of marine insurance to which the Marine Insurance Act 1906 applied.

R3.    Paragraph D3 above is admitted.

P2.    The Claimants were at all material times identified in the Policy as, and were, an "Insured" thereunder.

D4.    Paragraph 2 is admitted. Pursuant to Endorsement 1 dated 26th March 2006 it was agreed that the following amendment was incorporated into the Policy with effect from 16th March 2006:

"The name of the insured is changed to M/S Jamie Shipping Inc (as owners) and/or Bank Mandiri (Europe) Limited, UK (as mortgages) for their respective rights and interests fOR vessel CANADIAN CHALLENGER.
Puffin Marine Investments SA (as Owners) and/or Bank Mandiri (Europe) Limited, UK (as mortgages) for their respective rights and interests fRO vessel AGATE ISLNADS (sic))

SUBJECT OTHERWISE TO THE SAME TERMS, CONDITIONS AND LIMITATIONS OF THE SAID POLICY"

R4.    Paragraph D4 above is admitted.

P3.    The First Claimants (as the owners of the Vessel) and/or the Second Claimants (as the mortgagees of the Vessel) were at all material times fully interested in the Policy and will refer to the same as may be necessary for its full terms and effect. Further, by an assignment made after accrual of the First Claimants' interests under the Policy, the First Claimants assigned to the Second Claimants those interests.

D5.   Paragraph 3 is admitted:

   (1)  On or about 21st March 2006 the First Claimant assigned to the Second Claimant *"these insurances and all benefits thereof including all claims of whatsoever nature (including return of premiums) hereunder "*.

   (2)  The assignment further provided that all claims arising under the Policy, whether in respect of an actual, constructive, arrange or compromised total loss or otherwise howsoever, would be paid to the Second Claimant, or as the Second Claimant may direct.

R5.   **Paragraph D5 above is admitted.**

P4.   The Policy by its express terms provided *inter alia* that:

   (1)   The insurance was to cover a voyage from Cuba until safe arrival at Alang, India under double tow WEF from 16th March 2006 ("the Voyage").

   (2)   The Vessels covered by the Policy (and named in the schedule thereto) were "CANADIAN CHALLENGER" and "AGATE ISLANDS".

   (3)   The interest insured under the Policy was *"Hull, materials, machinery etc and everything connected therewith nothing exluded"*.

   (4)   The Vessel "CANADIAN CHALLENGER" was insured for the sum of US$1,000,000.

   (5)   The Institute Voyage Clauses – Hulls CL 285 (1/11/95) (amended in order to delete Clause 3) were to apply to the Policy.

D6.   As to paragraph 5:

(1) Sub-paragraph (1) is admitted. The Policy further provided (*inter alia*) that the voyage would in no event exceed 150 days. The following endorsements to the Policy extended the maximum period of the Policy as follows:

(a) Endorsement 2 dated 14th August 2006 extended the Policy for a period of 2 months with effect from 12th August 2006; and

(b) Endorsement 3 dated 17th August 2006 extended the Policy for period of 1 month with effect from 11th October 2006;

(2) Sub-paragraphs (2) to (5) are admitted.

R6.  Paragraph D6(1) (including sub-paragraphs (a) and (b)) is admitted.

D7.  The Defendant will refer to the Policy for its full terms and effect. The Policy further provided (*inter alia*):

"EXPRESS WARRANTIES: Warranted tug, towage and weather routing to be approved by staff surveyor of either: ... Salvage Association ... and all of their recommendations complied with prior, during and after the voyage at assured's expenses.
  ...
  ...
· Underwriters shall be discharged from all liability from the date of any breach of warranty.

The above warranties are additional to any explicit or implied warranties contained within the conditions above or any clauses referred to therein, or those imposed by Statute.

DEDUCTIBLE. Cl. 12 US$ 150,000 - any one accident or occurrence.
  ..."

R7,  As to paragraph D7 above:

(1) As is common ground (see the Defendants' paragraph 6(2) above), the Institute Voyage Clauses – Hulls Cl. 285 (1/11/95) applied to the Policy.

(2) The reference to "*Cl. 12*" in the term "*DEDUCTIBLE. CL 12 US$ 150,000 – any one accident or occurrence*" makes no sense unless it is understood to be a reference to the provision of the Institute Voyage Clauses – Hulls Cl. 285 (1/11/95)

regarding deductibles (i.e. Clause 10 thereof); there is no "*CL 12*" to which the term can otherwise refer; meanwhile the only reference to deductibles is that in Clause 10 of the Institute Voyage Clauses – Hulls Cl. 285 (1/11/95).

(3)     Accordingly, insofar as the Policy document includes the term "*DEDUCTIBLE. CL 12 US$ 150,000 – any one accident or occurrence*", it does not accurately reflect the agreement or intention of the parties. It therefore stands to be rectified in order to read "*DEDUCTIBLE. CL 10 US$ 150,000 – any one accident or occurrence*" (emphasis supplied).

(4)     Clause 10.1 of the Institute Voyage Clauses – Hulls Cl. 285 (1/11/95) provides expressly that the deductible for which a policy provides "*shall not apply to a claim for total or constructive loss of the vessel*".

(5)     In the premises, the Policy (duly rectified, and upon its true and proper construction) provides that no deductible shall apply to a claim in respect of total or constructive total loss.

(4)     Save as aforesaid, paragraph D7 is admitted.


D8.     On or about 20th May 2006, in accordance with the express warranties, a surveyor from The Salvage Association provided an Insurance Survey Certificate for the double tow of the vessels by the tug "RIG DELIVERER". The certificate provided that The Salvage Association had concluded that the tow presented no circumstances beyond those which might normally be accepted by underwriters, subject to compliance with the attached 9 recommendations.

