UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**COPY**

-----------------------------------------------------------X

JAMIE SHIPPING INC., PUFFIN MARINE
INVESTMENTS SA and BANK MANDIRI
(EUROPE) LTD., UK,

Case No.: 08 CV 6882(JFK)

Plaintiffs,

- against -

**AFFIDAVIT OF
CHRISTOPHER CARLSEN
IN SUPPORT OF ORDER TO
SHOW CAUSE**

OMAN INSURANCE COMPANY,

Defendant.

-----------------------------------------------------------X

CHRISTOPHER CARLSEN, being first duly sworn, deposes and states as follows:

1. I am a member of the law firm of Clyde & Co US LLP, attorneys for defendant Oman Insurance Company ("OIC") in this litigation. I submit this affidavit in support of OIC's motion, pursuant to Rules E(4)(f) and (5)(a) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (Supplemental Rules"), and Local Admiralty and Maritime Rule E.1 of the Southern District of New York, to compel plaintiffs to accept OIC's proffered irrevocable letter of credit as substitute security for the $3,558,738.50 in funds they have attached pursuant to the *Ex Parte* Order for Process of Maritime Attachment and Garnishment issued by the Court in this case on July 31, 2008 (the "Attachment Order").

2. OIC brings this motion by way of Order to Show Cause, rather than by notice of motion, because the attachment has deprived it of the use of this significant sum of money, resulting in continuing disruption to its business activities. Moreover, Rule E.1 of the Local Admiralty and Maritime Rules provides that the "prompt hearing" to which OIC is entitled under Supplemental Rule E(4)(f) "shall be conducted by a judicial officer within three court days, unless otherwise ordered." OIC has not made a previous application for similar relief.

3. Plaintiffs Jamie Shipping Inc., Puffin Marine Investments S.A., and Bank Mandiri (Europe) Ltd., UK, commenced this action on or about July 30, 2008, claiming damages based upon OIC's alleged wrongful failure to pay money due to plaintiffs under a policy of marine hull insurance. A copy of plaintiffs' Verified Complaint is attached hereto as Exhibit "A."

4. The subject marine hull insurance policy contains a clause providing that the insurance is subject to the exclusive jurisdiction of the "English Courts, Law and Practice." *See* Verified Complaint, ¶17, and the "Jurisdiction" clause in the policy attached as Exhibit 1 thereto.

5. In accordance with the exclusive jurisdiction clause in the insurance policy, plaintiffs have commenced proceedings against OIC in the High Court of London with respect to the claims described in the Verified Complaint. *See* Verified Complaint, ¶¶ 18-20.

6. Plaintiffs commenced this litigation in order to obtain jurisdiction over OIC and also to obtain security for their claims and in aid of the London High Court Proceedings. *Id.,* ¶ 22.

7. On July 31, 2008, plaintiffs obtained from the Court the Attachment Order pursuant to Rule B of the Supplemental Rules. A copy of the Attachment Order is attached hereto as Exhibit "B."

8. Thereafter, plaintiffs served the Attachment Order on various garnishee banks within the Southern District of New York, resulting in the attachment $3,558,738.50. *See* Letter from Plaintiff's Counsel dated August 19, 2008, a copy of which is attached hereto as Exhibit "C" (advising that plaintiff's claims have been "fully secured by way of Oman Insurance Company property that has been attached in New York.").

9. On August 11, 2008, Dubai based counsel for OIC requested that plaintiffs accept a bank guarantee issued by Mashreq Bank as substitute security for the funds attached pursuant to the Attachment Order. On August 13, 2008, London based counsel for plaintiffs rejected this

2

proposed alternate security, advising that the plaintiffs "would prefer to remain secured via csh funds." Copies of the email correspondence between counsel are attached hereto as Exhibit "D."

10. On August 19, 2008, OIC again offered, pursuant to Supplemental Rule E(5), to post substitute security in the form of an irrevocable letter of credit issued by Mashraq Bank, and provided plaintiff the wording of the letter credit that Mashreq Bank was prepared to issue. Copies of the correspondence and proposed letter of credit are attached hereto as Exhibit "E."

11. On August 20, 2008, plaintiff's New York based counsel confirmed to me by telephone that plaintiffs will not agree to accept a letter of credit as substitute security for the attached funds. Plaintiffs maintain that in the absence of the parties' agreement, only a surety bond may be compelled upon a Rule B plaintiff as substitute security under Supplemental Rule E(5). *See* August 19, 2008, letter from plaintiffs' counsel attached as Exhibit "C" hereto.

12. Mashreq Bank is headquartered in the United Arab Emirates with assets of approximately $23 billion dollars. It has offices in both London and New York City, and its New York operation is supervised by the New York State Department of Banking. *See* Mashreq Bank and New York State Banking Department website information attached hereto as Exhibit "F."

13. A proposed draft Order is attached hereto as Exhibit "G."

Dated: August 22, 2008
New York, New York

Christopher Carlsen

Sworn to before me this 22st day of August, 2008

Notary Public

PATRICIA A. DONNELLY
Notary Public, State of New York
No. 01DO5087441
Qualified in New York County
Commission Expires Nov. 30, 2009

3

# EXHIBIT A

JUDGE KEENAN     08 CV 6882

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

JAMIE SHIPPING INC., PUFFIN MARINE
INVESTMENTS SA and BANK MANDIRI
(EUROPE) LTD, UK,

                                        Plaintiffs,

        - against -

OMAN INSURANCE CO.,

                                        Defendant.

------------------------------------------------------X



## VERIFIED COMPLAINT

Plaintiffs, JAMIE SHIPPING INC. (hereafter referred to as "JAMIE"), PUFFIN

MARINE INVESTMENTS SA (hereafter referred to as "PUFFIN") and BANK MANDIRI

(EUROPE) LTD, UK (hereafter referred to as "BANK MANDIRI") by and through their

attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint against the

Defendant, OMAN INSURANCE CO. (hereafter referred to as "Defendant"), allege, upon

information and belief, as follows:

        1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333.  This matter also arises

under the Court's federal question jurisdiction within the meaning of 28 United States § 1331.

        2.      At all times material to this action, Plaintiff JAMIE was, and still is, a foreign

corporation, or other business entity, organized under, and existing by virtue of the laws of

Liberia and was the registered owner of the M/V CANADIAN CHALLENGER.

        3.      At all times material to this action, Plaintiff PUFFIN was, and still is, a foreign

corporation, or other business entity, organized under, and existing by virtue of the laws of Liberia and was the registered owner of the M/V AGATE ISLANDS.

4.     At all times material to this action, Plaintiff BANK MANDIRI was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law with a place of business at Cardinal Court, 23 Thomas More Street, London, E1W 144, and was the mortgagee of the M/V CANADIAN CHALLENGER and M/V AGATE ISLANDS.

5.     Upon information and belief, Defendant was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law with a place of business at Dubai, United Arab Emirates and was the hull insurer of the M/V CANADIAN CHALLENGER and M/V AGATE ISLANDS.

6.     Plaintiffs JAMIE and PUFFIN intended to tow their Vessels from Cuba to India for the Vessels there to be scrapped.

7.     Plaintiffs JAMIE, PUFFIN and BANK MANDIRI (collectively "Plaintiffs") contracted with the Defendant for marine hull insurance for purposes of making good to the Plaintiffs as insureds, or to indemnify the Insureds against, any loss, damage or liability to the Vessels during the voyage from Cuba to India. Defendant issued to Plaintiffs an marine policy of marine hull insurance (no. DMHP2006500G0221), and an attached Schedule thereto, so insuring the Vessels. *See a copy of Oman Insurance Co. marine hull insurance policy attached hereto as Exhibit 1.*

8.     The Vessel M/V CANADIAN CHALLENGER was insured for the sum of $1,000,000.00. *See Exhibit 1.*

9.     The Vessel M/V AGATE ISLANDS was insured for the sum of $1,250,000.00. *See Exhibit 1.*

10.     An amendment was incorporated into the insurance policy effective March 16, 2006 which provided as follows:

> The name of the insured is changed to M/S Jamie Shipping Inc (as owners) and/or Bank Mandiri (Europe) Ltd, UK (as mortgages) [sic] for their respective rights and interests IRO vessel "CANADIAN CHALLENGER".
>
> Puffin Marine Investments SA (as Owners) and/or Bank Mandiri (Europe) Ltd, UK (as mortgages) [sic] for their respective rights and interests IRO vessel "AGATE ISLNADS" [sic]."

11.     Subsequent to issuance of the aforesaid marine hull insurance policy, Plaintiffs JAMIE and PUFFIN, after carrying out necessary Vessel surveys and required Vessel repairs or modifications issued by surveyors following the surveys, commenced the towing of their Vessels as part of a convoy by the tug vessel RIG DELIVERER.

12.     During the voyage from Cuba to India the convoy experienced heavy weather and the Vessels drifted together and collided on or about July 18, 2006. Subsequently, the Vessels continued to range alongside and make contact with one another causing considerable damage to each Vessel. The damages incurred to each Vessel caused by an insured peril of the sea led to the eventual sinking and complete loss of the M/V CANADIAN CHALLENGER on September 15, 2006.

13.     After the M/V CANADIAN CHALLENGER sank, RIG DELIVERER and M/V AGATE ISLANDS put into Recife, where surveys were conducted and preparations made for the onward tow of M/V AGATE ISLANDS. On November 9, 2007, RIG DELIVERER and M/V AGATE ISLANDS departed from Recife, bound once more for Alang via South Africa. During this voyage, due to the damages incurred in the July 18, 2006 collision caused by an insured peril of the sea, the M/V AGATE ISLANDS sank and was completely lost off Durban on February 25, 2007.

14.    Notwithstanding the obligation of Defendant OMAN as the marine hull insurer for the Vessels, OMAN has refused to issue payments to the Plaintiffs for the insured hull value of each Vessel.

15.    Despite due and repeated demands, OMAN refuses to carry out its obligations as insurer and issue payment of the $1,000,000.00 insured hull value of the M/V CANADIAN CHALLENGER and the $1,250,000.00 insured hull value of the M/V AGATE ISLANDS.

16.    Plaintiffs have complied with all terms and obligations as Insureds under the marine hull insurance policy.

17.    The aforesaid marine hull insurance policy calls for all disputes arising thereunder to be resolved at the High Court in London pursuant to English law.

18.    Plaintiffs JAMBE and BANK MANDIRI have commenced proceedings in the High Court of London against Defendant for recovery of the marine hull insurance proceeds due and payable for the sinking and complete loss of the M/V CANADIAN CHALLENGER. *See copy of Reply (incorporating Particulars of Claim and Defence) attached hereto as Exhibit 2.* Such proceeds remain ongoing.

19.    Plaintiffs PUFFIN and BANK MANDIRI are preparing to commence proceedings in the High Court of London against Defendant for recovery of the marine hull insurance proceeds due and payable for the sinking and complete loss of the M/V AGATE ISLANDS.

20.    Plaintiffs PUFFIN and BANK MANDIRI specifically reserve their rights to resolve their dispute against Defendant in the High Court of London as per the marine hull insurance policy.

21.    As a result of Defendant's breach of the marine hull insurance policy, Plaintiff has incurred damages in the approximate amount of $2,250,000.00, exclusive of interest, costs and attorneys fees.

22.    This action is brought in order to obtain jurisdiction over Defendant and also to obtain security for Plaintiffs' claims and in aid of London High Court proceedings.

23.    Interest, costs and attorneys' fees are routinely awarded to the prevailing party under English Law. As best as can now be estimated, Plaintiffs expect to recover the following amounts as the prevailing parties in London High Court proceedings:

| | | |
|---|---|---|
| A. | Principal claim – | $2,250,000.00; |
| B. | Estimated interest on claim – | |
| | 3 years at 7.0% compounded quarterly: | $ 520,738.50; |
| C. | Estimated attorneys' fees and expenses: | $ 788,000.00; |
| Total: | | $ 3,558,738.50 |

24.    The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendant. *See affidavit of Anne C. LeVasseur annexed hereto as Exhibit 2.*

25.    The Plaintiffs seek an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any assets of the

Defendant held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendant and to secure the Plaintiffs' claims as described above.

WHEREFORE, Plaintiffs pray:

A.      That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Complaint failing which default judgment be entered against it;

B.      That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of $ 3,558,758.50 belonging to, due or being transferred to, from, or for the benefit of the Defendant, including but not limited to such property as may be held, received or transferred in Defendant's name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

C.      That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

D.      That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court;

F.    That in the alternative, this Court enter Judgment against the Defendant on the claims set forth herein;

G.    That this Court award Plaintiff the attorneys' fees and costs incurred in this action; and

H.    That the Plaintiff has such other, further and different relief as the Court may deem just and proper.

Dated:     July 30, 2008
           New York, NY

                        The Plaintiffs,
                        JAMIE SHIPPING INC
                        PUFFIN MARINE INVESTMENTS SA
                        BANK MANDIRI (EUROPE) LTD. UK

                        By: _Anne C. LeVasseur_
                           Kevin J. Lennon
                           Anne C. LeVasseur
                           LENNON, MURPHY & LENNON, LLC
                           420 Lexington Avenue, Suite 300
                           New York, NY 10170
                           (212) 490-6050 – phone
                           (212) 490-6070 – facsimile
                           kjl@lenmur.com
                           acl@lenmur.com

## ATTORNEY'S VERIFICATION

State of New York    )
                     )       ss.:    City of New York
County of New York   )

1.    My name is Anne C. LeVasseur.

2.    I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.    I am an attorney in the firm of Lennon, Murphy & Lennon, LLC attorneys for the Plaintiff.

4.    I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.    The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.    The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.    I am authorized to make this Verification on behalf of the Plaintiff.

Dated:    July 30, 2008
          New York, NY

                              _Anne C. LeVasseur_
                              Anne C. LeVasseur

8

EXHIBIT 1

 شركـة عُمـان للتأمين (ش.م.ع)
Oman Insurance Company(P.S.C.)   

Head Office:
P.O. Box 5209, DXB - UAE
Cable Address: TAMINOMAN
Tel: 2337002
Telefax: 2690719
Email: oicom@eim.com
Website: www.oicom.com
Toll Free: 800 4746

المكتب الرئيسي
ص.ب ٥٢٠٩، دبي - الإمارات
برقياً: تأمينعمان
هاتف: ٢٣٣٧٠٠٢
فاكس: ٢٦٩٠٧١٩
headoffice@oicom.com
www.oicom.com
مجاناً: ٨٠٠٤٧٤٦

## MARINE HULL POLICY

The Policy Insurance Witnesseth that ................................................................................................
OMAN INSURANCE CO. ..............................................................................................................
Premium to the Schedule the company will ....................................................................................
make good to the insured or to the insured's executors or administrators or to the party that ......
Policy as herein provided.

That the warranties and conditions of the ......................................................................................
Regulate to anything to be insurer ..............................................................................................
conditions provided ....................................................................................................................
premiums contained in this policy or related ..................................................................................