R8.     As to paragraph D8 above:

(1)     The said Insurance Survey Certificate was preceded by a towage approval inspection conducted by The Salvage Association upon "RIG DELIVERER" and the Vessel on 21st, 22nd and 23rd March 2006.

5

(2)    That towage approval inspection revealed *inter alia* that on the Vessel, vent pipes were "heavily corroded through", that the main deck and cross decks were "corroded through/holed in various cargo holds", that sea valves were corroded, that the Vessel had a list to starboard, that various engine room sounding pipes had no closing mechanism, that various tanks in the engine room had had manhole covers removed, that there were cropped/holed areas on the main deck, that there was a window/port hole opening in the accommodation block which required closing off, that there was a holed external bulkhead, that various vents were not watertight, and that the main deck masthouses were corroded/holed.

(3)    In light of this inspection, The Salvage Association made a number of recommendations with regard to closing, sealing or rendering watertight these various openings, by the use (variously) of welding, cement boxes and other means.

(4)    Those recommendations were duly effected.

(5)    It was against that background that the said Insurance Survey Certificate was issued.

(6)    Save as aforesaid, paragraph D8 is admitted.

D9.    The Salvage Association's recommendations provided (*inter alia*):

"*3. Tug assistance to be provided on arrival at intermediate bunkering ports as necessary and on arrival destination*

*4. Tow to proceed on agreed routing south to Trinidad or close port for full bunkers and inspection, Cape Town for bunkers and inspection, Durban for inspection to Along WC India.*

*5 vessel routing to include bunkering stations such that 110% quantity of fuels' LO necessary to next station is on board prior to departure.*

*6. Towed vessels to be boarded at regular intervals including bunker station stops during voyage and any deficiencies noted to be rectified. Inspections to be entered in tug log book.*

*...*

6

*9. Tug to maintain daily contact with Owners, and report position, speed, daily fuel consumption, fuel remaining on board and distance to next port/bunker station, and including condition of tow on a weekly basis to Salvage Association, any serious problems with tow to be immediately reported to Salvage Association muaired @wreckage.org. Fax 1-514-849-6661.*

R9.   Excepting typographical errors, paragraph D9 above is admitted.

D10.   Pursuant to the terms of the Policy set out at paragraph 7 of the Defence above and s. 33(3) of the Marine Insurance Act 1906:

  (1)   The Claimant warranted that it would comply with all 9 of The Salvage Association's recommendations prior, during and after the voyage; and

  (2)   the Defendant would be discharged from all liability from the date of any breach of warranties, including breach by failure to comply with The Salvage Association's recommendations prior, during or after the voyage.

R10.   As to paragraph D10, and without prejudice to the matters stated below:

  (1)   The Policy was, upon its true and proper construction, a single, indivisible policy covering the Claimants' interest in the vessels "AGATE ISLANDS" and "CANADIAN CHALLENGER".

  (2)   Thus, a breach of any of the warranties to which the Defendants refer had the effect that the Defendants were entitled either to be discharged from all liability under the Policy from the date of breach or (pursuant to section 34(3) of the 1906 Act) to waive any such breach and to affirm the Policy.

  (3)   In the event that the Defendants elected to waive any such breach and affirm the Policy, the Policy remained in effect (and the Claimants remained entitled to full relief thereunder) for all purposes and in respect of all interests thereunder.

7

(4)   Save as aforesaid, paragraph D10 is admitted.


P5.   The Institute Voyage Clauses – Hulls Cl. 285 (1/11/95) provided *inter alia* as follows:

  "*4.    PERILS*

  *4.1    This insurance covers loss of or damage to the subject matter insured caused by*

  *4.1.1   perils of the seas...*

  *4.2    This insurance covers loss of or damage to the subject-matter insured caused by*

  ...

  *4.2.2   negligence of Master Officers Crew or Pilots ... "*


D11.   Paragraph 5 is admitted.


P6.   The planned routing for the Voyage was from Nuevitas to Port of Spain, Trinidad and onwards to Cape Town, Durban and Alang. The tow was also permitted to proceed via intermediate bunkering stations.


D12.   As to paragraph 6:

  (1) It is admitted that the planned routing for the Voyage was from Nuevitas to Port of Spain, Trinidad or close port and onwards to Cape Town, Durban and Alang.

  (2) It is admitted that the Vessel was permitted to proceed to those intermediate bunkering stations as specifically set out in Recommendation 4 of The Salvage Association's Recommendations.

  (3) It is denied that, on the true and proper construction of The Salvage Association's Recommendations 3 & 4 the Vessel was permitted to proceed via other unnamed intermediate bunkering stations.   Recommendations 3 and 4 of The Salvage Association's Recommendations provide as follows:

8

*3. Tug assistance to be provided on arrival at intermediate bunkering ports as necessary and on arrival destination.*

*4 Tow to proceed on agreed routing south to Trinidad or close port for full bunkers and inspection, Cape Town for Bunkers and Inspection, Durban for Inspection to Alang WC India."*

(4) In the premises the Vessel was only permitted to proceed via intermediate bunkering stations at Trinidad, or close port and Capetown.

R12.    As to paragraph D12, and without prejudice to the other matters stated herein:

(1)    The purpose of the Salvage Association's Recommendation 4 was simply to:

(a)    Identify the agreed principle routing for the convoy from connection to Alang WC.

(b)    Identify those principle ports at which the convoy was to be inspected (and, as appropriate, also to bunker).

(2)    That recommendation did not, expressly (or, upon its true and proper construction, or impliedly) preclude intermediate bunkering.

(3)    Indeed, for practical purposes, it was probable that (even with the assurance of 110% of calculated bunker requirements on board) a convoy of tug and two substantial tows, heading into strong currents and strong prevailing winds, with the potential for heavy seas and poor weather conditions, might need to bunker on at least one occasion between Trinidad and Cape Town. Against this background, it can not have been the intention of the parties that the convoy should (under the terms of the Policy) be prohibited from calling at intermediate bunkering ports where such calls were necessary for the safety of the convoy.