If the insured shall make any claim ................................................................................. Policy shall
become void and all claim hereunder shall be forfeited.

## SCHEDULE

| | |
|---|---|
| The Policy No. | OMHSP2008080022R |
| The Name and Address of the Insured | ADVANCED DISTRIBUTION AND/OR PHRP ELSE FOR THEIR MARITIME RIGHTS AND INTEREST. |
| The Premium | AS AGREED |
| ........ Voyage | In ALANG INDIA UNDER DOUBLE TOW WEF |
| CUBA 26/03/2008 | |
| Vessel Name | "CANADIAN CHALLENGE" & "AGATE ISLANDS" |
| Insured | HULL MATERIALS MACHINERY ETC AND EVERYTHING CONNECTED THERSWITH NOTHING EXCLUDED. |
| Sum Insured | "CANADIAN CHALLENGE"- US$ 650,000/- ABSOLUTE ONE MILLION ONLY "AGATE ISLANDS"-US$ 1,250,00/- (ONE MILLION TWO HUNDRED AND FIFTY THOUSAND ONLY) |



Gulf Insurance Company (F.S.C.)    شركة ... للتأمين

<u>SCHEDULE ATTACHING TO AND FORMING PART OF
HULL POLICY NO. GMHP2K300SE0221</u>

| | | |
|---|---|---|
| TYPE | : | MARINE HULL |
| ORIGINAL INSURED | : | ADVANCED DISTRIBUTION AND/OR PHILIP ALGHI FOR THEIR RESPECTIVE RIGHTS AND INTEREST. |
| FIRST LOSS PAYEE | : | BANK SADERAT (EUROPE) LTD., U.K. |
| VESSEL | : | 1.  "CANABIAS CHALLENGER" ( EX-BEN CARGO / BLT 1974 / GRT TBA / LDT 5,385 / DWT TBA) VALUED AT US$ 1,050,000/- 2.  "AGATE ISLANDS" EX-AGATE STYLE) GEN CARGO / BLT 1977 / GRT 594 / LDT 5,455 / DWT TBA) VALUED AT US$ 1,700,000/-. |
| INTEREST | : | HULL MATERIALS, MACHINERY, ETC, AND EVERYTHING CONNECTED THEREWITH. |
| VALUES INSURED: HEREUNDER | : | 1.  US$ 1,050,000.00 2.  US$ 1,280,000.00 |
| VOYAGE / PERIOD | : | AT AND FROM CUBA ON THE SAFE ARRIVAL AT MILANO UNDER DOUBLA TOW W.E.F. 16/03/2000. VESSELS TO BE TOWED BY ARE TUGS CLASSED TUG. COVERAGE UNDER THIS POLICY IS FOR THE ABOVE DESCRIBED VOYAGE ONLY BUT IN NO EVENT SHALL IT EXCEED 30 DAYS IN ALL. ANY RISKS ARE SUB- JECTED WITHIN THIS 30 DAYS IN TOTAL REVERSIBLE AT EITHER END. |
| CONDITIONS | : | INSTITUTE VOYAGE CLAUSES - HULLS CLAUSE (1/11/95) AMENDED TO DELETE CLAUSE 3 AND TO EXCLUDE CLAIMS ARISING FROM MACHINERY DAMAGES BUT SUBJECT TO COVERAGE OVER UNDER NECESSARY REPAIRS CLAUSE AND TO INCLUDE 4/4THS RDC / AND LIMITED TO FULL VALUE CLAUSE 11 EXTENDED TO INCLUDE TOW/SPONSIBLES UP... INSTITUTE PROTECTION AND INDEMNITY CLAUSES HULLS - TIME CL. 344 (20/7/87) CL.6 AND DEEMED DELETED WITH SUBSEQUENT CLAUSE - LIMITED UP TO HULL VALUE SUB. EXCLUDING POLLUTION, CREW AND CARGO LIABILITIES ABSOLUTELY WITH A DEDUCTIBLE SAME AS CL. 12. INCLUDING LIABILITY FOR WRECKAGE AND POLLUTION AS PER 72 HOURS ANY EACH CLAUSE, LIMITED TO FULL VALUE AS PER EXCLUSION CLAUSE. INSTITUTE PROTECTION AND INDEMNITY WAR AND STRIKES CLAUSES HULLS - TIME CL.380 (20/7/87) ARE PARAGRAPH 5.2 DELETED AND REPLACED BY THE AUTOMATIC NOTICE OF CANCELLATION AUTOMATIC TERMINATION OF COVER AND WAR AND NUCLEAR EXCLUSIONS CLAUSE - HULLS, ETC. CL.259 (1/11/95) BUT PARAGRAPH 3.7 TO 3.2.3 INCLUSIVE OF CL. 259 IS DEEMED REPLACED BY THE CL.270. INSTITUTE WAR & STRIKES CLAUSES HULLS - VOYAGE CL. 265   (1/11/95) INCLUDING TERRORISM AND SABOTAGE. LONDON BLOCKING & TRAPPING ADDENDUM LPO 434. LIMITED TO HULL VALUE. P.LOTE AND/OR LIABILITY CLAUSES AMENDED. PORT OF REFUGE CLAUSE IN FULL. |

DSAS

 Oman Insurance Company (PSC)

- INSTITUTE RADIOACTIVE CONTAMINATION, CHEMICAL, BIOLOGICAL, BIO-CHEMICAL AND ELECTROMAGNETIC WEAPONS EXCLUSION CLAUSE (10/11/03).
- MARINE XML ELECTRONIC DATE RECOGNITION ENDORSEMENT.
- CONTRACTS (RIGHTS OF THIRD PARTIES) ACT 1999 EXCLUSION CLAUSE JH 2001/007.
- EXCLUDES DEMURRAGE AND ANY TUG DELAY PAYMENTS WHATSOEVER WHETHER UNDER THE TOWCON GENERAL AVERAGE, SALVAGE, SUE & LABOUR OR ANY OTHER INSURED INTEREST.
- NECESSARY REPAIRS CLAUSE.
- EXCLUDING CLAIMS ARISING FROM INVOLUNTARY BEACHING.
- ALL LIABILITY INTERESTS SUBJECT TO A COMBINED SINGLE LIMIT OF HULL VALUE.

EXPRESS WARRANTIES
- WARRANTED TUG, TOWAGE AND WHETHER RELATING TO BE APPROVED BY STAFF SURVEYOR OF EITHER :
- LONDON OFFSHORE CONSULTANTS, FALCONER BRYAN & ASSOCIATES, NOBLE DENTON, MATTOR MARINE OR BUREAU VERITAS/NKK, SALVAGE ASSOCIATION FOR ANY OTHER UNDERWRITERS APPROVED SURVEYORS AND ALL OF THEIR RECOMMENDATIONS COMPLIED WITH PRIOR, DURING AND AFTER THE TOWING AT THEIR EXPENSES.
- WARRANTED SURVEYOR TO APPROVE ANY PREVOYAGE PORT RISKS PRIOR TO ATTACHMENT.
- WARRANTED UNDERWRITERS TO BE NOTIFIED OF WARRANTY SURVEYOR UPON APPOINTMENT.
- WARRANTED NO CARGO ONBOARD BUT IT IS AGREED THAT THE GREEN FUEL OIL ON BOARD CANDIDATE CANDLESHIP WILL NOT PREJUDICE THIS INSURANCE SUBJECT TO SURVEYOR DETERMINING THE ALLOWED QUANTITY AND THE LOCATION ON BOARD WHICH WILL ADVISE TO US.
- WARRANTED WEATHER FORECAST TO BE OBTAINED CONTINUOUSLY, AT LEAST 48 HOURS PRIOR TO SAILING.
- WARRANTED TUGBOAT AIS CARGOES AND CLASS MAINTAINED DURING THE WHOLE PERIOD OF COVER.
- WARRANTED TUGBOAT TOW BEING THE STATION UNTIL DELIVERY TO BREAKERS (NEW BUYERS).
- UNDERWRITERS SHALL BE DISCHARGED FROM ALL LIABILITY FROM THE DATE OF ANY BREACH OF WARRANTY.
- WARRANTED EXPERIENCED CREW ON BOARD THE TUGBOAT.

THE ABOVE WARRANTIES ARE ADDITIONAL TO ANY EXPLICIT OR IMPLIED WARRANTIES CONTAINED WITHIN THE CONDITIONS ABOVE OR ANY CLAUSES REFERRED TO THEREIN, OR THOSE IMPOSED BY STATUTE.

DEDUCTIBLE            £1.42 USS.150,000% ANY ONE ACCIDENT OR OCCURRENCE.

RATE/PREMIUM         AS AGREED
PREMIUM PAYABLE AS FOLLOWS:
50% OF THE PREMIUM PAYABLE PRIOR TO ATTACHMENT – BALANCE OF 50% OF THE PREMIUM PAYABLE PRIOR TO SAILING OF THE CONVOY

JURISDICTION         THIS INSURANCE SHALL BE SUBJECT TO THE EXCLUSIVE JURISDICTION OF THE ENGLISH COURTS, UNLESS OTHERWISE EXPRESSLY AGREED PROVIDED HEREIN TO THE CONTRARY.

EXHIBIT 2



| | In the | High Court of Justice |
|---|---|---|
| | | Queen's Bench Division |
| | | Commercial Court |
| | Claim No. | 2005 Folio |
| | Issue date | 4ᵗʰ January 2005 |

Claimant
JAMES SHIPPING INC.
80 BROAD STREET
MONROVIA
LIBERIA
BANK LONDON (EUROPE) LTD, UK
CARDINAL COURT
23 THOMAS MORE STREET
LONDON  E1W 1YY
Defendant(s)
CROWN INSURANCE COMPANY

Brief details of claim

The claim relates to a dispute under a Policy of Insurance between the Claimant and the Defendant and arises but at the loss of the vessel "CANADIAN CHALLENGER" Please refer to the attached Particulars of Claim for further detail.

Value

To be assessed but the "CANADIAN CHALLENGER" was insured for USD 1 million Please refer to the attached Particulars of Claim for further detail.

| Crown Insurance Company P.S.C. | Amount claimed | To be assessed |
|---|---|---|
| PO Box 5902 | Court fee | £1,850.00 |
| Dubai | Solicitor's costs | To be assessed |
| UAE | Total amount | To be assessed |

The court office at

Claim No.

Does, or will, your claim include any issues under the Human Rights Act 1998?  ☐ Yes  ☒ No

Particulars of Claim (attached)(to follow)—

Please refer to the attached Particulars of Claim

Statement of Truth
*(I believe)(The Claimant believes) that the facts stated in these particulars of claim are true.
* I am duly authorised by the claimant to sign this statement

Full name  James Christopher Geeting

Name of claimant's solicitor's firm  Holman Fenwick & Willan

signed  *J. C. Geeting*                          position or office held  Partner
*(Claimant)(Litigation friend)(Claimant's solicitor)    (if signing on behalf of firm or company)
*delete as appropriate

Holman Fenwick & Willan
Marlow House
Lloyds Avenue
London
EC3N 3AL

Reference JCG/087/XLB

IN THE HIGH COURT OF JUSTICE                                    2008 FOLIO 6

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

BETWEEN:

(1) JAMIE SHIPPING INC.

(2) BANK MANDIRI (EUROPE) LTD. UK

                                                               Claimants

–and–

OMAN INSURANCE COMPANY

                                                               Defendants

_____

REPLY[1]

INCORPORATING PARTICULARS OF CLAIM[2]

AND DEFENCE[3]

_____

D1.    Unless otherwise stated:

(1) Paragraphs in bold single spaced type are paragraphs from the Particulars of Claim.

(2) References to paragraph number are to the paragraphs of the Particulars of Claim;

(3) The terminology used in the Particulars of Claim is adopted.

R1.    Save insofar as the same consists of admission of the matters stated in the Particulars of Claim, and save insofar as appears from the matters stated below, the Claimants join issue with the Defendants on their Defence.

---

[1] Designated by "R" followed by the relevant paragraph number to which the Reply is addressed.
[2] Designated by "P" followed by the relevant paragraph number.
[3] Designated by "D" followed by the relevant paragraph number of the Defence

P1.   By a Marine Hull Policy of insurance no. DMSY20060060022¹ contained in and/or
evidenced by an undated policy and attached schedule ("the Policy"), the Defendants
agreed (subject to the terms of the Policy) to make good to the "Insured" and/or to
indemnify the "Insured" against all such loss, damage or liability relating *inter alia* to
the vessel "CANADIAN CHALLENGER" ("the Vessel") as therein referred to.

D2.   Paragraph 1 is admitted.

D3.   The Policy was a contract of marine insurance to which the Marine Insurance Act 1906
applied.

R3.   Paragraph D3 above is admitted.

P2.   The Claimants were at all material times identified in the Policy as, and were, an
"Insured" thereunder.

D4.   Paragraph 2 is admitted. Pursuant to Endorsement 1 dated 24ᵗʰ March 2006 it was agreed
that the following amendment was incorporated into the Policy with effect from 10ᵗʰ March
2006:

"The name of the insured is changed to M/S Jantk Shipping Inc (as owners) and/or Bank Mendili
(Europe) Limited, UK (as mortgagee) for their respective rights and interests FOR vessel
CANADIAN CHALLENGER.
Puffin Marine Investments SA (as Owners) and/or Bank Mendili (Europe) Limited, UK (as
mortgagee) for their respective rights and interests FOR vessel AGATE ISLANDS (sic))

SUBJECT OTHERWISE TO THE SAME TERMS, CONDITIONS AND LIMITATIONS OF THE
SAID POLICY"

R4.   Paragraph D4 above is admitted.

P3.   The First Claimants (as the owners of the Vessel) and/or the Second Claimants (as the
mortgagees of the Vessel) were at all material times fully interested in the Policy and
will refer to the same as may be necessary for its full terms and effect. Further, by an
assignment made after accrual of the First Claimants' interests under the Policy, the
First Claimants assigned to the Second Claimants those interests.

D5.    Paragraph 5 is admitted:

    (1)  On or about 21ˢᵗ March 2006 the First Claimant assigned to the Second Claimant *"these insurances and all benefits thereof including all claims of whatsoever nature (including return of premiums) hereunder"*.

    (2)  The assignment further provided that all claims arising under the Policy, whether in respect of an actual, constructive, arrange or compromised total loss or otherwise howsoever, would be paid to the Second Claimant, or as the Second Claimant may direct.

R5.    Paragraph D5 above is admitted.

P4.    The Policy by its express terms provided *inter alia* that:

    (1)  The insurance was to cover a voyage from Cuba until safe arrival at Alang, India under double tow WEF from 16ᵗʰ March 2006 ("the Voyage").

    (2)  The Vessels covered by the Policy (and named in the schedule thereto) were "CANADIAN CHALLENGER" and "AGATE ISLANDS".

    (3)  The interest insured under the Policy was "*Hull, materials, machinery etc and everything connected therewith nothing excluded*".

    (4)  The Vessel "CANADIAN CHALLENGER" was insured for the sum of US$1,500,000.