(4)    Further, the Salvage Association's Recommendation 3 referred expressly to "*intermediate bunkering ports*". Such a reference would be redundant if the

9

intention of the parties was to restrict bunkering only to those ports to which Recommendation 4 referred: in such circumstances, there would be no *"intermediate bunkering ports"*. Accordingly, Recommendation 3, upon its true and proper construction, contemplated the need for the convoy to call at bunkering ports other than those to which Recommendation 4 referred.

(5)    In the premises, the Recommendations, upon their true and proper construction (alternatively, pursuant to a term to be implied therein in order to express the obvious intention of the parties), permitted the convoy to call at bunkering stations en route other than those to which Recommendation 4 referred.

P7.    On 22nd May 2006, the tug "RIG DELIVERER" departed from Nuevitas with "CANADIAN CHALLENGER" in tow.

D13.    Paragraph 7 is admitted.

P8.    On 23rd May 2006, "RIG DELIVERER" and "CANADIAN CHALLENGER" the vessel "AGATE ISLANDS" (which was anchored about 35 miles offshore Nuevitas) was included in the convoy. On 23rd to 24th May 2006, the tug made connection with "AGATE ISLANDS" and the convoy proceeded toward the next bunkering port, Port of Spain, Trinidad. The order in which the convoy proceeded was such that "AGATE ISLANDS" was towed ahead of "CANADIAN CHALLENGER".

D14    Save that it is admitted that:

(1) The "AGATE ISLAND" was connected up to the convoy on or about 23rd May 2006:

(2) The "AGATE ISLAND" was towed ahead of "CANADIAN CHALLENGER";

(3) The convoy departed on or about 23rd May 2006 for the Port of Spain, Trinidad where the "RIG DELIVERER" was to take on bunkers.

paragraph 8 is not admitted. The Defendant does not have primary knowledge of the remainder of the facts set out therein and the Claimant is put to strict proof of the other facts and matters set out therein.

P9.    The tow proceeded to Trinidad where bunkers were stemmed between 13th and 19th June 2006. On 20th June 2006 the convoy sailed from Trinidad for Recife, Brazil for the next bunkering station.

D15    Save that it is admitted that:

    (1) On or about 12th June 2006 the convoy arrived off the Port of Spain, Trinidad;

    (2) Bunkers were supplied to the "RIG DELIVERER" in a position approximately 15 miles North of the channel entrance by a harbour tug; and

    (3) On or about 20th June 2006 the convoy sailed for Recife, Brazil.

    paragraph 9 is not admitted. The Defendant does not have primary knowledge of the remainder of the facts set out therein and the Claimant is put to strict proof of the other facts and matters set out therein.

P10.    En route from Trinidad to Recife the convoy encountered stronger current than expected and, in light of these conditions, "RIG DELIVERER" was instructed to call at an intermediate bunker station, Sao Luis.

D16.    Save that it is not admitted that:

    (1) the current experienced was stronger than expected; and

    (2) no admissions are made as to the alleged instructions received by the "RIG DELIVERER".

    paragraph 10 is admitted. The convoy encountered the adverse equatorial current running at a rate of about 4 knots which slowed the progress of the convoy.

R16.  The final sentence of paragraph D16 is admitted.

P11.  On 14th July 2006, the starboard main engine of "RIG DELIVERER" was shut down in order to conserve fuel, and on 18th July 2006 the port main engine was shut down in order to conserve the remaining bunkers on board. Arrangements were made for "RIG DELIVERER" to proceed into Sao Luis with tug assistance.

D17.  Save that no admissions are made as to the arrangements made for the "RIG DEVELOPER" to proceed into Sao Luis with tug assistance, paragraph 11 is admitted.

R17.  For the avoidance of doubt, paragraph D17 contains a typographical error : the tug was the "RIG DELIVERER" (emphasis supplied).

P12.  Between 18th and 21st July 2006, while awaiting tug assistance, the convoy drifted off the coast of Brazil, in the vicinity of Sao Luis.  During this period, the weather deteriorated. The convoy encountered force 7 to 8 east to south easterly winds and the sea state increased to 5 to 6.  As a result "AGATE ISLANDS" drifted onto and lay alongside "CANADIAN CHALLENGER", causing some ranging damage on both sides.

D18.  As to paragraph 12 it is admitted that the deck log of the "RIG DELIVERER" for the period 18th to 21st July 2006 show the weather and sea state conditions set out in paragraph 12. Save as aforesaid paragraph 12 is not admitted.

P13.  On 21st July 2006, two harbour tugs from the port of Sao Luis arrived at the convoy. The tug "REBRAS JURUBATIBA" took over the tow, while "RIG DELIVERER" was assisted by the tug "INTER II" to proceed into Sao Luis in order to take on board bunkers and provisions.

D19.  Paragraph 13 is admitted.

P14.  On 29th July 2006, the towage connection with "RIG DELIVERER" was re-established, and the towing voyage continued towards Recife, the next bunkering

station. However, for the remainder of this leg of the voyage, the wind and weather conditions previously described were such as to reduce the speed of the convoy considerably.

D20. As to paragraph 14 it is admitted that :

(1) on or about 29th July 2006 the towage connection with the "RIG DELIVERER" was re-established;

(2) the convoy proceeded towards Recife, Brazil; and

(3) The weather conditions are recorded in the deck log of the "RIG DELIVERER" as being Easterly to South Easterly force 6-10 with heavy seas and an adverse current.

Save as aforesaid, paragraph 14 is not admitted.

P15. On about 28th August 2006, the convoy arrived off the coast of Recife, Brazil, where arrangements were made for bunkering "RIG DELIVERER" in preparation for the next leg of the towing voyage, to Cape Town.