    (5)  The Institute Voyage Clauses – Hulls CL 285 (1/11/95) (amended in order to delete Clause 5) were to apply to the Policy.

D6.    As to paragraph 5

3

(1)    Sub-paragraph (1) is admitted. The Policy further provided *(inter alia)* that the voyage would in no event exceed 150 days. The following endorsements to the Policy extended the maximum period of the Policy as follows:

    (a)   Endorsement 2 dated 14th August 2006 extended the Policy for a period of 2 months with effect from 12th August 2006; and

    (b)   Endorsement 3 dated 17th August 2006 extended the Policy for period of 1 month with effect from 11th October 2006;

(2)    Sub-paragraphs (2) to (3) are admitted.

B5.    Paragraph D6(2) (including sub-paragraphs (a) and (b)) is admitted.

B6.    The Defendant will refer to the Policy for its full terms and effect. The Policy further provided *(inter alia)*:

"EXPRESS WARRANTIES: Warranted tug, towage and weather routing to be approved by staff surveyor of either ... Salvage Association ... and all of their recommendations complied with prior, during and after the voyage at assured's expenses.

·   Underwriters shall be discharged from all liability from the date of any breach of warranty.

The above warranties are additional to any explicit or implied warranties contained within the conditions above or any clauses referred to therein, or those imposed by Statute.

DEDUCTIBLE. Cl. 12 US$ 150,000 – any one accident or occurrence.

B7.    As to paragraph D7 above:

(1)    As is common ground (see the Defendants' paragraph 6(2) above), the Institute Voyage Clauses – Hulls CL 285 (1/11/95) applied to the Policy.

(2)    The reference to "Cl. 12" in the term "DEDUCTIBLE. Cl. 12 US$ 150,000 – any one accident or occurrence" makes no sense unless it is understood to be a reference to the provision of the Institute Voyage Clauses – Hulls Cl. 285 (1/11/95)

6

regarding deductibles (i.e. Clause 10 thereof): there is no "CL 12" to which the term can otherwise refer; meanwhile the only reference to deductibles is that in Clause 10 of the Institute Voyage Clauses – Hulls CL 285 (1/11/95).

(3)    Accordingly, insofar as the Policy document includes the term "DEDUCTIBLE CL 12 US$ 150,000 – any one accident or occurrence", it does not accurately reflect the agreement or intention of the parties. It therefore stands to be rectified in order to read "DEDUCTIBLE CL 10 US$ 150,000 – any one accident or occurrence" (emphasis supplied).

(4)    Clause 10.1 of the Institute Voyage Clauses – Hulls CL 285 (1/1195) provides expressly that the deductible for which a policy provides "shall not apply to a claim for total or constructive loss of the vessel".

(5)    In the premises, the Policy (duly rectified and upon its true and proper construction) provides that no deductible shall apply to a claim in respect of total or constructive total loss.

(4)    Save as aforesaid, paragraph D7 is admitted.

D8.    On or about 29th May 2006, in accordance with the express warranties, a surveyor from The Salvage Association provided an Insurance Survey Certificate for the double tow of the vessels by the tug "RIG DELIVERER". The certificate provided that The Salvage Association had concluded that the tow presented no circumstances beyond those which might normally be accepted by underwriters, subject to compliance with the attached 9 recommendations.

R8.    As to paragraph D8 above:

(1)    The said Insurance Survey Certificate was preceded by a towage approval inspection conducted by The Salvage Association upon "RIG DELIVERER" and the Vessel on 21st, 22nd and 23rd March 2006.

5

(2)   That salvage approval inspection revealed inter alia that on the Vessel, vent pipes were "heavily corroded through", that the main deck and cross decks were "corroded through/holed in various cargo holds", that sea valves were corroded, that the Vessel had a list to starboard, that various engine room sounding pipes had no closing mechanism, that various tanks in the engine room had had manhole covers removed, that there were cropped/holed areas on the main deck, that there was a window/port hole opening in the accommodation block which required closing off, that there was a holed external bulkhead, that various vents were not watertight, and that the main deck masthouses were corroded/holed.

(3)   In light of this inspection, The Salvage Association made a number of recommendations with regard to closing, sealing or rendering watertight these various openings, by the use (variously) of welding, cement boxes and other means.

(4)   Those recommendations were duly effected.

(5)   It was against that background that the said Insurance Survey Certificate was issued.

(6)   Save as aforesaid, paragraph D8 is admitted.

D9.   The Salvage Association's recommendations provided (inter alia):

"3. Fuel continuance to be provided en arrival at intermediate bunkering ports as necessary and on arrival destination.

4. Vessel to proceed no speed reading south to Trinidad or close port for full bunkers and inspection. Cape Town for bunkers and inspection. Durban for inspection to Alang WC India.

5. vessel routing to include bunkering stations such that 110% quantity of fuels LO necessary to arrival Alang is on board prior to departure.

6. Insured vessels to be boarded at regular intervals including bunker station stops during voyage and any deficiencies noted to be rectified. Inspection to be entered in tug log book.

6

9. Duty to maintain daily contact with Owners, and report position, speed, daily fuel consumption, fuel remaining on board and distance to next port/ bunker station, and including condition of crew on a weekly basis to Salvage Association. Any serious problems with tow to be immediately reported to Salvage Association enquiry@lrmr.lr.org. Fax 1-514-347-6661.

R9.    Excepting typographical errors, paragraph D9 above is admitted.

D10.    Pursuant to the terms of the Policy set out at paragraph 7 of the Defence above and s. 33(3) of the Marine Insurance Act 1906:

    (1)    The Claimant warranted that it would comply with all 9 of The Salvage Association's recommendations prior, during and after the voyage; and

    (2)    the Defendant would be discharged from all liability from the date of any breach of warranties, including breach by failure to comply with The Salvage Association's recommendations prior, during or after the voyage.

R10.    As to paragraph D10, and without prejudice to the matters stated below:

    (1)    The Policy was, upon its true and proper construction, a single, indivisible policy covering the Claimants' interest in the vessels "AGATE ISLANDS" and "CANADIAN CHALLENGER".

    (2)    Thus, a breach of any of the warranties to which the Defendants refer had the effect that the Defendants were entitled either to be discharged from all liability under the Policy from the date of breach or (pursuant to section 34(3) of the 1906 Act) to waive any such breach and to affirm the Policy.

    (3)    In the event that the Defendants elected to waive any such breach and affirm the Policy, the Policy remained in effect (and the Claimants remained entitled to full relief thereunder) for all purposes and in respect of all interests thereunder.

(4)   Save as aforesaid, paragraph D10 is admitted.

P5.   The Institute Voyage Clauses – (Io)ls CL 295 (1/1 195) provided *inter alios* as follows:

    *"4.   PERILS*

    *4.1   This insurance covers loss of or damage to the subject matter insured caused by*

    *4.1.1   perils of the seas...*

    *4.2   This insurance covers loss of or damage to the subject-matter insured caused by*

    ...

    *4.2.1   negligence of Master Officers Crew or Pilots... "*

D11.   Paragraph 5 is admitted.

P6.   The planned routing for the Voyage was from Nuevitas to Port of Spain, Trinidad and onwards to Cape Town, Durban and Along. The tow was also permitted to proceed via intermediate bunkering stations.

D12.   As to paragraph 6:

    (1) It is admitted that the planned routing for the Voyage was from Nuevitas to Port of Spain, Trinidad or close port and onwards to Cape Town, Durban and Along.

    (2) It is admitted that the Vessel was permitted to proceed to those intermediate bunkering stations as specifically set out in Recommendation 4 of The Salvage Association's Recommendations.

    (3) It is denied that, on the true and proper construction of The Salvage Association's Recommendations 3 & 4 the Vessel was permitted to proceed via other unnamed intermediate bunkering stations.   Recommendations 3 and 4 of The Salvage Association's Recommendations provide as follows:

5

*"3. Tug assistance to be provided on arrival at intermediate bunkering ports as necessary and on critical confirmation.*

*4. Tow to proceed on agreed routing south to Trinidad or close port for full bunkers and inspection, Cape Town for Bunkers and Inspection, Durban for Inspection to Along WC India."*

(4) In the premises the Vessel was only permitted to proceed via intermediate bunkering stations at Trinidad or close port and Capetown.

R32.   As to paragraph D12, and without prejudice to the other matters stated herein:

(1)   The purpose of the Salvage Association's Recommendation 4 was simply to:

(a)   Identify the agreed principle routing for the convoy from connection to Along WC.

(b)   Identify those principle ports at which the convoy was to be inspected (and, as appropriate, also to bunker).

(2)   That recommendation did not expressly (or, upon its true and proper construction, or impliedly) preclude intermediate bunkering.

(3)   Indeed, for practical purposes, it was probable that (even with the assurance of 110% of calculated bunker requirements on board) a convoy of tug and two substantial tows, heading into strong currents and strong prevailing winds, with the potential for heavy seas and poor weather conditions, might need to bunker on at least one occasion between Trinidad and Cape Town. Against this background, it can not have been the intention of the parties that the convoy should (under the terms of the Policy) be prohibited from calling at intermediate bunkering ports where such calls were necessary for the safety of the convoy.

(4)   Further, the Salvage Association's Recommendation 3 referred expressly to "Intermediate bunkering ports". Such a reference would be redundant if the

9

intention of the parties was to restrict bunkering only to those ports to which Recommendation 4 referred; in such circumstances, there would be no "intermediate bunkering ports". Accordingly, Recommendation 3, upon its true and proper construction, contemplated the need for the convoy to call at bunkering ports other than those to which Recommendation 4 referred.

(5)    In the premises, the Recommendations, upon their true and proper construction (alternatively, pursuant to a term to be implied therein in order to express the obvious intention of the parties), permitted the convoy to call at bunkering stations en route other than those to which Recommendation 4 referred.

P7.    On 22nd May 2006, the tug "RIG DELIVERER" departed from Nuevitas with "CANADIAN CHALLENGER" in tow.

D13.   Paragraph 7 is admitted.

P8.    On 23rd May 2006, "RIG DELIVERER" and "CANADIAN CHALLENGER" the vessel "AGATE ISLANDS" (which was anchored about 35 miles offshore Nuevitas) was included in the convoy. On 23rd to 24th May 2006, the tug made connection with "AGATE ISLANDS" and the convoy proceeded toward the next bunkering port, Port of Spain, Trinidad. The order in which the convoy proceeded was such that "AGATE ISLANDS" was towed ahead of "CANADIAN CHALLENGER".

D14.   Save that it is admitted that:

(1) The "AGATE ISLAND" was connected up to the convoy on or about 23rd May 2006;

(2) The "AGATE ISLAND" was towed ahead of "CANADIAN CHALLENGER";

(3) The convoy departed on or about 23rd May 2006 for the Port of Spain, Trinidad where the "RIG DELIVERER" was to take on bunkers.

paragraph 8 is not admitted.  The Defendant does not have primary knowledge of the remainder of the facts set out therein and the Claimant is put to strict proof of the other facts and matters set out therein.

P9.    The tow proceeded to Trinidad where bunkers were returned between 13th and 19th June 2006. On 20th June 2006 the convoy sailed from Trinidad for Recife, Brazil for the next bunkering station.

D15    Save that it is admitted that:

(1) On or about 12th June 2006 the convoy arrived off the Port of Spain, Trinidad;

(2) Bunkers were supplied to the "RIG DELIVERER" in a position approximately 15 miles North of the channel entrance by a harbour tug; and

(3) On or about 20th June 2006 the convoy sailed for Recife, Brazil.

paragraph 9 is not admitted.  The Defendant does not have primary knowledge of the remainder of the facts set out therein and the Claimant is put to strict proof of the other facts and matters set out therein.

P10.    En route from Trinidad to Recife the convoy encountered stronger current than expected and, in light of these conditions, "RIG DELIVERER" was instructed to call at an intermediate bunker station, Sao Luis.

D16.    Save that it is not admitted that:

(1) the current experienced was stronger than expected; and

(2) no admissions are made as to the alleged instructions received by the "RIG DELIVERER".

paragraph 10 is admitted.  The convoy encountered the adverse expected current running at a rate of about 4 knots which slowed the progress of the convoy.

11

R16.    The final sentence of paragraph D16 is admitted.

P11.    On 14th July 2006, the starboard main engine of "RIG DELIVERER" was shut down in order to conserve fuel, and on 18th July 2006 the port main engine was shut down in order to conserve the remaining bunkers on board. Arrangements were made for "RIG DELIVERER" to proceed into Sao Luis with tug assistance.

D17.    Save that no admissions are made as to the arrangements made for the "RIG DEVELOPER" to proceed into Sao Luis with tug assistance, paragraph 11 is admitted.

R17.    For the avoidance of doubt, paragraph D17 contains a typographical error : the tug was the "RIG DELIVERER" (emphasis supplied).

P12.    Between 18th and 21st July 2006, while awaiting tug assistance, the convoy drifted off the coast of Brazil, in the vicinity of Sao Luis.  During this period, the weather deteriorated.  The convoy encountered force 7 to 8 east to south easterly winds and the sea state increased to 5 to 6.  As a result "AGATE ISLANDS" drifted onto and lay alongside "CANADIAN CHALLENGER", causing some ranging damage on both sides.

D18.    As to paragraph 12 it is admitted that the deck log of the "RIG DELIVERER" for the period 18th to 21st July 2006 show the weather and sea state conditions set out in paragraph 12.  Save as aforesaid paragraph 12 is not admitted.

P13.    On 21st July 2006, two harbour tugs from the port of Sao Luis arrived at the convoy.  The tug "REBRAS JURUBATIBA" took over the tow, while "RIG DELIVERER" was assisted by the tug "INTER II" to proceed into Sao Luis in order to take on board bunkers and provisions.

D19.    Paragraph 13 is admitted.

P14.    On 25th July 2006, the towage connection with "RIG DELIVERER" was re-established, and the towing voyage continued towards Recife, the next bunkering

station. However, for the remainder of this leg of the voyage, the wind and weather conditions previously described were such as to reduce the speed of the convoy considerably.

D20. As to paragraph 14 it is admitted that :

(1) on or about 29th July 2006 the towage connection with the "RIG DELIVERER" was re-established;

(2) the convoy proceeded towards Recife, Brazil and

(3) the weather conditions are recorded in the deck log of the "RIG DELIVERER" as being Easterly to South Easterly force 5-10 with heavy seas and an adverse current.

Save as aforesaid, paragraph 14 is not admitted.

P15. On about 25th August 2006, the convoy arrived off the coast of Recife, Brazil, where arrangements were made for bunkering "RIG DELIVERER" in preparation for the next leg of the towing voyage, to Cape Town.

D21. Paragraph 15 is admitted.

P16. From 25th August 2006 to 12th September 2006, the convoy steamed slowly off the coast awaiting further instructions, while arrangements were made for the bunkering and re-provisioning of "RIG DELIVERER". Both towed vessels were in a stable condition and the weather conditions comprised mainly of south-easterly force 5 to 6 winds and a sea state of 3 to 5.