D21. Paragraph 15 is admitted.

P16. From 28th August 2006 to 12th September 2006, the convoy steamed slowly off the coast awaiting further instructions, while arrangements were made for the bunkering and re-provisioning of "RIG DELIVERER". Both towed vessels were in a stable condition and the weather conditions comprised mainly of south-easterly force 5 to 6 winds and a sea state of 3 to 5.

D22 The first sentence of paragraph 16 is admitted. It is further admitted that the weather during this period was logged as comprising mainly of south easterly force 5 to 6 winds and a sea state of 3 to 5 (although at the beginning of that period the sea state logged includes a sea state of 2).

13

R22.    The final sentence of paragraph D22 is admitted. The Claimants will refer to the log as may be necessary for its precise contents and effect.

D23.    Save as aforesaid paragraph 16 is not admitted. In particular no admission is made as to the condition of the towed vessels "CANADIAN CHALLENGER" and "AGATE ISLAND".

P17.    At about 0540 hours on 12th September 2006, the crew of "RIG DELIVERER" observed that "CANADIAN CHALLENGER" had developed a list of about 5° to starboard. By the evening of 13th September 2006, the list had increased to 20° to starboard.

D24.    Paragraph 17 is not admitted. To the best of the Defendant's knowledge and belief:

        (1)    The deck log of the "RIG DELIVERER" first notes that the "CANADIAN CHALLENGER" had developed a list of approximately 5° to starboard on 14th September 2006:

        (2)    The deck log further notes that at 09:00 hrs on 14th September 2006 the list had increased to 15° starboard.

        (3)    The deck log further notes that at 17:00 hrs on 14th September 2006 the list had increased to 20° (or 25° (the log entry is not clear)) to starboard.

The Claimant is put to strict proof of the facts and matters set out in paragraph 17.

R24.    Paragraph D24 is noted and the contents of the log as stated are admitted. Based on a report (the "Time Sheet") made by the Master of "RIG DELIVERER" to the Owners/Managers on 15th September 2006, and subsequently disclosed to the Defendants' surveyors, Noble Denton, on 29th September 2006, the Claimants will contend that:

        (1)    At about 0545 hours on 12th September 2006 the Vessel was observed to have a starboard list of about 5° to 8°.

14

(2)    By the morning of 13th September 2006, the list had increased to about 12° to 15°.

(3)    By the evening of 13th September 2006, the list had increased to about 20°.

(4)    By the afternoon of 14th September 2006, the list had increased to about 25°.

(5)    The Vessel capsized to starboard at about 0250 hours on 15th September 2006.

(6)    The Vessel sank at about 0352 hours on 15th September 2006.

P18.    By the evening of 14th September 2006, the list had increased to about 25° to starboard and "CANADIAN CHALLENGER" had also begun to trim by the stern. As a precaution, the Master shortened the length of the tow line to about 100 metres so as to be in a position to observe "CANADIAN CHALLENGER" during the night.

D25    As to paragraph 18 it is admitted that:

(1) the deck log of the "RIG DELIVERER" records at 00:00 hrs on 15th September 2006 that the list of the "CANADIAN CHALLENGER" had increased to more than 25°.

(2) the deck log of the "RIG DELIVERER" records that the tow line to the "CANADIAN CHALLENGER" was shortened to approximately 100 meters during the evening of 14th September 2006.

Save as set out above paragraph 18 is not admitted and the Claimant is required to prove the facts and matters set out therein.

R25.    Paragraph D25 is noted. The Claimants refer to paragraph R24.

P19.    At about 0250 hours on the morning of 15th September 2006, "CANADIAN CHALLENGER" lost stability and capsized to starboard. The Master then reduced the length of the towing line so as to bring "CANADIAN CHALLENGER" close under the stern of "RIG DELIVERER".

15

D26   Paragraph 19 is admitted. The deck log of the "RIG DELIVERER" records that at 03:20 hrs
      the length of the towing line was reduced so that the "CANADIAN CHALLENGER" was
      20 to 25 m from the stern of the "RIG DELIVERER".

R26.  **The final sentence of paragraph D26 is admitted.**

P20.  **At 0325 hours on the same day, the Master of "RIG DELIVERER" ordered that the
      towing wire should be cut. "RIG DELIVERER" then remained in the vicinity of
      "CANADIAN CHALLENGER", which remained capsized but afloat.**

D27   Paragraph 20 is admitted.

P21.  **At about 0352 hours on 15th September 2006, "CANADIAN CHALLENGER" sank in
      approximate position 08°08'.23S, 033°55'.75W.**

D28.  Paragraph 21 is admitted.

P22.  **In the premises, the Vessel became a total loss by perils of the seas during the currency
      of the Policy. In this regard, and to the extent that it is necessary, the Claimants will
      contend that the Vessel was lost as a result of the ranging damage referred to in
      paragraph 12 above.**

D29.  Save that it is admitted that the Vessel became a total loss in that she sank on 15th
      September 2006, paragraph 22 is denied. It is denied that the Vessel became a total loss by
      perils of the seas during the currency of the Policy. In particular it is denied that the Vessel
      was lost on or about 15th September 2006 as a result of ranging damage which occurred on
      or about 21st July 2006.

D30.  The Defendant reserves the right to plead further following the provision of disclosure
      and/or expert evidence. Without prejudice to the foregoing and the burden of proof (which
      rests on the Claimant) the Defendant states as follows;

        (1) There was a period of two months between the alleged ranging damage and the Vessel
            sinking;

(2) The weather conditions (including sea state) improved during this period.

(3) The deck log of the "RIG DELIVERER" records that the crew went onboard the "CANADIAN CHALLENGER" on 31st August 2006 and stated that her condition was "satisfactory".