D22. The first sentence of paragraph 16 is admitted. It is further admitted that the weather during this period was logged as comprising mainly of south easterly force 5 to 6 winds and a sea state of 3 to 5 (although at the beginning of this period the sea state logged includes a sea state of 2).

15

R22.  The final sentence of paragraph D22 is admitted. The Claimants will refer to the log as . may be necessary for its precise contents and effect.

D23.  Save as aforesaid paragraph 16 is not admitted. In particular no admission is made as to the condition of the towed vessels "CANADIAN CHALLENGER" and "AGATE ISLAND".

P17.  At about 0540 hours on 12th September 2006, the crew of "RIG DELIVERER" observed that "CANADIAN CHALLENGER" had developed a list of about 5° to starboard. By the evening of 13th September 2006, the list had increased to 25° to starboard.

D24.  Paragraph 17 is not admitted. To the best of the Defendant's knowledge and belief:

    (1)  The deck log of the "RIG DELIVERER" first notes that the "CANADIAN CHALLENGER" had developed a list of approximately 5° to starboard on 14th September 2006:

    (2)  The deck log further notes that at 09:00 hrs on 14th September 2006 the list had increased to 15 ° starboard.

    (3)  The deck log further notes that at 17:00 hrs on 14th September 2006 the list had increased to 20 ° (or 25 ° (the log entry is not clear)) to starboard.

    The Claimant is put to strict proof of the facts and matters set out in paragraph 17.

R24.  Paragraph D24 is noted and the contents of the log as stated are admitted. Based on a report (the "Time Sheet") made by the Master of "RIG DELIVERER" to the Owners/Managers on 13th September 2006, and subsequently disclosed to the Defendants' surveyors, Noble Denton, on 29th September 2006, the Claimants will contend that:

    (1)   At about 0545 hours on 12th September 2006 the Vessel was observed to have a starboard list of about 5° to 8°.

14

    (2)    By the morning of 13th September 2006, the list had increased to about 12° to 15°.

    (3)    By the evening of 13th September 2006, the list had increased to about 20°.

    (4)    By the afternoon of 14th September 2006, the list had increased to about 25°.

    (5)    The Vessel capsized to starboard at about 0250 hours on 15th September 2006.

    (6)    The Vessel sank at about 0352 hours on 15th September 2006.

P23.    By the evening of 14th September 2006, the list had increased to about 25° to starboard and "CANADIAN CHALLENGER" had also begun to trim by the stern. As a precaution, the Master shortened the length of the tow line to about 100 metres so as to be in a position to observe "CANADIAN CHALLENGER" during the night.

D25    As to paragraph 18 it is admitted that:

    (1)    the deck log of the "RIG DELIVERER" records at 00:09 hrs on 15th September 2006 that the list of the "CANADIAN CHALLENGER" had increased to more than 25°.

    (2)    the deck log of the "RIG DELIVERER" records that the tow line to the "CANADIAN CHALLENGER" was shortened to approximately 100 meters during the evening of 14th September 2006.

    Save as set out above paragraph 18 is not admitted and the Claimant is required to prove the facts and matters set out therein.

R25.    Paragraph D25 is noted. The Claimants refer to paragraph R14.

P19.    At about 0250 hours on the morning of 15th September 2006, "CANADIAN CHALLENGER" lost stability and capsized to starboard. The Master then reduced the length of the towing line so as to bring "CANADIAN CHALLENGER" close under the stern of "RIG DELIVERER".

D25.    Paragraph 19 is admitted. The deck log of the "RIG DELIVERER" records that at 03:20 hrs the length of the towing line was reduced so that the "CANADIAN CHALLENGER" was 20 to 25 m from the stern of the "RIG DELIVERER".

P26.    The final sentence of paragraph D26 is admitted.

P26.    At 0325 hours on the same day, the Master of "RIG DELIVERER" ordered that the towing wire should be cut. "RIG DELIVERER" then remained in the vicinity of "CANADIAN CHALLENGER", which remained capsized but afloat.

D27.    Paragraph 20 is admitted.

P21.    At about 0352 hours on 15th September 2006, "CANADIAN CHALLENGER" sank in approximate position 08°58'.25S, 033°55'.75W.

D28.    Paragraph 21 is admitted.

P22.    In the premises, the Vessel became a total loss by perils of the seas during the currency of the Policy. In this regard, and to the extent that it is necessary, the Claimants will contend that the Vessel was lost as a result of the ranging damage referred to in paragraph 12 above.

D29.    Save that it is admitted that the Vessel became a total loss in that she sank on 15th September 2006, paragraph 22 is denied. It is denied that the Vessel became a total loss by perils of the seas during the currency of the Policy. In particular it is denied that the Vessel was lost on or about 15th September 2006 as a result of ranging damage which occurred on or about 21st July 2006.

D30.    The Defendant reserves the right to plead further following the provision of disclosure and/or expert evidence. Without prejudice to the foregoing and the burden of proof (which rests on the Claimant) the Defendant states as follows:

(i)    There was a period of two months between the alleged ranging damage and the Vessel sinking;

16

(2) The weather conditions (including sea state) improved during this period.

(3) The deck log of the "RIG DELIVERER" records that the crew went onboard the "CANADIAN CHALLENGER" on 33rd August 2006 and stated that her condition was "satisfactory".

(4) In the premises it is unlikely that the Vessel sank due to the ranging damage which occurred on or about 21st July 2006.

R30.  As to paragraph R30:

(1) While "CANADIAN CHALLENGER" was approved by The Salvage Association (on the Defendants' behalf) for towage, she was (as the Defendants well knew) intended for scrapping, on a scrapping voyage, and, accordingly, in scrap condition. In this regard, the Claimants refer to paragraph R8 above.

(2) At about 1800 hours on 18th July 2006 "AGATE ISLANDS" and "CANADIAN CHALLENGER" drifted together and collided.

(3) Initially, "AGATE ISLANDS" drifted down wind to lie alongside the port side of "CANADIAN CHALLENGER".

(4) In the southeasterly Force 6 winds and heavy swell, the two vessels ranged alongside each other for about 10 hours.

(5) Subsequently, "AGATE ISLANDS" began to drift astern, with the result that her starboard bow was resting on the port quarter of "CANADIAN CHALLENGER".

(6) Thereafter, the two vessels ranged against each other with the result that considerable damage was caused to the port quarter of "CANADIAN CHALLENGER" and visible holes were created in the stem of "AGATE ISLANDS".

17

(7)     From 18th to 19th July 2006 "AGATE ISLANDS" lay astern of "CANADIAN CHALLENGER" and then shifted position with the result that she lay alongside the starboard side of "CANADIAN CHALLENGER".

(8)     The two vessels continued to range against each other until 20th July 2006.

(9)     Meanwhile, weather conditions deteriorated, with the convoy experiencing south-easterly winds of Force 8 to 9 and heavy swell from 18th to 19th July 2006 and continued poor conditions until 21st July 2006.

(10)    By 21st July 2006, "AGATE ISLANDS" was about 50 metres off the starboard side of "CANADIAN CHALLENGER".

(11)    As a result of the earlier contact between the two vessels from 18th to 20th July 2006, damage to the stern of "CANADIAN CHALLENGER" was considerable, and included cracks in the vicinity of the waterline at the stern.

(12)    Despite the visible damage to "CANADIAN CHALLENGER", any inspection of the Vessel effected by the crew of "RIG DELIVERER" by means of boarding the Vessel would (given the condition of the Vessel see paragraph 28 above) necessarily have been of limited scope. While damage was visible externally at the stern of "CANADIAN CHALLENGER", an internal inspection would have been unlikely to reveal the existence of any breach of the hull below the waterline and/or any damage to and/or failure of the cement boxes and/or other repairs/closures to openings referred to in paragraph 28 above. Accordingly, any cause of ingress of water into the hull of "CANADIAN CHALLENGER" which was not immediately visible upon inspection would probably have gone unnoticed despite the exercise of reasonable measures by way of inspection.

(13)    Given the extent of the externally visible damage to "CANADIAN CHALLENGER", it is likely that other damage consequent upon the contact between the two vessels (which may have included damage to and/or the failure

13

of the reefust boxes and/or other repairs/closures to openings referred to in paragraph R8 above) resulted.

(14) Against this background, and given that weather conditions began to improve from about 21st July 2006, it is likely that the contact between the two vessels resulted in a slow ingress of water into the hull of "CANADIAN CHALLENGER" (either from a breach of the hull resulting directly from the contact between the vessels, or from damage to and/or the failure of the cement boxes and/or other repairs/closures to openings referred to in paragraph R8 above as a result of such contact). Such ingress would, in the presence of more benign weather and sea conditions, not have affected the stability of the Vessel until the free surface effect of the water which had entered the hull was sufficient to cause the list which was first observed on 12th September 2006. Once the stability of the Vessel was thus affected, however, further ingress, listing and the eventual capsizing and sinking of the Vessel was rapid.

(15) Thus, in the absence of any alternative explanation for the loss of the Vessel, it is probable that the damage resulting from the contact between the vessels was the cause of the loss.

(16) Without prejudice to the foregoing the Claimants will in any event rely upon the fact of the sinking of the Vessel while under tow and in open sea, coupled with the condition of the Vessel (as referred to in paragraph R8 above, and of which the Defendants were at all material times aware) and the weather conditions during the course of the voyage prior to the loss, as evidence sufficient to give rise to an obvious inference to the effect that the Vessel was lost by reason of a peril of the sea.

P25.   As a result of the matters set out above, the Defendants became liable under the Policy to pay to the Claimants the sum of US$1,000,000 as provided for in the Policy (being the agreed value of the Vessel thereunder).

D25.   Paragraph 25 is denied. It is denied that the Defendants became liable under the Policy to pay the Claimants the sum of US$1,000,000 for the following reasons:

19

(1) The Claimant was in breach of recommendations 4, 5, 6 and 9 of The Salvage Association's recommendations. In the premises the Defendant was discharged from all liability from the date of the breach of the express warranties (as further particularised at paragraphs 32 to 37 of the Defence below).

(2) Further and/or alternatively the loss was not caused by an insured peril. Paragraphs 29 & 30 of the Defence above are repeated.

(3) Further and in any event the Policy contained a US$150,000 deductible any one accident or occurrence. In the premises if, which is denied, the Defendant is liable to the Claimant under the Policy the Claimant is only entitled to recover the insured value minus the deductible, namely US$850,000.

D32. The Claimant was in breach of recommendation 4 of The Salvage Association's recommendations in that the Vessel proceeded via a bunkering port, namely Recife, Brazil, which was not permitted under recommendations 3 & 4 of The Salvage Association's recommendations. In the premises the Defendant was discharged from all liability from the date of the breach of recommendation 4.

R32. Paragraph D32 is denied. The Claimants refer to paragraph R12 above.

D33. The Claimant was in breach of recommendation 5 of The Salvage Association's recommendations in that the Vessel did not have 110% of the quantity of fuel onboard for the passage from Trinidad to Recife, Brazil (a port not permitted under The Salvage Association's Recommendations); and/or from Trinidad to Cape Town. In the premises the Defendant was discharged from all liability from the date of the breach of recommendation 5.

R33. Paragraph D33 is denied. Upon departure from Trinidad, "RIG DELIVERER" had on board no less than 110% of the quantity of bunkers required in order to complete a voyage to one of a number of possible intermediate bunker ports permitted under The Salvage Association's Recommendation 3 (including, but not limited to, for example, Georgetown, Paramibo, Belem and Sao Luis). As it was, bunkering took place at

20

Maqui (which was considerably further from Trinidad than any of the four ports mentioned above).

D34.  The Claimant was in breach of recommendation 6 of The Salvage Association's recommendations in that the Vessel was not boarded and/or inspected at regular intervals and/or such inspections were not entered in the tug log book. The deck log of the "RIG DELIVERER" records that the Vessel was only boarded and inspected on 31st August 2006. In the premises the Claimant is in breach of recommendation 6 of The Salvage Association's recommendations. In the premises the Defendant was discharged from all liability from the date of the breach of recommendation 6.

R34.  As to paragraph D34:

(1)    It is admitted that the log contains only the one record of the boarding and inspection of the Vessel (on 31st August 2006).

(2)    However, upon the true and proper construction thereof, Recommendation 6 took effect only as a warranty to the effect that the Vessel would be *"boarded at regular intervals including bunker station stops during voyage"* and to the effect that deficiencies noted would be rectified. The requirement to the effect that inspections were to be recorded in the log book (which requirement was not subject to any stipulation as to a time limit for compliance) was merely ancillary, and a failure to comply with that requirement did not amount to a breach of warranty.

(3)    The Claimants will as necessary rely upon the fact (recorded in a report by Messrs. Noble Denton dated 29th November 2006) that the Master of "RIG DELIVERER" informed Messrs. Noble Denton (acting on behalf of the Defendants) that *"the tow was boarded every ten days"*.

(4)    The Claimants will also rely as necessary upon the facts that:

(a)    The need to comply with The Salvage Association's recommendations had been impressed upon the crew of "RIG DELIVERER".

21

     (b)   Copies of the recommendations were placed on board "RIG DELIVERER".

     (c)   The crew of "RIG DELIVERER" complied with all other recommendations.

  (5)  In the premises, and save as aforesaid, paragraph D34 is denied.

  (6)  Without prejudice to the foregoing:

     (a)   The Claimants refer to paragraph R39 (11) and (12) above.

     (b)   In the premises, any inspection of the Vessel was futile and without practical benefit to either party.

     (c)   Accordingly, and as a matter of law, strict compliance with Recommendation 6 was excused and/or any failure to comply with the said recommendation was excusable and of no effect.

D35  Furthermore, the Defendant notes that the photos taken by the Master of the "RIG DELIVERER" show that there was no boarding ladder rigged on the starboard side of the Vessel. Given that the photographs of the "AGATE ISLAND" show that there was contact on both port and starboard sides of the Vessel the Claimant is put to strict proof that there was a boarding ladder on the port side of the Vessel at all material times so that boarding and inspection of both the Vessel and the "AGATE ISLAND" could be carried out.

R35.  As to paragraph D35:

  (1)  It was possible to board the Vessel other than by use of a boarding ladder. For example, on 15th May 2006 "AGATE ISLANDS" was boarded directly from "RIG DELIVERER" by means of mooring the latter vessel alongside the former.

    (2)    Accordingly, whether or not a boarding ladder was available on the port side of the Vessel is irrelevant; boarding was nonetheless possible.

D35.  The Claimant was in breach of recommendation 9 of The Salvage Association's recommendations that the Owners report weekly to The Salvage Association in that the Claimants did not report to The Salvage Association on a weekly basis. In the premises the Defendant was discharged from all liability from the date of the breach of recommendation 9.