(4) In the premises it is unlikely that the Vessel sank due to the ranging damage which occurred on or about 21st July 2006.

R30.    As to paragraph D30:

    (1)    While "CANADIAN CHALLENGER" was approved by The Salvage Association (on the Defendants' behalf) for towage, she was (as the Defendants well knew) intended for scrapping, on a scrapping voyage, and, accordingly, in scrap condition. In this regard, the Claimants refer to paragraph R8 above.

    (2)    At about 1000 hours on 18th July 2006 "AGATE ISLANDS" and "CANADIAN CHALLENGER" drifted together and collided.

    (3)    Initially, "AGATE ISLANDS" drifted down wind to lie alongside the port side of "CANADIAN CHALLENGER".

    (4)    In the south-easterly Force 6 winds and heavy swell, the two vessels ranged alongside each other for about 10 hours.

    (5)    Subsequently, "AGATE ISLANDS" began to drift astern, with the result that her starboard bow was resting on the port quarter of "CANADIAN CHALLENGER".

    (6)    Thereafter, the two vessels ranged against each other with the result that considerable damage was caused to the port quarter of "CANADIAN CHALLENGER" and visible holes were created in the stem of "AGATE ISLANDS".

17

(7)  From 18th to 19th July 2006 "AGATE ISLANDS" lay astern of "CANADIAN CHALLENGER" and then shifted position with the result that she lay alongside the starboard side of "CANADIAN CHALLENGER".

(8)  The two vessels continued to range against each other until 20th July 2006.

(9)  Meanwhile, weather conditions deteriorated, with the convoy experiencing south-easterly winds of Force 8 to 9 and heavy swell from 18th to 19th July 2006 and continued poor conditions until 21st July 2006.

(10)  By 21st July 2006, "AGATE ISLANDS" was about 50 metres off the starboard side of "CANADIAN CHALLENGER".

(11)  As a result of the earlier contact between the two vessels from 18th to 20th July 2006, damage to the stern of "CANADIAN CHALLENGER" was considerable, and included cracks in the vicinity of the waterline on the stern.

(12)  Despite the visible damage to "CANADIAN CHALLENGER", any inspection of the Vessel effected by the crew of "RIG DELIVERER" by means of boarding the Vessel would (given the condition of the Vessel: see paragraph R8 above) necessarily have been of limited scope. While damage was visible externally at the stern of "CANADIAN CHALLENGER", an internal inspection would have been unlikely to reveal the existence of any breach of the hull below the waterline and/or any damage to and/or failure of the cement boxes and/or other repairs/closures to openings referred to in paragraph R8 above. Accordingly, any cause of ingress of water into the hull of "CANADIAN CHALLENGER" which was not immediately visible upon inspection would probably have gone unnoticed despite the exercise of reasonable measures by way of inspection.

(13)  Given the extent of the externally visible damage to "CANADIAN CHALLENGER", it is likely that other damage consequent upon the contact between the two vessels (which may have included damage to and/or the failure

18

of the cement boxes and/or other repairs/closures to openings referred to in paragraph R8 above) resulted.

(14)    Against this background, and given that weather conditions began to improve from about 21st July 2006, it is likely that the contact between the two vessels resulted in a slow ingress of water into the hull of "CANADIAN CHALLENGER" (either from a breach of the hull resulting directly from the contact between the vessels, or from damage to and/or the failure of the cement boxes and/or other repairs/closures to openings referred to in paragraph R8 above as a result of such contact). Such ingress would, in the presence of more benign weather and sea conditions, not have affected the stability of the Vessel until the free surface effect of the water which had entered the hull was sufficient to cause the list which was first observed on 12th September 2006. Once the stability of the Vessel was thus affected, however, further ingress, listing and the eventual capsizing and sinking of the Vessel was rapid.

(15)    Thus, in the absence of any alternative explanation for the loss of the Vessel, it is probable that the damage resulting from the contact between the vessels was the cause of the loss.

(16)    Without prejudice to the foregoing, the Claimants will in any event rely upon the fact of the sinking of the Vessel while under tow and in open sea, coupled with the condition of the Vessel (as referred to in paragraph R8 above, and of which the Defendants were at all material times aware) and the weather conditions during the course of the voyage prior to the loss, as evidence sufficient to give rise to an obvious inference to the effect that the Vessel was lost by reason of a peril of the sea.

P23.    As a result of the matters set out above, the Defendants became liable under the Policy to pay to the Claimants the sum of US$1,000,000 as provided for in the Policy (being the agreed value of the Vessel thereunder).

D31.    Paragraph 23 is denied. It is denied that the Defendants became liable under the Policy to pay the Claimants the sum of US$1,000,000 for the following reasons:

19

(1) The Claimant was in breach of recommendations 4, 5, 6 and 9 of The Salvage Association's recommendations. In the premises the Defendant was discharged from all liability from the date of the breach of the express warranties (as further particularised at paragraphs 32 to 37 of the Defence below).

(2) Further and/or alternatively the loss was not caused by an insured peril. Paragraphs 29 & 30 of the Defence above are repeated.

(3) Further and in any event the Policy contained a US$150,000 deductible any one accident or occurrence. In the premises if, which is denied, the Defendant is liable to the Claimant under the Policy the Claimant is only entitled to recover the insured value minus the deductible, namely US$850,000.

D32.   The Claimant was in breach of recommendation 4 of The Salvage Association's recommendations in that the Vessel proceeded via a bunkering port, namely Recife, Brazil, which was not permitted under recommendations 3 & 4 of The Salvage Association's recommendations. In the premises the Defendant was discharged from all liability from the date of the breach of recommendation 4.