R36.  As to paragraph D36:

    (1)    At about 1200 hours local time each day, the Master of "RIG DELIVERER" provided the owners/managers of the Vessel with information regarding the progress of the towage operation. This included details of the 1200 hours position, course, speed over the ground, average speed over the previous 24 hours, wind and weather conditions, the performance of the main engines, oil and fuel quantities remaining on board, consumption figures for bunkers and water, and details of any defects or deficiencies which might affect the voyage.

    (2)    Owing to administrative error (the Master believed that the owners/managers would provide his reports to The Salvage Association, while owners/managers believed that the Master was himself providing them directly to The Salvage Association), these daily reports were not provided to The Salvage Association.

    (3)    As it was, sight by The Salvage Association of the Master's reports would have been futile and without practical benefit to either party: it would have made no difference to the progress or conduct of the towage operation, and would not have avoided the loss of the Vessel. In this regard, the Claimants will rely as necessary upon the fact that The Salvage Association took no steps prior to the loss of the Vessel to seek or enquire as to any report from the Master.

    (4)    Accordingly, and as a matter of law, strict compliance with Recommendation 9 was excused and/or any failure to comply with the said recommendation was excusable and of no effect.

D37.  In the premises the Defendant was discharged from all liability under the Policy before the Vessel became a total loss on or about 15th September 2006.

R37.  Against the background of the matters stated above, paragraph D37 is denied. Further and alternatively, and without prejudice to the matters stated above, the Defendants are in any event precluded from relying upon the alleged breaches of warranty (or any of them) as a defence to the Claimants' claim:

(1)  By about 22nd September 2006, The Salvage Association and/or Messrs. Noble Denton had been instructed by the Defendants to investigate the circumstances surrounding the loss of the Vessel.

(2)  From that date, The Salvage Association and/or Messrs. Noble Denton were provided by the owners/managers of the Vessel (and/or their legal representatives) with all assistance and information requested.

(3)  On 28th September 2006 owners/managers and their legal representatives met with a representative of the Defendants, Mr. Khandaker, in order to discuss the circumstances of the loss of the Vessel. Prior to or at that meeting, the Defendants were provided (by means of a "without prejudice" communication) with a detailed account of the circumstances of the loss and were taken through the available evidence. At that meeting, Mr. Khandaker confirmed that Messrs. Noble Denton were instructed by the Defendants to investigate the loss of the Vessel.

(4)  Further to that meeting, and later on the same date, owners/managers and their legal representatives met with a representative of Noble Denton, Captain Wells, and provided him with a detailed background to the loss of the Vessel, together with a copy of the "without prejudice" communication referred to above. At that meeting, Captain Wells identified a number of documents which he would wish to consider. Further, and in response to specific questions posed by Captain Wells regarding matters concerning compliance with The Salvage Association's recommendations (referred to above), Captain Wells was

24

informed of all matters relevant to the question of whether there had or had not been such compliance.

(5)    Thereafter, owners/managers made every effort to ensure that any documents requested by Captain Wells were provided to Noble Denton.

(6)    In the premises, by no later than 5th October 2006 the Defendants were sufficiently aware of all relevant facts and matters regarding the loss of the Vessel in order to determine whether there existed any right on their part (which right is denied) to be discharged from liability under the Policy by reason of the alleged or any breach(es) of warranty.

(7)    By an email communication dated 5th October 2006 the Defendants informed the owners/managers of the Vessel (via their broker) that *"Consequent to recent incident to Canadian Challenger we are pleased to confirm that insurance cover as per relevant policy will continue unprejudiced on Agate Island"*.

(8)    In the premises, and in light of the matters stated in paragraph RE(1) above, the Defendants unequivocally affirmed the Policy and waived any alleged breach(es) of warranty on the part of the Claimants.

(9)    In the premises, the Defendants waived any right (which is denied) to treat their liability under the Policy as discharged.

P34.    On or about 15th September 2006, and in accordance with the terms of the Policy, the Claimants notified the Defendants of the sinking of the Vessel and of the fact that she had become a total loss, and sought payment under the Policy.

D58.    It is admitted that on or about 16th September 2006 the Claimants notified the Defendants by e-mail that the Vessel had sunk about 50 miles off Recife in deep water. Save as aforesaid paragraph 38 is not admitted.

25

P25.  Wrongfully and in breach of contract, the Defendants have failed and/or refused to pay the value under the Policy and/or US$1,000,000 and/or any sums (whether by way of indemnity or otherwise) to the Claimants pursuant to the Policy or otherwise.

D39.  Paragraph 25 is denied. It is denied that the Defendants wrongfully and/or in breach of contract failed and/or refused to pay the value under the Policy as alleged or at all. For the reasons set out above the Defendants are not, and at all material times were not, under a liability to pay under the Policy for the loss of the Vessel. The Defendant was discharged from all liability under the Policy before the Vessel became a total loss on or about 15th September 2006.

R39.  For the reasons set out above, paragraph D39 is denied.

P26.  In the premises, the Defendants are liable:

    (1)    To pay to the Claimants the value under the Policy and/or US$1,000,000.

    (2)    Further and alternatively, in damages.

    (3)    Further and alternatively, to indemnify the Claimants pursuant to the Policy.

D40.  Paragraph 26 is denied. For the reasons set out above it is denied that the Claimant is entitled to the sums alleged, or any sums, under the Policy as alleged or at all.

R40.  For the reasons set out above, the denial in paragraph D40 (and that in paragraph D41 below) is without foundation.

P27.  Further the Claimants are entitled to and claim interest (compounded at quarterly rests) at common law, alternatively, simple interest pursuant to section 35A of the Supreme Court Act 1981 and/or the inherent jurisdiction of the Court on any sums that may be found due to them, at such commercial rate and for such period as the Court considers just.

26

241.  Save that if, which is denied, the Defendants are liable to the Claimants it is admitted that the Claimant is entitled to interest pursuant to s. 35A of the Supreme Court Act 1981. Save as aforesaid paragraph 27 is denied.

AND THE CLAIMANTS CLAIM:

(1)   The agreed value under the Policy, alternatively US$1,000,000.

(2)   Further and alternatively, damages.

(3)   Further and alternatively, an indemnity pursuant to the Policy.

(4)   Interest pursuant to common law and/or pursuant to section 35A of the Supreme Court Act 1981 and/or the inherent jurisdiction of the Court.

(5)   Costs

(6)   Such further or other relief as may be necessary or appropriate.

P: NEVIL PHILLIPS (counsel for the Claimants)
D: RUTH HOSKING (counsel for the Defendants)
R: NEVIL PHILLIPS (counsel for the Claimants)

The Claimants believe that the facts stated in this Reply are true.  I am duly authorised by the Claimants to sign this statement.

Signed:        _Andrew Crispian Gray_
Full Name:     Andrew Crispian Gray
Position:      Solicitor employed by Holman, Fenwick & Willan
Dated:         5th March 2008

863376 21NC

27

EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

JAMIE SHIPPING INC., PUFFIN MARINE                    :      08 CV _____
INVESTMENTS SA and BANK MANDIRI                       :
(EUROPE) LTD. UK,                                     :
                                                      :
                        Plaintiffs,                   :
                                                      :
        - against -                                   :
                                                      :
OMAN INSURANCE CO.,                                   :
                                                      :
                        Defendant.                    :
-------------------------------------------------------------X

### AFFIDAVIT IN SUPPORT OF PRAYER FOR MARITIME ATTACHMENT

State of Connecticut  )
                      )    ss: SOUTHPORT
County of Fairfield   )

        Anne C. LeVasseur, being duly sworn, deposes and says:

        1.      I am a member of the Bar of this Court and represent the Plaintiffs herein. I am

familiar with the facts of this case and make this Affidavit in support of Plaintiffs' prayer for the

issuance of a Writ of Maritime Attachment and Garnishment, pursuant to Rule B of the

Supplemental Admiralty Rules of the Federal Rules of Civil Procedure.

### DEFENDANT IS NOT PRESENT IN THE DISTRICT

        2.      I have attempted to locate the Defendant, OMAN INSURANCE CO. within this

District. As part of my investigation to locate the Defendant within this District, I checked the

telephone company information directory, as well as the white and yellow pages for New York

listed on the Internet or World Wide Web, and did not find any listing for the Defendant.

Finally, I checked the New York State Department of Corporations' online database which

showed no listings or registration for the Defendant.

3.    I submit based on the foregoing that the Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

4.    Upon information and belief, the Defendant has, or will have during the pendency of this action, tangible and intangible property within this District and subject to the jurisdiction of this Court, held in the hands of in the hands of garnishees within this District, which are believed to be due and owing to the Defendant.

5.    This is Plaintiffs' first request for this relief made to any Court.

PRAYER FOR RELIEF FOR ORDER ALLOWING SPECIAL PROCESS SERVER

6.    Plaintiffs seek an Order pursuant to Rule 4(c) of the Federal Rules of Civil Procedure, for an Order appointing Patrick F. Lennon, Kevin J. Lennon, Charles E. Murphy, Nancy R. Peterson, Coleen A. McEvoy, Anne C. LeVasseur or any other partner, associate, paralegal or agent of Lennon, Murphy & Lennon, LLC, or any process server employed by Gotham Process Servers, in addition to the United States Marshal, to serve the Ex Parte Order and Process of Maritime Attachment and Garnishment, together with any interrogatories, upon the garnishee(s), together with any other garnishee(s) who (based upon information developed subsequent hereto by the Plaintiffs) may hold property of, for or on account of, the Defendant.

7.    Plaintiffs seek to serve the prayed for Process of Maritime Attachment and Garnishment with all deliberate speed so that it may be fully protected against the potential of being unable to satisfy a judgment/award ultimately obtained by Plaintiffs and entered against the Defendant.

8.    To the extent that this application for an Order appointing a special process server

-2-

with respect to this attachment and garnishment does not involve a restraint of physical property, there is no need to require that the service be effected by the Marshal as it involves simple delivery of the Process of Maritime Attachment and Garnishment to the various garnishees to be identified in the writ.

### PRAYER FOR RELIEF TO SERVE LATER IDENTIFIED GARNISHEES

9.    Plaintiffs also respectfully request that the Court grant it leave to serve any additional garnishee(s) who may, upon information and belief obtained in the course of this litigation, to be holding, or believed to be holding, property of the Defendant, within this District. Obtaining leave of Court at this time to serve any later identified garnishees will allow for prompt service of the Process of Maritime Attachment and Garnishment without the need to present to the Court amended Process seeking simply to identify other garnishee(s).

### PRAYER FOR RELIEF TO DEEM SERVICE CONTINUOUS

10.    Further, in order to avoid the need to physically serve the garnishees/banks daily and repetitively, Plaintiffs respectfully seek further leave of the Court, as set out in the accompanying Ex Parte Order for Process of Maritime Attachment, for any process that is served on a garnishee to be deemed effective and continuous service throughout the remainder of the day upon which service is made commencing from the time of such service; and such service to be further deemed effective through the end of the next business day, provided that another service is made that day, and to authorize service of process via facsimile or e-mail following initial *in personam* service.

--5--

## PRAYER FOR RELIEF TO TEMPORARILY SEAL CASE

11.     Upon information and belief, it is the practice of many law firms in the maritime bar to review the daily electronic docket sheet of the Southern District of New York for all maritime actions filed in the district and inform the defendant(s) named therein of any Ex Parte Orders of Attachment pending against them, thus defeating the purpose of the "Ex Parte" application.

12.     Upon information of belief, it is the practice of certain publications, specifically Tradewinds, to publish the names of defendants named in Ex Parte Orders of Attachment, thus further defeating the purpose of the "Ex Parte" application.

13.     Upon information and belief, Tradewinds has very recently publicized the names of parties in Rule B proceedings, the amount of the attachments, and other details of the actions, thereby further defeating the purpose of the "Ex Parte" application.

14.     The Courts within the Southern District of New York have an interest in preserving the efficacy of the Ex Parte Orders issued therein.

15.     The above interest supersedes the interest in maintaining a completely public docket, especially given that the public's access will only be limited temporarily until assets are attached and notice of attachment has been provided to the Defendant.

16.     Indeed, the public's access to Ex-Parte Orders of Maritime Attachment defeats their entire purpose, by depriving Plaintiffs of the element of surprise and potential allowing Defendant to re-route their funds to avoid the attachment, thus making the attachment remedy hollow.

17.    For the foregoing reasons, Plaintiffs request that the Court issue an Order temporarily sealing the court file in this matter, including the Verified Complaint and all other pleadings and Orders filed and/or issued herein until further notice of this Court or notification to the clerk that property has been attached.

18.    This request is narrowly tailored to meet Plaintiffs' needs. Once property is attached, the case should be unsealed, as the interest underlying sealing the case will have been largely eliminated.

Dated:        July 30, 2008
              Southport, CT


                                    _____
                                    Anne C. LeVasseur


Sworn and subscribed to before me
this 30th day of July, 2008


_____
Notary Public


–5–

EXHIBIT B

08 CV 6882

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------X
JAMIE SHIPPING INC., PUFFIN MARINE        :        08 CV _____
INVESTMENTS SA and BANK MANDIRI           :
(EUROPE) LTD, UK,                         :
                                          :        EX PARTE ORDER
                    Plaintiffs,           :        FOR PROCESS OF
                                          :        MARITIME
    - against -                           :        ATTACHMENT
                                          :
OMAN INSURANCE CO.,                       :
                                          :
                    Defendant.            :
---------------------------------------------------X

WHEREAS, on July 30 2008, Plaintiff, JAMIE SHIPPING INC., PUFFIN MARINE

INVESTMENTS SA and BANK MANDIRI (EUROPE) LTD. UK filed a Verified Complaint, herein

for damages amounting to $ 3,558,738.50 inclusive of interest, costs and reasonable attorneys' fees,

and praying for the issuance of Process of Maritime Attachment and Garnishment pursuant to Rule B

of the Supplemental Admiralty Rules for Certain Admiralty and Maritime Claims of the Federal Rules

and Civil Procedure; and

WHEREAS, the Process of Maritime Attachment and Garnishment would command that the

United States Marshal, or other designated process server, attach any and all of the Defendant's

property within the District of this Court; and

WHEREAS, the Court has reviewed the Verified Complaint and the Supporting Affidavit,

and the conditions of Supplemental Admiralty Rule B appearing to exist;

NOW, upon motion of the Plaintiff, it is hereby:

ORDERED, that pursuant to Rule B of the Supplemental Rules for Certain Admiralty and

Maritime Claims, the Clerk of the Court shall issue Process of Maritime Attachment and Garnishment

against all tangible or intangible property, credits, letters of credit, bills of lading, effects, debts and

monies, electronic funds transfers, freights, sub-freights, charter hire, sub-charter hire or any other funds or property up to the amount of $ 3,558,738.50 belonging to, due or being transferred to, from or for the benefit of the Defendant, including but not limited to such property as may be held, received or transferred in Defendant's name(s) or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named on whom a copy of the Process of Maritime Attachment and Garnishment may be served; and it is further

ORDERED that supplemental process enforcing the Court's Order may be issued by the Clerk upon application without further Order of the Court; and it is further

ORDERED that following initial service by the U.S. Marshal, or other designated process server, upon each garnishee, that supplemental service of the Process of Maritime Attachment and Garnishment, as well as this Order, may be made by way of facsimile transmission or other verifiable electronic means, including e-mail, to each garnishee; and it is further

ORDERED that service on any garnishee as described above is deemed to be effective and continuous service throughout the remainder of the day upon which service is made commencing from the time of such service; and such service is further deemed to be effective through the end of the next business day, provided that another service is made that day; and it is further

ORDERED that pursuant to Federal Rule of Civil Procedure 5(b)(2)(D) each garnishee may consent, in writing, to accept service by any other means.