R32.   **Paragraph D32 is denied. The Claimants refer to paragraph R12 above.**

D33    The Claimant was in breach of recommendation 5 of The Salvage Association's recommendations in that the Vessel did not have 110% of the quantity of fuel onboard for the passage from Trinidad to Recife, Brazil (a port not permitted under The Salvage Association's Recommendations) and/or from Trinidad to Cape Town. In the premises the Defendant was discharged from all liability from the date of the breach of recommendation 5.

R33.   **Paragraph D33 is denied. Upon departure from Trinidad, "RIG DELIVERER" had on board no less than 110% of the quantity of bunkers required in order to complete a voyage to one of a number of possible intermediate bunker ports permitted under The Salvage Association's Recommendation 3 (including, but not limited to, for example, Georgetown, Paramibo, Belem and Sao Luis). As it was, bunkering took place at**

Itaqui (which was considerably further from Trinidad than any of the four ports mentioned above).

D34.  The Claimant was in breach of recommendation 6 of The Salvage Association's recommendations in that the Vessel was not boarded and/or inspected at regular intervals and/or such inspections were not entered in the tug log book. The deck log of the "RIG DELIVERER" records that the Vessel was only boarded and inspected on 31st August 2006. In the premises the Claimant is in breach of recommendation 6 of The Salvage Association's recommendations.  In the premises the Defendant was discharged from all liability from the date of the breach of recommendation 6.

R34.  As to paragraph D34:

(1)  It is admitted that the log contains only the one record of the boarding and inspection of the Vessel (on 31st August 2006).

(2)  However, upon the true and proper construction thereof, Recommendation 6 took effect only as a warranty to the effect that the Vessel would be "*boarded at regular intervals including bunker station stops during voyage*" and to the effect that deficiencies noted would be rectified. The requirement to the effect that inspections were to be recorded in the log book (which requirement was not subject to any stipulation as to a time limit for compliance) was merely ancillary, and a failure to comply with that requirement did not amount to a breach of warranty.

(3)  The Claimants will as necessary rely upon the fact (recorded in a report by Messrs. Noble Denton dated 19th November 2006) that the Master of "RIG DELIVERER" informed Messrs. Noble Denton (acting on behalf of the Defendants) that "*the tow was boarded every ten days*".

(4)  The Claimants will also rely as necessary upon the facts that:

(a)  The need to comply with The Salvage Association's recommendations had been impressed upon the crew of "RIG DELIVERER".

21

      (b)    Copies of the recommendations were placed on board "RIG DELIVERER".

      (c)    The crew of "RIG DELIVERER" complied with all other recommendations.

    (5)    In the premises, and save as aforesaid, paragraph D34 is denied.

    (6)    Without prejudice to the foregoing:

      (a)    The Claimants refer to paragraph R30 (11) and (12) above.

      (b)    In the premises, any inspection of the Vessel was futile and without practical benefit to either party.

      (c)    Accordingly, and as a matter of law, strict compliance with Recommendation 6 was excused and/or any failure to comply with the said recommendation was excusable and of no effect.

D35    Furthermore, the Defendant notes that the photos taken by the Master of the "RIG DELIVERER" show that there was no boarding ladder rigged on the starboard side of the Vessel. Given that the photographs of the "AGATE ISLAND" show that there was contact on both port and starboard sides of the Vessel the Claimant is put to strict proof that there was a boarding ladder on the port side of the Vessel at all material times so that boarding and inspection of both the Vessel and the "AGATE ISLAND" could be carried out.

R35.    As to paragraph D35:

    (1)    It was possible to board the Vessel other than by use of a boarding ladder. For example, on 15th May 2006 "AGATE ISLANDS" was boarded directly from "RIG DELIVERER" by means of mooring the latter vessel alongside the former.

      (2)     Accordingly, whether or not a boarding ladder was available on the port side of the Vessel is irrelevant; boarding was nonetheless possible.

D36.   The Claimant was in breach of recommendation 9 of The Salvage Association's recommendations that the Owners report weekly to The Salvage Association in that the Claimants did not report to The Salvage Association on a weekly basis. In the premises the Defendant was discharged from all liability from the date of the breach of recommendation 9

R36.   As to paragraph D36:

      (1)     At about 1200 hours local time each day, the Master of "RIG DELIVERER" provided the owners/managers of the Vessel with information regarding the progress of the towage operation. This included details of the 1200 hours position, course, speed over the ground, average speed over the previous 24 hours, wind and weather conditions, the performance of the main engines, oil and fuel quantities remaining on board, consumption figures for bunkers and water, and details of any defects or deficiencies which might affect the voyage.

      (2)     Owing to administrative error (the Master believed that the owners/managers would provide his reports to The Salvage Association, while owners/managers believed that the Master was himself providing them directly to The Salvage Association), these daily reports were not provided to The Salvage Association.

      (3)     As it was, sight by The Salvage Association of the Master's reports would have been futile and without practical benefit to either party: it would have made no difference to the progress or conduct of the towage operation, and would not have avoided the loss of the Vessel. In this regard, the Claimants will rely as necessary upon the fact that The Salvage Association took no steps prior to the loss of the Vessel to seek or enquire as to any report from the Master.

      (4)     Accordingly, and as a matter of law, strict compliance with Recommendation 9 was excused and/or any failure to comply with the said recommendation was excusable and of no effect.

D37.   In the premises the Defendant was discharged from all liability under the Policy before the
       Vessel became a total loss on or about 15th September 2006.

R37.   Against the background of the matters stated above, paragraph D37 is denied. Further
       and alternatively, and without prejudice to the matters stated above, the Defendants
       are in any event precluded from relying upon the alleged breaches of warranty (or any
       of them) as a defence to the Claimants' claim:

       (1)    By about 22nd September 2006, The Salvage Association and/or Messrs. Noble
              Denton had been instructed by the Defendants to investigate the circumstances
              surrounding the loss of the Vessel.

       (2)    From that date, The Salvage Association and/or Messrs. Noble Denton were
              provided by the owners/managers of the Vessel (and/or their legal
              representatives) with all assistance and information requested.