Dated: July 31, 2008

SO ORDERED:

_John F. Kee_
U. S. D. J.

CERTIFIED AS A TRUE COPY ON
THIS DATE  08.01.08
BY _____
        Clerk
        Deputy

08 CV 6882

THE PRESIDENT OF THE UNITED STATES OF AMERICA

To the Marshal of the Southern District of New York (or designated process server) - GREETINGS:

WHEREAS a Verified Complaint has been filed in the United States District Court for the Southern District of New York on the 30th day of July 2008 by

JAMIE SHIPPING INC., PUFFIN MARINE INVESTMENTS SA and BANK MANDIRI (EUROPE) LTD. UK
Plaintiff,

against

OMAN INSURANCE CO.
Defendant,

in a certain action for breach of maritime contract wherein it is alleged that there is due and owing from the Defendants to the said Plaintiff the amount of $5,558,738.50 and praying for process of maritime attachment and garnishment against the said Defendant

WHEREAS, this process is issued pursuant to such prayer and requires that a garnishee(s) shall serve their answer(s), together with answers to any Interrogatories served with the Complaint, within 20 days after service of process upon him and requires that Defendant shall serve its answer within 30 days after process has been executed, whether by attachment of property or service on the garnishee.

NOW, THEREFORE, we do hereby command you that if the said Defendant cannot be found within the District you attach goods and chattels to the amount sued for, and if such property cannot be found that you attach other property, credit and effects to the amount sued for in the hands of:

ABN Amro, American Express Bank, Bank of America, Bank of New York, Bank of China, BNP Paribas, Barclay's Bank, Citibank, Calyon, Deutsche Bank, HSBC Bank USA Bank, J.P. Morgan Chase, Societe Generale, Standard Chartered Bank, UBS, Wachovia Bank N.A., and/or Fortis Bank

to wit: property, letters of credit, deposits, funds, credits, bills of lading, debts, settlement agreements, or other assets, tangible or intangible, in whatever form of:

OMAN INSURANCE CO.

and that you promptly after execution of this process, file the same in this court with your return thereon.

WITNESS, the Honorable _John F. Keenan_ Judge of said Court, this _1st_ day of ~~July~~ August 2008, and of our Independence the two-hundred and thirty-second.

Lennon, Murphy & Lennon, LLC
Attorneys for Plaintiff
The Gray Bar Building
420 Lexington Ave., Suite 300
New York, NY 10170
Phone (212) 490-6050

J. MICHAEL McMAHON
Clerk

By: _____
Deputy Clerk

NOTE: This Process is issued pursuant to Rule B(1) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure and/or New York Civil Practice Law and Rules, Article 62.

# EXHIBIT C



**Lennon, Murphy & Lennon, LLC**

ATTORNEYS AT LAW

420 Lexington Ave., Suite 300
New York, NY 10170
phone (212) 490-6050
fax (212) 490-6070

www.lemmur.com

Tide Mill Landing
2425 Post Rd, Suite 302
Southport, CT 06890
phone (203) 256-8600
fax (203) 256-8615

mail@lenmur.com

August 19, 2008

_Via Facsimile (212) 710-3950_
Clyde & Co. LLP
405 Lexington Avenue
New York, NY 10174
Attn: Christopher Carlsen, Esq.

Re:   Jamie Shipping Inc et al v. Oman Insurance Co.
      Your ref.:   0705559
      Our ref.:    08-1526

Dear Mr. Carlsen:

Thank you for your letter dated today addressed to Mary Fedorchak of our office. Please be advised that Ms. Fedorchak is our paralegal. All further correspondence on this matter should be directed to the attention of the undersigned and/or Ms. Anne LeVasseur.

We have passed a copy of your letter to our instructing solicitors and will revert to you once we have been instructed. However, please note that Supplemental Rule E(5) does not mandate that a Rule B plaintiff agree to accept a letter of credit as substitute security. Our view of Supplemental Rule E(5) is that in the absence of the parties agreement that only a surety bond may be compelled upon a Rule B plaintiff as substitute security.

Please be advised that our clients' claims are fully secured by way of Oman Insurance Co. property that has been attached in New York. We have issued cease and desist notices to the garnishee banks that have been served with the Ex Parte Order and Process of Maritime Attachment and Garnishment. The banks thus should no longer be screening for transactions or accounts involving Oman Insurance Co. Should you believe that further transactions or accounts are being impacted please let us know and we will take prompt actions to address the same.

Should you wish to discuss this matter please do not hesitate to contact the undersigned.

Kind regards,

Kevin J. Lennon

KJL/bhs

Patrick F. Lennon | Charles E. Murphy | Kevin J. Lennon | Nancy R. Siegel | Anne C. LeVasseur | Coleen A. McEvoy

# EXHIBIT D



"Rory Butler"
<Rory.Butler@hfw.com>

08/13/2008 06:54 PM

To  "Mark Beswetherick" <Mark.Beswetherick@clydeco.ae>

cc  "Alec Emmerson" <Alec.Emmerson@clydeco.ae>, "Brian Nash" <Brian.Nash@clydeco.ae>, "Robert Lawrence" <Robert.Lawrence@clydeco.ae>, "James Gosling"

bcc

Subject  RE: Canadian Challenger & Agate Islands

History:       🖢 This message has been forwarded.

Dear Mark

I write further to your e-mail below. I apologise for to the delay in responding. I did indeed receive clients instructions yesterday afternoon but have been tied up on an urgent casualty since then.

Clients position is that a bank guarantee from Mashreq bank is not acceptable to them. Clients would prefer to remain secured via cash funds. It is not uncommon for funds attached in Rule B actions to remain attached and to be held in the US Court Registry. Alternatively clients may be prepared to agree to transfer the funds attached to date and any further funds attached in the future to an escrow account to be set up in London, wording of the escrow agreement to be discussed. This option would have the advantage that the attached funds would earn interest. Please could you advise if this suggestion is of interest to your clients.

For the sake of good order I would note that I understand, as a matter of US law, that clients are not obliged to accept a bank guarantee as alternative security. Further that I believe it will be difficult for your clients to vacate the attachment.

I look forward to hearing from you.

Kind regards

Rory

Rory Butler
**Holman Fenwick Willan**
Direct: +44 (0)20 7264 8310
Mobile: +44 (0)7766 247848
rory.butler@hfw.com

**From:** Mark Beswetherick [mailto:Mark.Beswetherick@clydeco.ae]
**Sent:** 13 August 2008 11:16
**To:** Rory Butler
**Cc:** Alec Emmerson; Brian Nash; Robert Lawrence; Rory Butler
**Subject:** Re: Canadian Challenger & Agate Islands

Dear Rory,

Further to my email below, OIC is disappointed not to have yet received a response from your clients to my email dated 11 August setting out OIC's proposal that Mashreq Bank provide a guarantee in return for the release of the Rule B attachment. I understood from our conversation yesterday that a response would be received during the course of the day. As I mentioned to you, OIC wants to resolve this issue as soon as possible, and they are not prepared to let this issue drag on. The proposal of alternative security in the form of a bank guarantee is frankly uncontroversial, and one to which your client should agree (subject only to finalising the wording of Mashreq's guarantee).

In the circumstances, if we do not hear from your clients by 6pm today (UAE time), we anticipate that we will be instructed to issue in the Southern District Court of New York, without further notice to you, a motion to vacate the Rule B attachment, including a request that your clients be required to pay the costs of the motion, and damages. OIC reserves the right to argue that your clients have acted unreasonably by delaying to agree to vacate the Rule B attachment in light of this open offer.

For the avoidance of doubt, OIC also reserves the right to argue, if necessary, in due course that the Rule B attachment should be vacated in any event, regardless of whether alternative security is to be provided.

I look forward to hearing from you as soon as possible.

Yours sincerely,

Mark Beswetherick
Associate

## CLYDE & CO LLP

Dubai Office: PO Box 7001 | Suite 102 | City Tower 2 | Sheikh Zayed Road | Dubai | United Arab Emirates
Reception: +971 4 331 1102 | Fax: +971 4 331 9920 | Web: www.clydeco.com

DDI: +971 4 312 8650 | Mobile: +971 50 457 3091 | email: Mark.Beswetherick@clydeco.ae

Clyde & Co LLP is a limited liability partnership registered in England and Wales under number OC326539. A list of members is available for inspection at its registered office 51 Eastcheap, London EC3M 1JP. Clyde & Co LLP uses the word "partner" to refer to a member of the LLP, or an employee or consultant with equivalent standing and qualifications. Regulated by the Solicitors Regulation Authority.

INTERNATIONAL LAW FIRM
ABU DHABI  BELGRADE  CARACAS  DOHA  DUBAI  GUILDFORD  HONG KONG  LONDON  MOSCOW  NANTES
NEW YORK  PARIS  PIRAEUS  RIO DE JANEIRO  SAN FRANCISCO  SHANGHAI  SINGAPORE  ST PETERSBURG



Mark
Beswetherick/DUBAI/CLYDE
_CO          To Rory Butler (Holman Fenwick)
             Brian Nash/DUBAI/CLYDE_CO@CLYDE_CO, Alec
08/11/2008 03:55 PM   cc Emmerson/DUBAI/CLYDE_CO@CLYDE_CO, Robert
             Lawrence/DUBAI/CLYDE_CO@CLYDE_CO
             Subj Canadian Challenger & Agate Islands
             ect

Dear Rory,

As discussed earlier today, I should be grateful if you would take instructions in principle from your clients on our client's (OIC) proposal to arrange a bank guarantee in return for the release of the Rule B attachment in the US and your clients agreement not to pursue alternative security in respect of the Canadian Challenger or Agate Islands claim in future.   Currently, we are only on the court record in respect of the Canadian Challenger matter, but anticipate that we will be instructed shortly on the Agate Islands claim.

As I mentioned, OIC proposes to arrange a guarantee to be provided by the Mashreq Bank, which has a branch office in London. Mashreq will no doubt be familiar to your colleagues in this region, if not also to you.  I should be grateful if you would confirm that your clients agree in principle to Mashreq bank acting as the guarantor.

I attach a draft wording for the proposed guarantee.  This has not yet been approved by our client (or Mashreq) and may therefore be subject to amendment, but it is in a fairly standard form and, for the sake of expediency, I am forwarding it to you now as our client would like to resolve this matter as soon as possible. No doubt we can discuss any amendments that you or your clients may require in due course, but as a general comment we would prefer to keep the guarantee in as simple terms as possible.

I look forward to hearing from you once you have taken your clients' instructions.

Yours sincerely,

Regards,

Mark Beswetherick
Associate

## CLYDE & CO LLP

Dubai Office: PO Box 7001 | Suite 102 | City Tower 2 | Sheikh Zayed Road | Dubai | United Arab Emirates
Reception: +971 4 331 1102 | Fax: +971 4 331 9920 | Web: www.clydeco.com

DDI: +971 4 312 8650 | Mobile: +971 50 457 3091 | email: Mark.Beswetherick@clydeco.ae

Clyde & Co LLP is a limited liability partnership registered in England and Wales under number OC326539. A list of members is available for inspection at its registered office 51 Eastcheap, London EC3M 1JP. Clyde & Co LLP uses the word "partner" to refer to a member of the LLP, or an employee or consultant with equivalent standing and qualifications. Regulated by the Solicitors Regulation Authority.

INTERNATIONAL LAW FIRM
ABU DHABI  BELGRADE  CARACAS  DOHA  DUBAI  GUILDFORD  HONG KONG  LONDON  MOSCOW  NANTES
NEW YORK  PARIS  PIRAEUS  RIO DE JANEIRO  SAN FRANCISCO  SHANGHAI  SINGAPORE  ST PETERSBURG

كلايد اند كو
CLYDE&CO

LEGAL NOTICE: This email and any attachments are confidential and may also be

privileged. If you have received this message in error, please (a) notify the sender immediately, (b) destroy this email and any attachments, and (c) do not use, copy, store and/or disclose to any person this email and any attachments. In the event of any technical difficulty with this email and any attachments, please contact the Clyde & Co IT Department on +971 4 331 1102 or email postmaster@clydeco.ae

From 1 September, we will be based in new offices in London. Our new address will be Friary Court, 65 Crutched Friars, London, EC3N 2AE

HOLMAN FENWICK WILLAN
Marlow House
Lloyds Avenue
London EC3N 3AL
T: + 44 (0) 20 7488 2300
F: + 44 (0) 20 7481 0316

hfw.com



A list of partners' names is available at this address. The firm is regulated by the Solicitors Regulation Authority

This e-mail (including all attachments) is intended for the named addressee. It is confidential and may be privileged

If you have received it in error, please contact us immediately and then delete it. You should not disclose its contents to any other person

This message has been scanned for viruses by BlackSpider MailControl

# EXHIBIT E



US LLP

The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Telephone: 212 710 3900
Facsimile: 212 710 3950
www.clydeco.us
christopher.carlsen@clydeco.us

August 19, 2008

Via facsimile: (212) 490-6070

Mary Fedorchak, Esq.
Lennon, Murphy & Lennon, LLC
The Graybar Building
420 Lexington Avenue, Suite 300
New York, New York 10170

Re:  Jamie Shipping Inc. et al v. Oman Insurance Co.
     S.D.N.Y. Docket No. 08 Civ. 6882
     Your File No. 1526-08 SEALED
     Clyde & Co Ref: 0705559

Dear Ms. Fedorchak:

We are working with Clyde & Co's Dubai office in connection with the above-referenced matter. I enclose a copy of the letter sent by our Dubai office today to your office and Holman Fenwick & Willan in which Oman Insurance Company has offered to post security in the form of the enclosed Letter of Credit issued by Mashreq Bank in accordance with Rule E(5) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. Please confirm to me today that your client is willing to accept this Letter of Credit as security for the Ex Parte Order of Maritime Attachment and Garnishment issued in this matter, and release the funds that have been attached to date pursuant to that Order. If you believe that this proffered security is not adequate to protect your client's position, please tell me why to see if we can agree on language that is acceptable to your client. Please advise me of your position today so that, if necessary, we can seek Court involvement immediately in order to prevent further unnecessary disruption to our client's business operations.

Thank you for your cooperation.

Sincerely yours,

Christopher Carlsen

CC/mv

Enclosure

Clyde & Co US LLP is a Delaware limited liability partnership with offices in New York and San Francisco.