       (3)    On 28th September 2006 owners/managers and their legal representatives met
              with a representative of the Defendants, Mr. Khandaker, in order to discuss the
              circumstances of the loss of the Vessel. Prior to or at that meeting, the
              Defendants were provided (by means of a "without prejudice" communication)
              with a detailed account of the circumstances of the loss and were taken through
              the available evidence. At that meeting, Mr. Khandaker confirmed that Messrs.
              Noble Denton were instructed by the Defendants to investigate the loss of the
              Vessel.

       (4)    Further to that meeting, and later on the same date, owners/managers and
              their legal representatives met with a representative of Noble Denton, Captain
              Wells, and provided him with a detailed background to the loss of the Vessel,
              together with a copy of the "without prejudice" communication referred to
              above. At that meeting, Captain Wells identified a number of documents which
              he would wish to consider. Further, and in response to specific questions posed
              by Captain Wells regarding matters concerning compliance with The Salvage
              Association's recommendations (referred to above), Captain Wells was

24

informed of all matters relevant to the question of whether there had or had not
been such compliance.

(5)     Thereafter, owners/managers made every effort to ensure that any documents
requested by Captain Wells were provided to Noble Denton.

(6)     In the premises, by no later than 5th October 2006 the Defendants were
sufficiently aware of all relevant facts and matters regarding the loss of the
Vessel in order to determine whether there existed any right on their part
(which right is denied) to be discharged from liability under the Policy by
reason of the alleged or any breach(es) of warranty.

(7)     By an email communication dated 5th October 2006 the Defendants informed
the owners/managers of the Vessel (via their broker) that "*Consequent to recent
incident to Canadian Challenger we are pleased to confirm that insurance cover
as per relevant policy will continue unprejudiced on Agate Island*".

(8)     In the premises, and in light of the matters stated in paragraph R10(1) above,
the Defendants unequivocally affirmed the Policy and waived any alleged
breach(es) of warranty on the part of the Claimants.

(9)     In the premises, the Defendants waived any right (which is denied) to treat
their liability under the Policy as discharged.

P24.   On or about 15th September 2006, and in accordance with the terms of the Policy, the
Claimants notified the Defendants of the sinking of the Vessel and of the fact that she
had become a total loss, and sought payment under the Policy.

D38.   It is admitted that on or about 16th September 2006 the Claimants notified the Defendants
by e-mail that the Vessel had sunk about 50 miles off Recife in deep water. Save as
aforesaid paragraph 38 is not admitted.

P25.  Wrongfully and in breach of contract, the Defendants have failed and/or refused to pay the value under the Policy and/or US$1,000,000 and/or any sum (whether by way of indemnity or otherwise) to the Claimants pursuant to the Policy or otherwise.

D39.  Paragraph 25 is denied. It is denied that the Defendants wrongfully and/or in breach of contract failed and/or refused to pay the value under the Policy as alleged or at all. For the reasons set out above the Defendants are not, and at all material times were not, under a liability to pay under the Policy for the loss of the Vessel. The Defendant was discharged from all liability under the Policy before the Vessel became a total loss on or about 15th September 2006.

R39.  For the reasons set out above, paragraph D39 is denied.

P26.  In the premises, the Defendants are liable:

    (1)    To pay to the Claimants the value under the Policy and/or US$1,000,000.

    (2)    Further and alternatively, in damages.

    (3)    Further and alternatively, to indemnify the Claimants pursuant to the Policy.

D40.  Paragraph 26 is denied. For the reasons set out above it is denied that the Claimant is entitled to the sums alleged, or any sums, under the Policy as alleged or at all.

R40.  For the reasons set out above, the denial in paragraph D40 (and that in paragraph D41 below) is without foundation.

P27.  Further the Claimants are entitled to and claim interest (compounded at quarterly rests) at common law, alternatively, simple interest pursuant to section 35A of the Supreme Court Act 1981 and/or the inherent jurisdiction of the Court on any sums that may be found due to them, at such commercial rate and for such period as the Court considers just.

26

D41.   Save that it, which is denied, the Defendants are liable to the Claimants it is admitted that
the Claimant is entitled to interest pursuant to s. 35A of the Supreme Court Act 1981. Save
as aforesaid paragraph 27 is denied.

## AND THE CLAIMANTS CLAIM:

(1)    The agreed value under the Policy, alternatively US$1,000,000.

(2)    Further and alternatively, damages.

(3)    Further and alternatively, an indemnity pursuant to the Policy.

(4)    Interest pursuant to common law and/or pursuant to section 35A of the Supreme
Court Act 1981 and/or the inherent jurisdiction of the Court.

(5)    Costs

(6)    Such further or other relief as may be necessary or appropriate.

> P: NEVIL PHILLIPS (counsel for the Claimants)
>
> D: RUTH HOSKING (counsel for the Defendants)
>
> R: NEVIL PHILLIPS (counsel for the Claimants)

The Claimants believe that the facts stated in this Reply are true.  I am duly authorised by the
Claimants to sign this statement.

Signed:      _Andrew Gray_

Full Name:   Andrew Crispian Gray

Position:    Solicitor employed by Holman, Fenwick & Willan

Dated:       5ᵗʰ    March 2008

502136 1JXC

27

EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JAMIE SHIPPING INC., PUFFIN MARINE                    :        08 CV _____
INVESTMENTS SA and BANK MANDIRI                       :
(EUROPE) LTD. UK,                                     :
                                                      :
                          Plaintiffs,                 :
                                                      :
        - against -                                   :
                                                      :
OMAN INSURANCE CO.,                                   :
                                                      :
                          Defendant.                  :
------------------------------------------------------------------X

## AFFIDAVIT IN SUPPORT OF PRAYER FOR MARITIME ATTACHMENT

State of Connecticut  )
                      )    ss: SOUTHPORT
County of Fairfield   )

        Anne C. LeVasseur, being duly sworn, deposes and says:

        1.    I am a member of the Bar of this Court and represent the Plaintiffs herein. I am

familiar with the facts of this case and make this Affidavit in support of Plaintiffs' prayer for the

issuance of a Writ of Maritime Attachment and Garnishment, pursuant to Rule B of the

Supplemental Admiralty Rules of the Federal Rules of Civil Procedure.