Clyde & Co US LLP is affiliated with Clyde & Co, a multinational partnership of lawyers regulated by The Law Society of England & Wales that practices from branch and affiliate* offices located in:
ABU DHABI BELGRADE* CARACAS DOHA DUBAI GUILDFORD HONG KONG LONDON MOSCOW NANTES PARIS PIRAEUS RIO DE JANEIRO SHANGHAI SINGAPORE ST PETERSBURG*

BY FAX

CLYDE&CO كلايد أند كو ال ل بي

City Tower 2
Suite 102
Sheikh Zayed Road
Dubai, United Arab Emirates
PO Box 7001
Telephone: +971 4 331 1102
Facsimile: +971 4 331 9920
Email: mark.beswetherick@clydeco.ae
www.clydeco.com

Holman Fenwick & Willan
Marlow House Lloyds Avenue
London
EC3N 3AL
United Kingdom
Fax: +44 20 7481 0316

Attn: James Gosling & Rory Butler

Lennon, Murphy & Lennon, LLC
GrayBar Building
420 Lexington Ave,
Suite 300
New York
NY 10170
Fax: (212) 490-6070

Our ref
MB/MRG/0705559/909822.1

Your ref

Date
19 August 2008

Dear Sirs

**JAMIE SHIPPING INC, BANK MANDIRI (EUROPE) LTD UK, PUFFIN MARINE INVESTMENT SA -V- OMAN INSURANCE COMPANY ("OUR CLIENT")**

We refer to Holman Fenwick & Willan's ("HFW") email dated 13 August 2008 (copy attached for ease of reference) in which HFW indicated that its clients are not prepared to accept a bank guarantee from Mashreq Bank ("Mashreq"), but would prefer to remain secured by cash funds.

In our client's view (which we share) that stance is wholly unreasonable and there is no justification for not accepting the proposed guarantee, which provides your client with adequate security in respect of the claims.

We are advised that, contrary to HFW's assertions in the email dated 13 August 2008, the court in New York will vacate the Rule B attachment provided adequate alternative security is offered: in our view it has been. Our client has now sought confirmation from Mashreq on the wording of the guarantee to be offered. We attach the draft approved wording by Mashreq, which is uncontroversial. Mashreq is prepared to issue this as a letter of credit via its New York branch (or if required via its London branch by way of for an equivalent bank guarantee).

If we do not hear from you by 4pm today (UK time) that the above offer is accepted by your client, we will take whatever steps are required to vacate the Rule B attachment without further notice to you. Any applications made will include a request that your clients be ordered to pay the costs on the grounds that they have behaved unreasonably in not accepting the offered guarantee/letter of credit.

INTERNATIONAL LAW FIRM  ABU DHABI  BELGRADE*  CARACAS  DOHA  DUBAI  GUILDFORD  HONG KONG  LONDON  MOSCOW  NANTES  NEW YORK
PARIS  PIRAEUS  RIO DE JANEIRO  SAN FRANCISCO  SHANGHAI  SINGAPORE  ST PETERSBURG*  Clyde & Co LLP offices and associated * offices

Clyde & Co LLP is a limited liability partnership registered in England and Wales under number OC326539. A list of members is available for inspection at its registered office 51 Eastcheap, London EC3M 1JP.
Clyde & Co LLP uses the word "partner" to refer to a member of the LLP, or an employee or consultant with equivalent standing and qualifications. Regulated by the Solicitors Regulation Authority

For the avoidance of doubt, any steps taken in New York to vacate the Rule B Attachment are explicitly without waiver of or prejudice to any rights our client has in respect of the current proceedings in the London High Court (Claim No. Folio 6 of 2008), including the right to apply for an anti-suit injunction.

We look forward to hearing from you by return.

Yours faithfully.

Clyde & Co LLP

CC. Christopher Carlson, New York Office

MASHREQ BANK LETTER OF CREDIT – TO BE
HEADED ON NEW YORK BRANCH LETTERHEAD
– DRAFT

TO:      JAMIE SHIPPING INC
         BANK MANDIRI (EUROPE) LTD UK
         PUFFIN MARINE INVESTMENT SA

         C/O HOLMAN FENWICK & WILLAN
         MARLOW HOUSE
         LLOYD'S AVENUE
         LONDON
         EC3N 3AL

REF: JAMIE SHIPPING INC (1) BANK MANDIRI (EUROPE) LTD (2) UK PUFFIN MARINE
INVESTMENT SA (3) V OMAN INSURANCE COMPANY, DOCKET NUMBER: 08CIV.6882
UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF NEW YORK

IN CONSIDERATION OF YOUR (1) RELEASING ALL ATTACHMENTS IN WHATSOEVER
AMOUNT IN ANY BANKS PURSUANT TO YOUR EX PARTE MARITIME ATTACHMENT
AND GARNISHMENT ORDER DATED 3 JULY 2008 ("THE GARNISHMENT ORDER")
INCLUDING YOUR ATTACHMENT AT [                      ] IN THE SUM OF $[       ],
AND AT [            ], IN THE SUM OF [        ] AND ANY OTHER ATTACHMENTS IN
ANY BANK IF ANY,
AND (2) WITHDRAWING THE GARNISHMENT ORDER AGAINST ALL PROPERTY
BELONGING TO, CLAIMED BY OR BEING HELD FOR OMAN INSURANCE COMPANY
("OIC") IN AN AMOUNT UP TO AND INCLUDING $3,558,738.50 (UNITED STATES
DOLLARS THREE MILLION, FIVE HUNDRED AND FIFTY EIGHT THOUSAND, SEVEN
HUNDRED AND THIRTY EIGHT AND FIFTY CENTS),
AND (3) REFRAINING FROM ATTACHING OR APPLYING TO ATTACH ANY PROPERTY
BELONGING TO, CLAIMED BY OR BEING HELD FOR OIC IN ANY JURISDICTION IN
ORDER TO OBTAIN FURTHER SECURITY IN RESPECT OF THE LONDON HIGH
COURT PROCEEDINGS COMMENCED BY YOU AGAINST OIC UNDER CLAIM NO. 2008
FOLIO 6 ON 4 JANUARY 2008  ARISING FROM THE SINKING OF THE "CANADIAN
CHALLENGER" ("THE CANADIAN CHALLENGER CLAIM") OR ANY OTHER
PROCEEDINGS ARISING FROM SUCH SINKING, AND/OR ANY PRESENT OR FUTURE
PROCEEDINGS ARISING FROM THE SINKING OF THE "AGATE ISLANDS" ("THE
AGATE ISLANDS CLAIM"),

WE, MASHREQ BANK, WHOSE REGISTERED OFFICE IS [                    ], AT THE REQUEST OF AND ON THE ACCOUNT OF OIC, ISSUE OUR IRREVOCABLE STANDBY LETTER OF CREDIT NUMBER [          ] ("THE STANDBY") IN FAVOUR OF: (1) JAMIE SHIPPING INC, (2) BANK MANDIRI (EUROPE) LTD, (3) UK PUFFIN MARINE INVESTMENT SA, FOR AN AMOUNT NOT TO EXCEED AN AGGREGATE TOTAL AMOUNT OF $3,558,738.50 (UNITED STATES DOLLARS THREE MILLION, FIVE HUNDRED AND FIFTY EIGHT THOUSAND, SEVEN HUNDRED AND THIRTY EIGHT AND FIFTY CENTS) ("THE AGGREGATE TOTAL AMOUNT"),

WE HEREBY UNDERTAKE TO YOU THAT PAYMENT BY US UNDER THIS STANDBY NOT EXCEEDING THE AGGREGATE TOTAL AMOUNT SHALL BE MADE WITHIN 14 BUSINESS DAYS FOLLOWING RECEIPT AT OUR NOMINATED SOLICITORS OFFICE, CLYDE & CO, PO BOX 7001, CITY TOWER 2, SHEIKH ZAYED ROAD, DUBAI, UNITED ARAB EMIRATES, OF THE FOLLOWING DOCUMENTS:

1     YOUR SIGHT DRAFT(S) DRAWN ON US OR YOUR WRITTEN PAYMENT DEMAND(S) FOR AN AMOUNT NOT EXCEEDING THE AGGREGATE TOTAL AMOUNT, AND

2     A COPY OF A FINAL NON-APPEALABLE JUDGMENT OF THE HIGH COURT IN LONDON IN THE CANADIAN CHALLENGER CLAIM AND/OR THE AGATE ISLANDS CLAIM, DULY CERTIFIED TO BE A TRUE COPY BY YOUR ENGLISH LAWYERS, HOLMAN FENWICK & WILLAN, AND ACCOMPANIED BY THEIR SIGNED AND DATED LETTER, ADDRESSED TO US, CONFIRMING THEREIN THAT THE ATTACHED COPY OF THE JUDGMENT INCLUDES A DIRECTION THAT OIC SHALL MAKE PAYMENT TO (1) JAMIE SHIPPING INC, (2) BANK MANDIRI (EUROPE) LTD, OR (3) UK PUFFIN MARINE INVESTMENT SA, WHICH IS EQUAL TO THE AMOUNT OF THE SIGHT DRAFT(S) DRAWN OR WRITTEN PAYMENT DEMAND MADE UNDER THIS IRREVOCABLE LETTER OF CREDIT BY (1) JAMIE SHIPPING INC, (2) BANK MANDIRI (EUROPE) LTD, OR (3) UK PUFFIN MARINE INVESTMENT SA, AND

3     A SIGNED AND DATED LETTER ISSUED BY YOUR ENGLISH LAWYERS, HOLMAN FENWICK & WILLAN ADDRESSED TO US AND CONFIRMING THEREIN THAT THE AMOUNT OF THE SIGHT DRAFT(S) DRAWN OR WRITTEN PAYMENT DEMAND MADE UNDER THIS IRREVOCABLE STANDBY LETTER OF CREDIT BY (1) JAMIE SHIPPING INC, (2) BANK MANDIRI (EUROPE) LTD, OR (3) UK PUFFIN MARINE INVESTMENT SA IS DUE AND PAYABLE TO THEM AND IS EQUAL IN AMOUNT AS MUTUALLY AGREED BETWEEN OIC AND (1) JAMIE SHIPPING INC, (2) BANK MANDIRI (EUROPE) LTD, OR (3) UK PUFFIN MARINE INVESTMENT SA.

PROVIDED ALWAYS THAT OUR LIABILITY HEREUNDER SHALL NOT EXCEED THE SUM OF THE AGGREGATE TOTAL AMOUNT INCLUSIVE OF ANY INTEREST, COSTS AND LEGAL FEES.

THIS IRRECOVABLE STANDBY LETTER OF CREDIT:
(1) IS NOT AN ADMISSION OF LIABILITY AND IS ISSUED WITHOUT WAIVER OF OR PREJUDICE TO ANY RIGHT OR DEFENSE WHICH OIC MAY HAVE ,INCLUDING, BUT

NOT LIMITED TO, ITS RIGHTS AND DEFENSES WITH RESPECT TO THE ALLEGATIONS ASSERTED AGAINST IT IN THE ABOVE REFERENCED PROCEEDINGS FILED IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND/OR THE LONDON HIGH COURT, AND ITS RIGHT TO CHALLENGE THE VALIDITY OF THE GARNISHMENT ORDER AND THE ATTACHMENTS, MADE PURSUANT THERETO, AND/OR THE PARTICULAR ELEMENTS AND AMOUNTS OF SECURITY SPECIFIED THEREIN,

(2) IS PERSONAL TO YOU AND MAY NOT BE ASSIGNED, AND

(3) THIS STANDBY SHALL EXPIRE ON [    ] AUGUST 2009 ("THE PRESENT EXPIRY DATE")

IT IS A CONDITION OF THE IRREVOCABLE LETTER OF CREDIT THAT IT SHALL BE DEEMED AUTOMATICALLY EXTENDED, WITHOUT AMENDMENT, FOR ADDITIONAL PERIOD(S) OF ONE YEAR FROM THE PRESENT EXPIRY DATE OR ANY FUTURE EXTENDED EXPIRATION DATE, UNLESS WE NOTIFY YOU IN WRITING, NOT LESS THAN 30 DAYS PRIOR TO ANY SUCH EXPIRATION DATE THAT WE HAVE ELECTED NOT TO EXTEND SUCH EXPIRATION DATE FOR SUCH ADDITIONAL PERIOD. UPON RECEIPT BY YOU OF SUCH NOTICE, YOU MAY DRAW HEREUNDER FOR AN AMOUNT NOT EXCEEDING THE THEN UNUSED BALANCE OF THIS STANDBY BY YOUR WRITTEN STATEMENT QUOTING OUR STANDBY NUMBER AND STATING THAT THE FUNDS WILL BE RETAINED AND USED BY YOU TO MEET ANY OF THE OBLIGATION(S) OF OIC AND, FURTHER, THAT IN THE EVENT THE OBLIGATION(S) ARE SATISFIED, YOU WILL REFUND TO US THE RESIDUAL UNUSED BALANCE OF THE AMOUNT PAID BY US TO YOU HEREUNDER.

THIS STANDBY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH ENGLISH LAW AND ANY DISPUTE ARISING HEREUNDER SHALL BE SUBMITTED TO THE EXCLUSIVE JURISDICTION OF THE ENGLISH HIGH COURT OF JUSTICE.

AUTHORISED SIGNATORY: ............................................

DATED: ............................................

```
***  TX REPORT  ***
***********************

TRANSMISSION OK

TX/RX NO                  1006
RECIPIENT ADDRESS         912124906070
DESTINATION ID
ST. TIME                  08/19 09:32
TIME USE                  01'22
PAGES SENT                10
RESULT                    OK
```



The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Telephone: 212 710 3900
Facsimile: 212 710 3950
www.clydeco.us
christopher.carlsen@clydeco.us

August 19, 2008

Via facsimile: (212) 490-6070

Mary Fedorchak, Esq.
Lennon, Murphy & Lennon, LLC
The Graybar Building
420 Lexington Avenue, Suite 300
New York, New York 10170

Re:  Jamie Shipping Inc. et al v. Oman Insurance Co.
     S.D.N.Y. Docket No. 08 Civ. 6882
     Your File No. 1526-08 SEALED
     Clyde & Co Ref: 0705559

Dear Ms. Fedorchak:

We are working with Clyde & Co's Dubai office in connection with the above-referenced matter. I enclose a copy of the letter sent by our Dubai office today to your office and Holman Fenwick & Willan in which Oman Insurance Company has offered to post security in the form of the enclosed Letter of Credit issued by Mashreq Bank in accordance with Rule E(5) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. Please confirm to me today that your client is willing to accept this Letter of Credit as security for the Ex Parte Order of Maritime Attachment and Garnishment issued in this matter, and release the funds that have been attached to date pursuant to that Order. If you believe that this proffered security is not adequate to protect your client's position, please tell me why to see if we can agree on language that is acceptable to your client. Please advise me of your position today so that, if necessary, we can seek Court involvement immediately in order to prevent further unnecessary disruption to our client's business operations.