## DEFENDANT IS NOT PRESENT IN THE DISTRICT

        2.    I have attempted to locate the Defendant, OMAN INSURANCE CO. within this

District. As part of my investigation to locate the Defendant within this District, I checked the

telephone company information directory, as well as the white and yellow pages for New York

listed on the Internet or World Wide Web, and did not find any listing for the Defendant.

Finally, I checked the New York State Department of Corporations' online database which

showed no listings or registration for the Defendant.

3. I submit based on the foregoing that the Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

4. Upon information and belief, the Defendant has, or will have during the pendency of this action, tangible and intangible property within this District and subject to the jurisdiction of this Court, held in the hands of in the hands of garnishees within this District, which are believed to be due and owing to the Defendant.

5. This is Plaintiffs' first request for this relief made to any Court.

## PRAYER FOR RELIEF FOR ORDER ALLOWING SPECIAL PROCESS SERVER

6. Plaintiffs seek an Order pursuant to Rule 4(c) of the Federal Rules of Civil Procedure, for an Order appointing Patrick F. Lennon, Kevin J. Lennon, Charles E. Murphy, Nancy R. Peterson, Coleen A. McEvoy, Anne C. LeVasseur or any other partner, associate, paralegal or agent of Lennon, Murphy & Lennon, LLC, or any process server employed by Gotham Process Servers, in addition to the United States Marshal, to serve the Ex Parte Order and Process of Maritime Attachment and Garnishment, together with any interrogatories, upon the garnishee(s), together with any other garnishee(s) who (based upon information developed subsequent hereto by the Plaintiffs may hold property of, for or on account of, the Defendant.

7. Plaintiffs seek to serve the prayed for Process of Maritime Attachment and Garnishment with all deliberate speed so that it may be fully protected against the potential of being unable to satisfy a judgment/award ultimately obtained by Plaintiffs and entered against the Defendant.

8. To the extent that this application for an Order appointing a special process server

-2-

with respect to this attachment and garnishment does not involve a restraint of physical property, there is no need to require that the service be effected by the Marshal as it involves simple delivery of the Process of Maritime Attachment and Garnishment to the various garnishees to be identified in the writ.

## PRAYER FOR RELIEF TO SERVE LATER IDENTIFIED GARNISHEES

9.    Plaintiffs also respectfully request that the Court grant it leave to serve any additional garnishee(s) who may, upon information and belief obtained in the course of this litigation, to be holding, or believed to be holding, property of the Defendant, within this District. Obtaining leave of Court at this time to serve any later identified garnishees will allow for prompt service of the Process of Maritime Attachment and Garnishment without the need to present to the Court amended Process seeking simply to identify other garnishee(s).

## PRAYER FOR RELIEF TO DEEM SERVICE CONTINUOUS

10.    Further, in order to avoid the need to physically serve the garnishees/banks daily and repetitively, Plaintiffs respectfully seek further leave of the Court, as set out in the accompanying Ex Parte Order for Process of Maritime Attachment, for any process that is served on a garnishee to be deemed effective and continuous service throughout the remainder of the day upon which service is made commencing from the time of such service; and such service to be further deemed effective through the end of the next business day, provided that another service is made that day, and to authorize service of process via facsimile or e-mail following initial *in personam* service.

−3−

## PRAYER FOR RELIEF TO TEMPORARILY SEAL CASE

11.    Upon information and belief, it is the practice of many law firms in the maritime bar to review the daily electronic docket sheet of the Southern District of New York for all maritime actions filed in the district and inform the defendant(s) named therein of any Ex Parte Orders of Attachment pending against them, thus defeating the purpose of the "Ex Parte" application.

12.    Upon information of belief, it is the practice of certain publications, specifically Tradewinds, to publish the names of defendants named in Ex Parte Orders of Attachment, thus further defeating the purpose of the "Ex Parte" application.

13.    Upon information and belief, Tradewinds has very recently publicized the names of parties in Rule B proceedings, the amount of the attachments, and other details of the actions, thereby further defeating the purpose of the "Ex Parte" application.

14.    The Courts within the Southern District of New York have an interest in preserving the efficacy of the Ex Parte Orders issued therein.

15.    The above interest supersedes the interest in maintaining a completely public docket, especially given that the public's access will only be limited temporarily until assets are attached and notice of attachment has been provided to the Defendant.

16.    Indeed, the public's access to Ex-Parte Orders of Maritime Attachment defeats their entire purpose, by depriving Plaintiffs of the element of surprise and potential allowing Defendant to re-route their funds to avoid the attachment, thus making the attachment remedy hollow.

-4-

17.    For the foregoing reasons, Plaintiffs request that the Court issue an Order

temporarily sealing the court file in this matter, including the Verified Complaint and all other

pleadings and Orders filed and/or issued herein until further notice of this Court or notification to

the clerk that property has been attached.

18.    This request is narrowly tailored to meet Plaintiffs' needs. Once property is

attached, the case should be unsealed, as the interest underlying sealing the case will have been

largely eliminated.

Dated:        July 30, 2008
              Southport, CT

                                                    _Anne C. LeVasseur_
                                                    Anne C. LeVasseur

Sworn and subscribed to before me
this 30ᵗʰ day of July, 2008

_Mauye E. Horchal_
Notary Public

                                    –5–