EXHIBIT F





Opening the way
to your financial future

Introducing

On Arriva

The credit card th
UAE talking...

Settle in faster w
'On Arrival Packa

Mashreq reports
half year results

An employment r
nationals...

**Winning Weekends**
with all your Mashreq Credit
Cards
**Learn more >**

**MashreqMillionaire**
What would you do with AED
4,000,000?
**Learn more >**




About Us > Overview



## Welcome to Mashreq

Mashreq has provided banking and financial services to millions of customers and businesses since 1967.

We are the largest private bank in the United Arab Emirates (UAE) with a growing retail presence in the region including Qatar and Bahrain.

We focus on providing our customers access to a wide range of innovative products and services.

Mashreq is invariably among the highest performing banks in the region. Last year we recorded a Net Profit of over US$517 million from a Total Operating Income of $1,048 million. At the end of last year our Total Assets stood at $23.8 billion.

Our branch network extends across the UAE with one in every two households in the UAE banking with us. We also have customer service centres in key retail locations and one of the largest ATM networks in the country. We also have 12 overseas offices in nine countries, including Europe, US, Asia and Africa.

### Vision

To offer our customers the most rewarding banking relationships, financially and personally.

**Read more >**

### Organisation & Affiliates

At Mashreq, our board comprises seven Directors. All of them are highly respected business leaders.

**Read more >**

### History

Celebrating our 40th anniversary in May 2007, we have grown to its current position as the largest p bank in the UAE.

**Read more >**

### Financials

Mashreq has a track record is of healthy, consiste

**Read more >**

 mashreq المشرق

Locations > Overview



## Location Finder

Mashreq has one of the largest branch and ATM networks in the UAE as well as overseas offices in 11 countries and expanding operations across the GCC including Qatar, Bahrain and Egypt. Use the form below to find the location that is right for you.

| Location Type * | Branch |  |

Country *                     United States of America

Submit

### New York Branch (Exclusive Correspondent Banking Branch)

| Address | 50 Broadway Suite 1500, New York, NY 10004, USA |
| Telephone | +212 5458200 |
| Fax | +212 5450918 |

New Branches – Dubai
Jumeirah Beach Residences

Park Place

Abu Hail

Karama

New Branches – Abu Dhabi
Muroor II

Najdah

New Branches – Al Ain
Muwaiji



*State of New York Banking Department*

*Institutions We Supervise*
*Foreign Branches*
*As of August 18, 2008*

Allied Irish Banks, p.l.c.
405 Park Avenue
New York, NY 10022 4481

ABN AMRO Bank N.V.
55 East 52nd Street
New York, NY 10055 0002

Banca Monte dei Paschi di Siena S.p.A.
55 East 59th Street
New York, NY 10022 1112

Banco de La Nacion Argentina
225 Park Avenue
New York, NY 10169 0002

Banco do Brasil, S.A.
600 Fifth Avenue
New York, NY 10020 2302

Banco Bilbao Vizcaya Argentaria, S.A.
1345 Avenue of the Americas
New York, NY 10105 0302

Banco Del Estado de Chile
400 Park Avenue
New York, NY 10022 9464
Mail To : 400 Park Avenue, 22nd Floor
New York, NY 10022 9464

Banco Espanol de Credito, S.A.
730 Fifth Avenue
New York, NY 10019 0001

Banco Espirito Santo, S.A.
320 Park Avenue
New York, NY 10022 6815

Banco Itau, S.A.
540 Madison Avenue
New York, NY 10022 3265
Mail To : 540 Madison Avenue 24th Floor
New York, NY 10022 3265

Banco Popular de Puerto Rico
5 West 51st Street
New York, NY 10019 6901

Banco Santander, S.A.
45 East 53rd Street
New York, NY 10022 4604

Bank of Baroda
One Park Avenue

New York, NY 10016 5802

Bank of India
277 Park Avenue
New York, NY 10172 0001

Bank of Montreal
3 Times Square
New York, NY 10036 6520

Bank of Tokyo - Mitsubishi UFJ, Ltd.,
The
1251 Avenue of the Americas, 14th Floor
New York, NY 10020 1104

Bank Hapoalim B.M.
1177 Avenue of the Americas
New York, NY 10036 2790
Mail To : 1177 Avenue of the Americas
12th and 14th Floors
New York, NY 10036 2790

Barclays Bank PLC
200 Park Avenue
New York, NY 10166 0398

Bayerische Hypo-und Vereinsbank
Aktiengesellschaft
150 East 42nd Street
New York, NY 10017 5612

BNP Paribas
787 7th Avenue
New York, NY 10019 6083

Caixa Geral de Depositos, S.A.
280 Park Avenue, 28th Floor
(East Building)
New York, NY 10017 1216

Calyon
1301 Avenue of the Americas
New York, NY 10019 6022

Chang Hwa Commercial Bank, Ltd.
685 Third Avenue
New York, NY 10017 4024

Chiba Bank, Ltd., The
1133 Avenue of the Americas (15th Floor)
New York, NY 10036 6710

China Merchants Bank Co., LTD
509 Madison Avenue
New York, NY 10022

Chinatrust Commercial Bank, Ltd.
366 Madison Avenue
New York, NY 10017 7110
Mail To : 366 Madison Avenue, 3rd floor

New York, NY 10017 7110

Commerzbank Aktiengesellschaft
Two World Financial Center
New York, NY 10281 3204
Mail To : 2 World Financial Center, 33rd Floor
New York, NY 10281 3204

Cooperatieve Centrale Raiffeisen-Boeren
Leenbank B.A., Rabobank Nederland
245 Park Avenue
New York, NY 10167 0062

Credit Industriel et Commercial
520 Madison Avenue
New York, NY 10022 4213
Mail To : 520 Madison Ave. 37th floor
New York, NY 10022 4213

Credit Suisse
11 Madison Avenue
New York, NY 10010 3698

Depfa Bank plc
623 Fifth Avenue, 22nd floor
New York, NY 10022 6842

Deutsche Bank AG
60 Wall Street
New York, NY 10005 2858
Mail To : 60 Wall Street, 46th Floor
Mail Stop NYC60-4601
New York, NY 10005 2858

Dexia Credit Local S.A.
445 Park Avenue
New York, NY 10022 2606

DnB NOR Bank ASA
200 Park Avenue
New York, NY 10022 0396
Mail To : 200 Park Avenue (31st Floor)
New York, NY 10166 0396

Dresdner Bank AG
1301 Avenue of the Americas
New York, NY 10019 6163

DZ Bank AG Deutsche
Zentral-Genossenschaftsbank
609 Fifth Avenue
New York, NY 10017 1021

Eurohypo Aktiengesellschaft
1114 Avenue of the Americas
New York, NY 10036 7703

Fortis Bank S.A./N.V.
520 Madison Avenue
New York, NY 10022 4213

Gunma Bank, Ltd., The
780 Third Avenue
New York, NY 10017 2024
Mail To : 780 Third Avenue,
6th Floor
New York, NY 10017 2024

Habib Bank Limited
60 East 42nd Street
New York, NY 10165 0006
Mail To : 60 East 42nd Street
New York, NY 10165 0006

HSH Nordbank AG
230 Park Avenue
New York, NY 10169 0005
Mail To : 230 Park Avenue
New York, NY 10169 0005

Industrial Bank of Korea
1250 Broadway
New York, NY 10001 3798
Mail To : 1250 Broadway, 37th Fl.
New York, NY 10001

Intesa Sanpaolo S.p.A.
1 William Street
New York, NY 10004 2595

Kookmin Bank
565 Fifth Avenue
New York, NY 10017 2466
Mail To : 565 Fifth Avenue, 24th floor
New York, NY 10017 2466

Korea Development Bank, The
320 Park Avenue
New York, NY 10022 6815
Mail To : 320 Park Avenue, 32nd Floor
New York, NY 10022 6815

KBC Bank N.V.
1177 Avenue of the Americas
New York, NY 10036 2714
Mail To : 1177 Avenue of the Americas
New York, NY 10036 2714

Landesbank Baden - Wurttemberg
280 Park Avenue
New York, NY 10017 1244
Mail To : 280 Park Avenue,
31st Floor-West Building
New York, NY 10017 1244

Landesbank Hessen - Thuringen
Girozentrale
420 Fifth Avenue
New York, NY 10018 2712

Lloyds TSB Bank plc
1251 Avenue of the Americas
New York, NY 10020 1104
Mail To : 1251 Avenue of the Americas
39th Floor
New York, NY 10020 1104

Malayan Banking Berhad
400 Park Avenue
New York, NY 10022 4406
Mail To : 400 Park Ave, 9th floor
New York, NY 10022 4406

Mashreq Bank psc
50 Broadway
New York, NY 10004 6516
Mail To : 50 Broadway
Suite 1500
New York, NY 10004

Mega International Commercial Bank Co.,
Ltd
59-65 Liberty Street
New York, NY 10005 1018
Mail To : 65 Liberty Street
New York,, NY 10005 1018

Mitsubishi UFJ Trust and Banking
Corporation
520 Madison Avenue (39th Floor)
New York, NY 10022 4324

Mizuho Corporate Bank, Ltd.
1251 Avenue of the Americas
New York, NY 10020 1183

National Bank of Canada
65 East 55th Street
New York, NY 10022 3219

National Bank of Egypt
40 East 52nd Street
New York, NY 10022 5911

National Bank of Pakistan
100 Wall Street, 21st Floor
New York, NY 10005 3701

Natixis
1251 Avenue of the Americas
New York, NY 10020 0070
Mail To : 1251 Avenue of the Americas, 34th Floor
New York, NY 10020 0070

Norddeutsche Landesbank Girozentrale
1114 Avenue of the Americas, 37th Floor
New York, NY 10036 7703

Nordea Bank Finland Plc
437 Madison Avenue

New York, NY 10022 7001

Nordea Bank Norge ASA
437 Madison Avenue
New York, NY 10022 7001

Norinchukin Bank, The
245 Park Avenue
New York, NY 10167 0104
Mail To : 245 Park Avenue, 21st Floor
New York,, NY 10167 0104

Philippine National Bank
30 Broad Street
New York, NY 10004
Mail To : 30 Broad Street, 36th Floor
New York, NY 10004

Royal Bank of Scotland plc, The
101 Park Avenue, 10th & 11th Floor
New York, NY 10178 1199
Mail To : 101 Park Avenue
10th Floor
New York, NY 10178 1199

Shinhan Bank
600 Third Avenue
New York, NY 10016
Mail To : 600 Third Ave. 17th Floor
New York, NY 10016

Shinkin Central Bank
114 West 47th Street
New York, NY 10036 1510

Shoko Chukin Bank, The
666 Fifth Avenue
New York, NY 10103 0905
Mail To : 666 Fifth Ave., 14th Floor
New York,, NY 10103 0905

Skandinaviska Enskilda Banken
245 Park Avenue
New York, NY 10167 0061

Societe Generale
1221 Avenue of the Americas
New York, NY 10020 1092

Standard Chartered Bank
One Madison Avenue
New York, NY 10010 3666

State Bank of India
460 Park Avenue
New York, NY 10022 1972
Mail To : 460 Park Avenue, Second Floor
New York, NY 10022 1972

Sumitomo Mitsui Banking Corporation

277 Park Avenue
New York, NY 10172 0601
Mail To : 277 Park Ave., 6th Flr
New York, NY 10172 0601

Sumitomo Trust and Banking Company
Limited, The
527 Madison Avenue (3rd Floor)
New York, NY 10022 4396

Svenska Handelsbanken AB
875 Third Avenue
New York, NY 10022 6225

Swedbank AB
One Penn Plaza
New York, NY 10119 0002
Mail To : One Penn Plaza, 15th Flr.
New York, NY 10119 0002

T.C. Ziraat Bankasi
122 East 42 Street
New York, NY 10168
Mail To : 122 E. 42nd Street, Suite 310
New York, NY 10168

Toronto-Dominion Bank, The
31 West 52nd Street
New York, NY 10019 6101

Turkiye Vakiflar Bankasi T.A.O.
680 Fifth Avenue
New York, NY 10019 5429
Mail To : 680 Fifth Avenue, 23rd Floor
New York, NY 10019 5429

United Bank Limited
80 Broad Street
New York, NY 10004 2209
Mail To : 80 Broad St., 24th Floor
New York, NY 10004 2209

UniCredit Banca di Roma, S.p.A.
34 East 51st Street
New York, NY 10022 6898

UniCredito Italiano S.p.A.
150 East 42nd Street
29th and 32nd Floors
New York, NY 10017 5632

WestLB AG
1211 Avenue of the Americas
New York, NY 10036 8801

# EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JAMIE SHIPPING INC., PUFFIN MARINE
INVESTMENTS SA and BANK MANDIRI                    Case No.: 08 CV 6882(JFK)
(EUROPE) LTD., UK,

                        Plaintiffs,

            - against -

OMAN INSURANCE COMPANY,

                        Defendant.
-------------------------------------------------------------X

## ORDER

A motion having been made by Defendant to compel Plaintiffs, pursuant to Rule E(5)(a) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions to the Federal Rules of Civil Procedure, to accept an irrevocable letter of credit issued by Mashreq Bank as substitute security for $3,558,738.50 in funds attached by Plaintiffs pursuant to the *Ex Parte* Order of Maritime Attachment and Garnishment issued by this Court on July 31, 2008 ("Attachment Order"), and after due consideration of the parties' motion papers and the arguments of counsel:

It is hereby Ordered, Adjudged and Decreed:

1. That the proffered irrevocable letter of credit to be issued by Mashreq Bank is hereby approved by the Court, pursuant to Rule E(5)(a) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, as substitute security for the $3,558,738.50 attached pursuant to the Attachment Order;

2. That the maritime attachment of the Defendant's property in the hands of various garnishees in the within proceeding hereby be dissolved and vacated, and all garnishees holding

property belonging to the Defendant named in this action shall immediately release from attachment all property belonging to the Defendant restrained pursuant to this Court's Attachment Order; and

     3.  That this case shall proceed in ordinary course.

Dated: August 29, 2008
      New York, New York

                                 _____

                                 Hon. John F. Keenan
                                 United States District Judge

2

## AFFIDAVIT OF SERVICE BY HAND

STATE OF NEW YORK    )
                        ) ss.:
COUNTY OF NEW YORK )

      Kumar Rajh, being duly sworn, deposes and says that deponent is not a party of this

action, is over 18 years of age and resides in South Richmond Hill, New York. On August 22,

2008 deponent served the within **ORDER TO SHOW CAUSE** by hand upon:

Kevin J. Lennon, Esq.
Lennon, Murphy & Lennon
420 Lexington Avenue, Suite 300
New York, New York 10170

                                                    Kumar Rajh

Sworn to before me this
22nd day of August, 2008

      Notary Public

PATRICIA A. DONNELLY
Notary Public, State of New York
No. 01DO5067441
Qualified in New York County
Commission Expires Nov. 30, 2009

57472v1