UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JAMIE SHIPPING INC., PUFFIN MARINE INVESTMENTS SA and BANK MANDIRI (EUROPE) LTD., UK,

Case No.: 08 CV 6882(JFK)

Plaintiffs,

- against -

OMAN INSURANCE COMPANY,

Defendant.
------------------------------------------------------------X

**DEFENDANT OMAN INSURANCE COMPANY'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL PLAINTIFF TO ACCEPT AN IRREVOCABLE LETTER OF CREDIT AS SUBSTITUTE SECURITY PURSUANT TO RULE E(5) OF THE SUPPLEMENTAL RULES FOR ADMIRALTY OR MARITIME CLAIMS AND ASSET FORFEITURE ACTIONS**

## PRELIMINARY STATEMENT

Plaintiff's argument that Local Rule 65.1.1 controls the issue of the substitute security that it may be compelled to accept under Supplemental Rule E(5)(a) is wrong because Local Rule 65.1.1 does not apply to proceedings under Rule E(5)(a).

Defendant Oman Insurance Company ("OIC") maintains that Judge Lynch's decision in *Pancoast Trading S.A. v. Eurograni S.r.l.*, 2008 U.S. Dist. LEXIS 4224, 2008 A.M.C. 859 (S.D.N.Y. 2008), is not controlling here for two reasons: first, the substitute security offered in that case was "no more than an 'IOU' backed only by [plaintiff's] promise to pay." *Id.*, at 1. That is a very different situation from the irrevocable letter of credit offered by the multi-national, multi-billion dollar bank in this case. Second, the parties and the Court in *Pancoast Trading* did not address the threshold issue of whether Rule 65.1.1 should, or can, be applied to dictate the type of substitute security acceptable under Supplemental Rule E(5)(a).[1]

It is not clear whether Judge Lynch considered Local Rule 65.1.1 to be the exclusive list of substitute security that can and will be approved by the Court under Supplemental Rule E(5)(a) absent the agreement of the parties, or that it simply serves as a guideline for the Court's decision. Judge Lynch first stated that the Local Rule "provide[s] a firm *guideline* for what constitutes adequate security", but also later stated that "Local Rule 65.1.l(b) identifies the kinds of undertakings, guarantees or deposits *that constitute adequate security* where security is required." *Id.* at 2 (emphasis added). However, OIC respectfully submits that to the extent that *Pancoast Trading* holds that Local Rule 65.1.1 dictates the only acceptable forms of substitute security in this case, or even that Local Rule 65.1.1 should serve as a "firm guideline" for the

[1] The parties' motion papers, copies of which are available on Pacer, demonstrate that the parties did not even address the issue of whether Local Rule 65.1.1 properly could be applied to the issue of substitute security.

Court to follow in making its determination whether the proffered security is adequate, it is incorrect and should not be followed by this Court.

**ARGUMENT**

**I**

**LOCAL RULE 65.1.1 WAS NOT DESIGNED TO APPLY TO SUPPLEMENTAL RULE E(5)(a) PROCEEDINGS**

As is explained in detail in Section II below, under Supplemental Rule E(5)(a), a defendant has the absolute and unrestricted right to post any type of substitute security to obtain the release of its attached property – so long as the substitute security adequately protects the plaintiff's position in the litigation.

Rule A.1(b) of the Local Admiralty and Maritime Rules of the Southern and Eastern Districts of New York provides specifically that "[t]he Local Civil Rules also apply to the procedure in [claims and proceedings governed by the Supplemental Admiralty Rules], *except to the extent that they are inconsistent with* the Supplemental [Admiralty] Rules." *Id.* (emphasis added). Local Rule 65.1.1 would be inconsistent with Supplemental Rule E(5)(a) if it were applied because it would restrict the defendant's unfettered right to post any type of adequate security to only the three choices set forth therein.

Moreover, the numbering of Rule 65.1.1 further establishes that it was designed to apply to situations such as where a party is required to post security in connection with injunctive relief -- rather than the situation where substitute security is being posted in order to release property that was attached under Supplemental Rule B. Fed. R. Civ. P. 83(a) requires, in part, that local rules "must conform to any uniform numbering system prescribed by the Judicial Conference of the United States." Therefore, Local Rule 65.1.1 logically refers to Rules 65 and 65.1 of the Federal Rules of Civil Procedure. Federal Rule 65(c) provides for the giving of security in

connection with the issuance of a preliminary injunction or temporary restraining order, and Federal Rule 65.1 establishes that a surety on a bond or other undertaking agrees to submit to the court's jurisdiction with respect to its liability on that bond or undertaking.

Significantly, Federal Rule 65.1 contains the following introductory language to make it clear that it applies to admiralty proceedings: "Whenever these rules (including the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions) require or allow a party to give security." However, Local Rule 65.1.1(b) omits similar introductory language that would make it specifically applicable to admiralty proceedings, and instead begins with the phrase "[e]xcept as otherwise provided by law." This deliberate choice of wording, combined with the "except to the extent that they are inconsistent with the Supplemental [Admiralty] Rules" language in Rule A.1(b) of the Local Admiralty Rules noted above, establishes that Local Rule 65.1.1 was not designed to be applied to Supplemental Rule E(5)(a) proceedings.

In the context of this case, the language "except as otherwise provided by law" in Local Rule 65.1.1(b) refers to the fact that Supplemental Rule E(5)(a) provides that a defendant has an unrestricted right to post any type of adequate substitute security. Accordingly, the following provisions of that Local Rule do not apply to this case. *See also In the Matter of Slobodna Plovidba*, 1987 WL 20043 *1 (W.D. Mich., March 26, 1987)("[I]t is highly doubtful that [a local district court rule similar to Local Rule 65.1.1] was intended to apply in the specialized area of admiralty.")

## II

## LOCAL RULE 65.1.1 CANNOT BE APPLIED TO SUPPLEMENTAL RULE E(5)(a) PROCEEDINGS BECAUSE IT WOULD IMPERMISSIBLY ABRIDGE THE DEFENDANT'S RIGHT TO POST SUBSTITUTE SECURITY

Rule E(5)(a) provides that when a defendant's property is attached, the "property [shall be] released, on the giving of security, to be approved by the court." This language in no way restricts the type of security involved. The defendant has the absolute and unfettered right to have its property released so long as it provides substitute security that adequately protects the plaintiff's position in the litigation. "Should it wish, [the defendant] has the option of relieving itself of this particular attachment by posting *other security*." *Aqua Stoli Shipping, Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 444 (2d Cir. 2006)(emphasis added). Because Local Rule 65.1.1 would restrict the defendant to its three forms of security, it impermissibly would abridge the defendant's substantive right under Rule E(5)(a) to post other types of substitute security.

"[A] district court has discretion to adopt local rules that are necessary to carry out the conduct of its business. ... A district court's discretion in promulgating local rules is not, however, without limits. ... [Such local rules must be] consistent with 'the principles of right and justice.' ... [28 U.S.C.] Section 2071 requires that local rules of a district court 'shall be consistent with' the 'rules of practice and procedure prescribed by the Supreme Court.'" *Frazier v. Heebe*, 482 U.S. 641, 645, 107 S.Ct. 2607, 2611, 96 L.Ed.2d 557 (1987)(citations omitted)(striking down a local rule because its requirement that a member of the Louisiana bar live or maintain an office in Louisiana in order to apply for admission to the District Court's bar did not achieve any purpose and therefore was "unnecessary and irrational."). "[I]t is axiomatic that the Federal Rules of Civil Procedure trump inconsistent interpretations of local rules." *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004). "A

local rule need not be directly contradictory to a federal rule to be invalid; a local rule that is inconsistent with the purposes of a federal rule is also invalid." *O2 Micro Int'l Ltd. v. Monolithic Power Systems, Inc.*, 467 F.3d 1355, 1365 (Fed. Cir. 2006). "[A]ny inconsistencies between a local and a federal rule must be resolved in favor of the federal rule." *Stilloe v. Almy Brothers, Inc.*, 782 F. Supp. 731, 732 (N.D.N.Y. 1992).

> A local rule may 'dictate practice or procedure but may not enlarge, abridge or modify any substantive right." *In re Frayne Sunahara*, 326 B.R. 768, 782 (9th Cir. 2005)(*quoting Rivermeadows Assocs., Ltd. v. Falcey (In re Rivermeadows Assocs., Ltd.*), 205 B.R. 265, 269 (10th Cir. 1997)). "A local rule must be both constitutional and rational, and its subject matter must be within the ambit of the court's regulatory power. ... Even if a local rule does not contravene the test of a national rule, the former cannot survive if it subverts the latter's purpose. *See Hawes v. Club Ecuestre El Comandante*, 535 F.2d 140, 144 (1st Cir. 1976). Then, too, local rules should cover only interstitial matters. *See* Fed. R. Crim P. 57 advisory committee's note; *see also United States v. Horn*, 29 F.3d 754, 760 (1st Cir. 1994)(noting that a court's inherent power has definite limits). They may not create or affect substantive rights, *see* 28 U.S.C. §2072(b), or institute "basic procedural innovations," *Miner v. Atlass*, 363 U.S. 641, 650, 80 S.Ct. 1300, 4 L.Ed.2d 1462 (1960).

*Stern v. U.S. District Court for the District of Massachusetts*, 214 F.3d 4, 13 (1st Cir. 2000). *See also, Z.D. Bonner v. Adams*, 734 F.2d 1094, 1099 (5th Cir. 1984)(same).

Moreover, a "district court has the inherent power to decide when a departure from its Local Rules should be excused or overlooked." *Somlyo v. J. Lu-Rob Enterprises, Inc.*, 932 F.2d 1043, 1048 (2d Cir. 1991). "The district court's inherent discretion to depart from the letter of the Local Rules extends to every Local Rule regardless of whether a particular Local Rule specifically grants the judge the power to deviate from the Rule." *Id.* "Fairness is the standard that guides the district court in its exercise of that discretion." *Id.*, 1049. "The district court should ask whether the application of the letter of Local Rules to a particular case would cause

an unjust result. If faced with potential unfairness, the district court's determination of fairness may include, but is not limited to, a consideration of the facts of the case, the content and goal of the Local Rules, the legal precedent on analogous issues, and the letter and legislative intent of any relevant statute." *Id. See also Dedji v. Mukasey*, 525 F.3d 187,192 (2d Cir. 2008)("'[A] district court can depart from the strictures of its own local procedural rules where (1) it has a sound rationale for doing so, and (2) so doing does not unfairly prejudice a party who has relied on the local rule to his detriment.'")(*quoting U.S. v. Eleven Vehicles*, 200 F.3d 203, 215 (3d Cir. 2000)).

Because defendant OIC has the unfettered right under Supplemental Rule E(5)(a) to obtain the release of its attached property by posting substitute security of any type that adequately protects plaintiff's position, a local rule that would restrict or abridge that substantive right by limiting the choices of substitute security is invalid and cannot be applied. So long as it is adequately protected, it is immaterial to plaintiff what type of substitute security is posted in a Rule B case. The three types of security described in Local Rule 65.1.1 would not make plaintiff any "more secure" in its claim in this case than the proffered letter of credit, and application of that Local Rule to limit OIC's choices of substitute security to the exclusion of the letter of credit would not in any way serve to advance or achieve the purpose of Rule E(5)(a). Accordingly, Local Rule 65.1.1 cannot be applied to decide the question of whether OIC's proffered substitute security is acceptable because the strictures contained in that rule are "unnecessary and irrational." *See Frazier v. Heebe*, 482 U.S. at 645.

Moreover, plaintiff's suggestion that this Court refrain from exercising its discretion to determine whether the proffered letter of credit is adequate security, and instead default to the dictates of Local Rule 65.1.1, is inappropriate. *See Roth v. Bank of the Commonwealth*, 583 F.2d

527, 539 (6th Cir. 1978)(noting that a court's refusal to exercise its discretion by refusing to consider the question before it is improper because "it is inherent in the use of discretion that it be exercised and not neglected altogether.").

Maritime attachments arose, in part, because of the maritime defendants' ability to sail with its property out of the court's jurisdiction. *See Aqua Stoli Shipping, Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 443 (2d Cir. 2006)("Maritime parties are peripatetic, and their assets are often transitory."). To remedy this situation, Rule B was created to enable the plaintiff to: "first, to gain jurisdiction over an absent defendant; and second, to assure satisfaction of a judgment." *Id.*, at 437. However, because of its disruptive affect on the defendant's business operations, Rule E(5)(a) was created to afford the defendant the option of continuing to use his attached property provided he posted adequate substitute security. For example, suppose that instead of attaching wire transfers, plaintiff in this case had attached a shipment of defendant's watches stored in a New York City warehouse that defendant had contracted to sell to a third-party. If the defendant also had a shipment of jewelry of the same or greater value stored in the same warehouse, Rule E(5)(a) would afford him the absolute right, in the exercise of his discretion, to obtain the release of the watches (thereby allowing him to complete his business with his buyer) by posting the jewelry as substitute security. The concept is no different in this case. The proffered letter of credit is of equal value to the attached funds, and it use as substitute security will not in anyway prejudice plaintiff's position in this case.

This result is further compelled by the equities of the situation presented by this attachment. An attachment is easily obtained under Rule B. *See Aqua Stoli*, 460 F.3d at 443 (describing Rule B as "a relatively broad maritime attachment rule, under which the attachment is quite easily obtained."). Plaintiff has attached more than $3,558,738.50 of OIC's money

without having to prove a single allegation set forth in his Complaint, and indeed without even having commenced one of the two underlying arbitrations in London. It would be especially unfair under these circumstances to allow plaintiff the power to dictate the type of substitute security the defendant must post to release its property – without regard to the issue of whether the proffered substitute security adequately protects plaintiff's position. *See Somlyo*, 932 F.2d at 1049(Fairness is the standard used to determine whether a court should exercise its discretion to disregard the application of a Local Rule).

Plaintiff's attempt to dismiss the cases cited by OIC as "not truly support[ing] Defendant's position" is without merit. The fact that these cases involved proceedings under Rule F instead of Rule B is meaningless because they involve the identical concept presented by this motion – that a defendant is not restricted to any particular form of substitute security (provided it does not prejudice the plaintiff's position), and the Court has the discretion to determine what is adequate security. *See In the Matter of Slobodna Plovidba*, 1987 WL 20043 (W.D. Mich., March 26, 1987); *In the Matter of A&J Towing, Inc.*, 1997 WL 289396 (E.D. La., May 29, 1997); *Karim v. Finch Shipping Co.*, 1998 WL 713396 (E.D. La. October 6, 1998). Copies of these unpublished decisions are attached hereto as Exhibit "A." *See also Acacia Vera Navigation Co., Ltd. v. Kezia, Ltd.*, 78 F.3d 211, 214 n.8 (5th Cir. 1996)("A letter of undertaking (LOU) is another form of security allowed to secure the release of a vessel in an in rem action under Fed. R. Civ. P. Supp. Rule E(5)(a)."); *L&L Marine Transportation, Inc. v. M/V Hokuetsu Hope*, 895 F. Supp. 297, 300 (S.D. Al. 1995)("A letter of undertaking serves as adequate security to release a vessel."); *Maritima Antares, S.A. v. Vessel Essi Camilla*, 633 F. Supp. 694, 695 (E.D. Va. 1986)("A letter of undertaking provides an equally acceptable means of warranting payment of damage awards.").

Finally, plaintiff's half-hearted attempt to infer that unspecified questions may exist as to the creditworthiness of Mashreq Bank is completely without merit. Attached hereto as Exhibit "B" is a copy of Mashreq Bank's 2007 Annual Report detailing its financial assets and condition. This report, as well as the bank's annual reports for the preceding seven years, easily are accessible on Mashreq Bank's website at http://www/mashreqbank.com/about-us/financials/annual-reports.asp. If plaintiff truly had a realistic concern about the financial security of the letter of credit offered by this multi-national, multi-billion dollar financial institution, with offices in New York operating under the supervision of the New York State Banking Department, it presumably would have brought that fact to the Court's attention.

Accordingly, OIC respectfully submits that the Court should determine that a letter of credit is an acceptable form of substitute security that may be compelled on a plaintiff under Supplemental Rule E(5)(a), and that the letter of credit proffered by OIC constitutes adequate security in this case.

**CONCLUSION**

OIC respectfully requests that its motion to compel be granted in all respects.

Dated: September 2, 2008
New York, New York

Respectfully submitted,

By____________________________

Christopher Carlsen (CC 9628)
CLYDE & CO US LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
(212) 710-3900

Attorneys for Defendant
Oman Insurance Company

# EXHIBIT A

Not Reported in F.Supp., 1987 WL 20043 (W.D.Mich.), 1987 A.M.C. 2209

United States District Court, W.D. Michigan, Northern Division.
In the Matter of the Petition of SLOBODNA PLOVIDBA, an agency of the Government of Yugoslavia, as owners of the M/V JABLANICA for Exoneration from or Limitation of Liability.
No. M86-209 CA3.
March 26, 1987.

Foster, Meadows & Ballard, P.C., Robert N. Dunn, Detroit, Mich., for petitioner.

Leonard C. Jaques, The Jaques Admiralty Law Firm, P.C., Detroit, Mich., for claimants.

*ORDER DENYING CLAIMANTS' MOTION TO INCREASE SECURITY AND FOR FILING OF A SURETY BOND*

STEPHEN W. KARR, United States Magistrate.

**1* This is a petition under the Limitation of Liability Act, 42 U.S.C. § 181 *et seq.,* as amended. Petitioner Slobodna is an agency of the Yugoslav government and owner of the vessel *M/V Jablanica.* Claimants are personal representatives of three fishermen killed when their boat collided with the *Jablanica* in the waters of upper Lake Michigan off Charlevoix County.

The purpose of Slobodna's petition is to limit its potential tort liability to the value of the *Jablanica* and her freight pursuant to 46 U.S.C. § 183(a). In compliance with 46 U.S.C. § 185 and Fed.R.Civ.P. Supplemental Rule F(1), Slobodna tendered to this court a "Letter of Undertaking" for a sum in excess of $2.6 million. Judge Hillman, by *ex parte* order dated November 17, 1986, accepted the tender as adequate security for an amount equal to the appraised value of the *Jablanica* plus freight, costs and interest.

Claimants are dissatisfied with both the form and amount of security thus far provided by the shipowner. Their present motion therefore asks the court to order Slobodna to file a "surety bond" in the augmented amount of $7.6 million. For the reasons set forth below, the court denies the motion.

*Form of Security*

Slobodna's security is currently in the form of a "Letter of Undertaking" signed by the United Kingdom Mutual Steam Ship Assurance Association (Bermuda) Ltd. (UKMA). By the terms of this instrument UKMA submits to this court's jurisdiction and agrees to pay any judgment against Slobodna up to $2.6 million. On its face this would appear to be adequate security, and Judge Hillman so found on November 17, subject to redetermination pursuant to Supplemental Rule F(7).

Nevertheless, claimants object to this "undertaking" as merely a bare promise by a foreign entity. They assert that Slobodna must produce a domestic formal surety bond, relying on a local court rule and *Matter of Compania Naviera Marasia, S.A., Atlantico,* 466 F.Supp. 900 (S.D.N.Y.1979).

Slobodna responds in effect that UKMA is the largest marine underwriter in the world, and that its "undertaking" is just as good as any other available commercial security. It adds further that the sovereign nation of Yugoslavia should not be put to the harassment and expense of procuring a corporate surety bond.

The court agrees with Slobodna. Supplemental Rule F(1) and 46 U.S.C. § 185 speak only in terms of "approved security", not "domestic corporate surety bonds". Likewise, Fed.R.Civ.P. 65.1, which refers to the giving of security required by "these rules, including the Supplemental Rules for Certain Admiralty and Maritime Claims," provides for security "given in the form of a bond or stipulation or

*other undertaking* " (emphasis added).[FN1] Thus, the statutes do not appear to mandate any particular form of security. A local rule of court does generally require that security undertakings must be executed by surety companies approved by the Treasury Department. W.D.Mich.R. 37(b). Presumably, UKMA is not on the Treasury list. However, Rule 37(b) is part of a section of the local rules that addresses "Actions in General", and it is highly doubtful that it was intended to apply in the specialized area of admiralty. Hence, the court does not believe that Rule 37(b) should control the question of the adequacy of UKMA's "Letter of Undertaking".

***2** Turning to the surprisingly sparse case law, the court notes that the *Atlantico* decision does support claimants' position. There the court approved as security a "Letter of Undertaking" identical to that issued by UKMA in this case, but it made clear that the approval was conditioned on the absence of objection from any claimant. 466 F.Supp. at 903. Approval was based on the fact that "Letters of Undertaking" are common and customary forms of security in the shipping trade. *Id* at 902. The court further held, however, that in the event of objection the shipowner would be required to post a bond issued by a Treasury Department-approved corporation. *Id* at 903.

The court accepts the actual result of *Atlantico,* but rejects the "claimant objection" exception discussed therein. The exception gives to claimants "an absolute right" to reject sureties. 466 F.Supp. at 903. Such an untrammeled right in effect transfers the power to determine what is "approved security" from the court to claimants, which flies in the face of the language and intent of 46 U.S.C. § 185 and Fed.R.Civ.P. Supplemental Rule F(1). In other words, security approval matters should be within the discretion of the court, not the parties. *See New York Marine Managers v. Helena Marine Service,* 758 F.2d 313, 317 (8th Cir.), *cert. denied,* 106 S.Ct. 148 (1985).

In the absence of any proper guidance from the authorities discussed above, the court concludes that it must exercise the discretion alluded to in *New York Marine Managers* by balancing the parties' interests. Claimants obviously possess an important stake in ensuring that Slobodna produces a reputable surety from whom they can collect any judgment with reasonable ease. The court has no doubt that UKMA is a responsible insurer, and not a fly-by-night foreign question mark. *See* 7A *Benedict on Admiralty* § 1.01 (7th ed. 1986) (Rules of United Kingdom Mutual Steam Ship Assurance Association (Bermuda) Ltd. listed first in volume of Protection and Indemnity Club Rules). Furthermore, it does not seem likely that claimants would experience much difficulty in holding UKMA to its "Letter of Undertaking". This is because there is little realistic probability that UKMA would jeopardize its good name in the marine insurance business by defaulting on an obligation to a government shipowner to pay the relatively moderate (by insurance standards) amount of $2.6 million. Therefore, any increased collectibility interests claimants may have in forcing Slobodna to substitute a domestic corporate surety bond for UKMA's "Letter of Undertaking" must be viewed as rather slight.

Slobodna's interest in opposing claimant's motion is monetary. It simply does not wish to incur the added expense of procuring a surety bond. In weighing this interest, the court cannot close its eyes to the fact that petitioner is a governmental agency of a foreign sovereign. Although Slobodna must comply with our law when plying its ships in American waters, the court recognizes that an order requiring the filing of a surety bond is equivalent to an order for expenditure from the Yugoslav treasury. Protection of the national fisc is certainly an important interest. Given that UKMA's "Letter of Undertaking" is as a practical matter adequate, the court concludes that Slobodna's interest outweights that of claimants on this issue. Accordingly, the motion to change the form of security is denied.

*Amount of Security*

***3** Claimants base this portion of their motion upon Fed.R.Civ.P. Supplemental Rule F(7), which states in pertinent part that:

any claimant may demand that the deposit or security be increased on the ground that it is insufficient to carry out the provisions of the statutes relating to claims in respect of loss of life or bodily injury; and, after notice and hearing, the court may similarly order that the deposit or security

be increased or reduced.

The statutes mentioned in Rule F(7) are the "Loss of Life" amendments to the Limitation of Liability Act. Specifically material here is 46 U.S.C. § 183(b):

(b) In the case of any seagoing vessel, *if the amount of the owner's liability as limited under subsection (a)* of this section *is insufficient to pay* all losses in full, and the portion of such amount applicable to the payment of losses in respect of *loss of life or bodily injury* is less than $420 per ton of such vessel's tonnage, *such portion shall be increased to an amount equal to $420 per ton,* to be available only for the payment of losses in respect of loss of life or bodily injury. If such portion so increased is insufficient to pay such losses in full, they shall be paid therefrom in proportion to their respective amounts.

(emphasis added).

Claimants argue that the $2.6 million (the § 183(a) fund) put up thus far by Slobodna is insufficient to cover their personal injury and wrongful death damages. They therefore ask the court to order Slobodna to increase its security to $420 per ton of the *Jablanica,* or approximately $7.6 million (the § 183(b) fund). Claimants argue that the $2.6 million security is inadequate in light of their aggregate claims of compensatory and punitive damages totaling $22 million. The damage figures are based upon pain and suffering, loss of support, consortium etc. by the respective spouses, children, parents and siblings of the deceased middle-aged fishermen.

Slobodna responds that claimants' damage calculations are outrageously high given that one fisherman (Peterson) was survived only by a parent, and another (Perkins) only by his spouse and no minor children. Slobodna also raises two legal arguments against an increase in security. First, it argues that the setting up of a § 183(b) fund is not appropriate until it has *in fact* been determined that the § 183(a) fund is insufficient to cover loss of life and bodily injury damages; i.e., the § 183(b) fund cannot be created until after the merits have been tried and the court has ascertained actual and punitive damages. There is some support for this argument in old case law, and a major admiralty treatise suggests that the literal terms of § 183(b) ( *is* insufficient, not *may be* insufficient) are consistent with this approach. *See The Park Victory* (Petition of Luckenbach S.S. Co.), 1953 A.M.C. 808 (S.D.N.Y.1953); G. Gilmore & C. Black, *The Law of Admiralty,* 920 (2 ed. 1975).

However, modern courts have concluded that it is "sensible" to order a § 183(b) increase in security before trial where the amount of claimed damages greatly exceeds the value of the ship (the § 183(a) fund). *Complaint of Panoceanic Tankers Corp. (The Panoceanic Faith),* 332 F.Supp. 313 (S.D.N.Y.1971); *Petition of Alva Steamship Co. Ltd (The Alva Cape),* 262 F.Supp. 328 (S.D.N.Y.1967). Slobodna characterizes the approach taken in these cases as an "exception" to the "general rule" reflected in *Park Victory,* and its second argument is based on the assertion that the present case does not involve a disparity between claimed damages and the § 183(a) fund of sufficient magnitude to warrant the exceptional treatment accorded claimants in *Panoceanic Faith* and *Alva Cape.*

**4* The court concludes that it need not further address either party's contentions, because the augmentation of security issue is controlled by authority not cited in their briefs and oral arguments. In *Complaint of Caribbean Sea Transport Ltd.,* 748 F.2d 622 (11th Cir.1984), *reh'g denied,* 753 F.2d 948 (1985), the Court of Appeals initially noted that "the law is not clear as to when, how, and under what conditions the court can order additional security posted under § 183(b)." 748 F.2d at 628. After a thorough, well-reasoned discussion of the issue, the court concluded as follows:

However, section 183(b) does provide that the owner's liability to personal injury claimants will be increased only if the section 183(a) fund "is insufficient to pay all losses in full." Thus we think that personal injury claimants must make a clear, preliminary showing that the section 183(a) fund will be insufficient to cover all personal injury claims before a court should augment that fund under section 183(b). We hold that in order to augment the security fund pursuant to section 183(b), the district court must make preliminary determinations of the nature and extent of personal injury claims and the likelihood of recovery based on those claims, including that there is a likelihood that the section

183(a) fund will be insufficient to pay those claims in full. This will usually require some sort of evidentiary hearing. We emphasize that the product of such a hearing does not represent a final adjudication of liability and damages, but merely represents a preliminary appraisal of the ship owner's exposure to damages.

*Id.* at 628-29. The language of the Eleventh Circuit in *Caribbean Sea Transport* makes clear that the burden of showing that the shipowner faces likely exposure to damages in excess of the § 183(a) fund rests with the personal injury claimant. Placing the burden on the claimant is consistent with the pro-shipowner purposes of the Limitation of Liability Act.

A hearing was held on this motion on March 23, 1987. At that proceeding claimants introduced no testimony or other evidence bearing upon the "nature and extent of personal injury claims" involved in this case (other than counsel's statement that the three fishermen drowned), or "the likelihood of recovery based on those claims", or the "likelihood that the § 183(a) fund will be insufficient to pay those claims in full." Claimants therefore patently failed to carry the burden of preliminary persuasion delineated in *Caribbean Sea Transport.* Accordingly, their motion to increase security is also denied.

FN1. Claimants cite as additional authority for their position 6 U.S.C. § 7. This statute was repealed five years ago. Act of September 13, 1982, § 5(b), Pub.L. No. 97-258, 96 Stat. 1085. Its successor, 31 U.S.C. § 9306, applies only in situations where a "surety bond" is required by law. *See* 31 U.S.C. § 9304. As stated above, applicable statutes do not refer to "surety bonds".

W.D.Mich.,1987.
Matter of Petition of Slobodna Plovidba
Not Reported in F.Supp., 1987 WL 20043 (W.D.Mich.), 1987 A.M.C. 2209

END OF DOCUMENT

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 289396 (E.D.La.)

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, E.D. Louisiana.
In the Matter of A. & J. TOWING, INC., as owner of the M/V SEAHORSE
Civ. A. No. 97-0548.
May 29, 1997.

DUVAL

*1 Before the court is a motion filed by Respondent Pearl Bodden de Mosquitto requesting an entry of summary judgment dismissing Petitioner A. & J. Towing, Inc.'s ("A. & J.'s") limitation of liability action. Alternatively, Mosquitto seeks the following forms of relief: (1) an order dissolving the stay that restrains further proceedings against A. & J. for claims arising out of the incident described in the complaint, (2) an order vacating the court's acceptance of A. & J.'s Letter of Undertaking deposited as security for the casualty loss, (3) an order adjusting the court-approved limitation fund, (4)an order requiring A. & J. to deposit cash or bond as approved security for the amount of the limitation fund.

Mosquitto's Motion for Summary Judgment was initially set for hearing on April 2, 1997 but was subsequently reset for April 16, 1997. Having considered the pleadings and applicable law as well as the posture of this case, the court finds that the Motion for Summary Judgment, as well as all requests for alternative relief should be denied with the exception of Mosquitto's request for adjustment of the limitation fund.

## A. Motion for Summary Judgment

### 1. The Parties

Respondent Mosquitto's husband was a crewmember aboard the M/V FLORIDA SEAHORSE at the time that it was towing the SUARD IV from astern. According to the marine casualty report, the SEAHORSE's towline began to "yaw," or veer from side to side, until it broke loose of the Norman pins, whose purpose is to ensure the towline is directed aft. The towline then struck and killed Mosquitto's husband.

Petitioner A. & J. Towing, Inc., owner of the SEAHORSE, seeks exoneration from damages or limitation of liability for the accident pursuant to 46 U.S.C. section 183 *et seq.* and Rule F of the Supplemental Rules of Admiralty and Maritime Claims of the Federal Rules of Civil Procedure. These statutory provisions entitle shipowners who comply with certain procedural requirements to limit liability following maritime accidents that occur without their knowledge or privity. In an effort to comply with statutory mandates, A. & J. posted security in the form of a Letter of Undertaking that valued the company's casualty loss at $400,000. The court subsequently accepted this affidavit of value.

### 2. Bases for Summary Judgment

Mosquitto seeks summary judgment on grounds that the Letter of Undertaking that A. & J. posted as security for its interest in the casualty loss in compliance with Rule F(1) and 46 U.S.C. section 185 is invalid because it: (1) does not constitute "approved security" within the meaning of the statute, (2) misidentifies the casualty, and (3) contains a knowingly false and incomplete valuation of the casualty loss.

3. Standard for Motion for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Stults v. Conoco,* 76 F.3d 651, 656 (5th Cir.1996). When the moving party has carried its burden under Rule 56(c), the adverse party must set forth "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Tubacex, Inc. V. M/V Risan,* 45 F.3d 951, 954 (5th Cir.1995). "Facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). With these standards in mind, the court turns to the merits of the arguments.

4. Analysis

***2** The Letter of Undertaking is not invalid for summary judgment purposes. As a general matter, Rule F does not foreclose the use of letters of undertaking as security for limitation petitions. Rule F (1) states that a petitioner seeking to limit liability "must deposit with the court, for the benefit of claimants, a sum equal to the amount of the value of his interest in the vessel and pending freight, or approved security, therefor ..." However, the statute does not mandate a particular form that such security must take.

Furthermore, in *In The Matter of Slobodna Plovidba,* 1987 A.M.C. 2209, the court approved the use of a letter of undertaking as adequate security, having observed that "security approval matters should be within the discretion of the court, not the parties." *Id.* at 2211-12. Thus, Mosquitto's suggestion that "approved security" encompasses only cash and bonds comports with neither the statutory language nor the case law.

Mosquitto's contention that a letter of undertaking cannot be accepted where, as here, a claimant objects to its use is also rejected. Mosquitto correctly points out that in *In The Matter of Compania Naviera Marasia S.A. Atlantico,* 466 F.Supp. 900, 903 (S.D.N.Y.1979), the court conditioned its approval of a letter of undertaking on claimants' lack of objection. However, in *Plovidba,* the court rejected the objection-exception after expressing concern that it would transfer from courts to claimants the "absolute right" to determine what constitutes "approved security." 1987 A.M.C. 2209 at 2211-12.

The court also finds that A. & J.'s inaccurate description of the location of the casualty does not render the Letter of Undertaking invalid for summary judgment purposes. Both A. & J.'s complaint and the Letter of Undertaking state that the accident occurred on the Mississippi River. However, according to the U.S. Coast Guard report, the incident took place in the Gulf Intracoastal Waterway in Lafourche Parish, Louisiana. Mosquitto contends that A. & . J.'s incorrect statements invalidate its Letter of Undertaking. The court rejects this argument.

No statutory provision requires that "approved security" make any reference to the circumstances surrounding a given casualty. According to Rule F(2), *complaints* in limitation proceedings "shall state," *inter alia,* "whether the vessel was damaged, lost, or abandoned, and, if so, when and *where"* (emphasis added). Yet this section is inapplicable to A. & J.'s Letter of Undertaking, which does not constitute a complaint.

To the extent that the mistaken reference renders the complaint defective, such defect may be cured by amendment under the relation back doctrine of Rule 15 of the Federal Rules of Civil Procedure. Rule 15(a) authorizes courts to give a party leave to amend its pleadings "when justice so requires" once more than 20 days have elapsed since the adverse party has been served. In light of

this directive and the role that equitable considerations play in limitation actions, the court permits A. & J. to amend its complaint.

**3* In *Moore-McCormack Lines, Inc. V. Richardson,* 295 F.2d 583, 597 (2d Cir.1961), the court stated that a limitation proceeding is "the administration of equity in an admiralty court and all the ease with which rights can be adjusted in equity is intended to be given to the proceeding." The equitable considerations weigh in A. & J.'s favor in this case. The general requirement of Rule F(2) is that complaints "set forth the facts on the basis of which the right to limit liability is asserted and all facts necessary to enable the court to determine the amount to which the owner's liability shall be limited."

Despite the inaccurate reference to the location of the accident, A. & J.'s complaint alleges sufficient facts to satisfy both requirements. Furthermore, any potential prejudice to Mosquitto that might have resulted from the misidentification has been rectified by the fact that the U.S. Coast Guard report has apprised both parties of the true location of the incident. In light of the foregoing analysis, A. & . J.'s error does not support the motion for summary judgment.

The court also finds that A. & J.'s valuation of the casualty loss fails to provide sufficient justification for Mosquitto's motion. A. & J. enlisted a marine expert to appraise the value of its vessel and pending freight, pursuant to Rule F(1). According to 46 U.S.C. section 185, Note 11, this type of appraisal is the usual method by which the value of vessels are ascertained in limitation proceedings.

Mosquitto has made numerous allegations with respect to A. & J.'s valuation that raise genuine issues of material fact that must be resolved by the trier of fact. These factual matters include: whether A. & J. acted in "bad faith" by hiring a "friendly surveyor" and by failing to disclose insurance payments, improvements and renovations that increased the boat's value; whether or not the appraisement incorporates the value of the SEAHORSE's "pending freight" as is required under Rule F (1)(Mosquitto claims that it does not but the Letter of Undertaking expressly states otherwise); and whether the valuation is as of the date on which the accident occurred or the date of the termination of the voyage, which Rule F(1) requires.

Contrary to Mosquitto's assertion, the Letter of Undertaking is not invalid because of A. & . J.'s failure to value the SEAHORSE's tow. Mosquitto has argued that the "flotilla rule" requires that both the tug and barge be included in the security, citing *The CARROLL,* 60 F.2d 985, 987 (D.C.Md.1932) to support this proposition.

More modern cases have rejected the "flotilla rule" where, as here, there is no common ownership of the barge and tow. *See Cenac Towing Co., Inc. V. Terra Resources, Inc.,* 734 F.2d 251, 254 (5th Cir.1984) (the flotilla doctrine requires the tender of all the vessels in a flotilla where they were "not only owned by the same person, but were also both engaged in a common enterprise and under a single command"). *See also In Re Archer Daniels Midland Co.,* 1995 WL 600892, *1 (E.D.La.10/11/95) (holding that all three of the *Cenac* factors-common ownership, common enterprise, and single command-must be present for the flotilla doctrine to apply).

**4* Because A. & J. had no interest in the SEAHORSE's tow, the common ownership requirement of *Cenac* is not satisfied and the flotilla doctrine does not apply. Therefore, A. & . J.'s security does not fail for excluding the value of the tow.

B. Alternative Motion for Dissolution of the Stay

Having denied the Motion for Summary Judgment, the court addresses Mosquitto's request for alternative relief. The court first finds that it would be improper to lift the stay at this time.

In granting A. & J.'s request for a stay of proceedings, the court exercised its injunctive power pursuant to Rule F(3). This provision authorizes courts to enjoin any further proceedings relating to a limitation claim against a shipowner who has complied with the procedural requirements of Rule F(1). Courts have recognized the "inherent conflict" between this provision, which grants exclusive federal

jurisdiction over limitation proceedings, and the "savings to suitors" clause, 28 U.S.C. 1333, which preserves claimants' right to pursue state law based claims. *In Re Complaint of Port Arthur Towing, Co.*, 42 F.3d 312 (5th Cir.1995) at 315. Courts have alleviated this tension by recognizing two situations in which the bar of Rule F(3) may be lifted: (1) the single-claim-inadequate-fund situation and (2) the multiple-claim-adequate-fund situation.

Despite Mosquitto's characterization of the case at bar as a single claim scenario, the court is convinced that it more closely resembles the multiple claim situation. Mosquitto has expressed an intention to bring actions against a number of different parties that may cross-claim against A. & J. for contribution or indemnification (Respondent's Defenses Contesting Right to Limitation, pp. 11-12). In *Odeco Oil & Gas. Co., Drilling Division v. Bonette*, 4 F.3d 401 (5th Cir.1993), the court held that [p]arties seeking indemnification or contribution from a shipowner must be considered claimants within the meaning of the Limitation Act. *Id.* at 404.

Whether or not Mosquitto has already filed suit against other parties is irrelevant to the analysis. In *Kattelman v. Otis Engineering, Corp.*, 650 F.Supp. 1111 (E.D.La.1988), the court held that "... where, as here, a *potential* set of circumstances exists in which the shipowner could be held liable for indemnification, a multiple claimant situation emerges ..." (emphasis added). *Id.* at 1115. *See Bonnette, supra*, 4 F.3d 401, 405 (in deciding whether to lift the stay in a limitation proceeding, the district court should have considered potential claims for contribution or indemnity, even though such claims had not yet materialized). Thus, the mere possibility that other litigants will seek indemnification or contribution in excess of the limitation fund suffices to create a multiple claimant situation.

Cross-claims for contribution and indemnification by co-defendants against a limitation fund can create multiple-claimant- *inadequate*-fund situations for which the court recognizes no exception to Rule F(3). To prevent such a situation from arising, courts require that claimants make certain stipulations that preserve shipowners' right of limitation.

**5* Before a court can dissolve a stay where multiple claimants are involved, all claimants must stipulate that they: (1) concede the sufficiency in amount of the stipulation of value contained in the limitation petition, (2) consent to waive any claim of res judicata relevant to the issue of limited liability based on any judgment obtained in state court, and (3) concede the shipowner's right to litigate all issues relating to limitation in the limitation proceeding. *In Re Mister Wayne*, 729 F.Supp. 1124 (E.D.La.1989) at 1128. The court finds that the stipulations in this case are inadequate to fully protect A. & J.'s limitation rights.

First, none of A. & . J.'s potential codefendants has agreed to the stipulations, which means that dissolution of the stay could impermissibly expose A. & . J. to liability in excess of the limitation fund. *See In Re Complaint of Port Arthur Towing*, 42 F.3d at 312 (trial court's refusal to lift a stay was proper where stipulations failed to bind all necessary parties)

Furthermore, the stipulations do not restrict Mosquitto's right to recover an amount exceeding the limitation fund. The case law is well-settled that a party seeking dissolution of a stay need not concede the shipowner's stipulation of value. However, even in cases where this value is disputed, plaintiffs must agree to limit their recovery. *See In Re Two "RI" Dilling Co., Inc.*, 943 F.2d 576, 577 (5th Cir.1991) (plaintiffs properly stipulated that no judgment would be enforced above the valuation of the vessel and freight contained in the complaint). *See also Magnolia Marine Transport v. Laplace Towing Corp.*, 964 F.2d 1571, 1575 (5th Cir.1992) (to be sufficient, stipulations must state that no judgment will be asserted in excess of the value of the limitation fund). Despite Mosquitto's acknowledgement of the exclusive jurisdiction of the admiralty court with respect to limitation issues, she has not agreed to restrict any recovery she may receive pursuant to state-law.

In sum, Mosquitto's failure to bring all necessary parties into the agreement and to limit the amount of potential relief that she stands to gain leaves A. & J. inadequately protected. Therefore, the court denies the motion to dissolve the stay.

C. Additional Requests for Alternative Relief

Lastly, the court turns its attention to Mosquitto's requests for an order vacating the limitation court's acceptance of the Letter of Undertaking and requiring deposit of approved security. The court denies each of these requests.

The court's refusal to vacate the Letter of Undertaking and order the deposit of cash or bond as security is based on the same reasons that led the court to deny summary judgment on this issue. Given the elasticity of Rule F's language, the court's discretion to decide security issues, and the uneven application of the objection-exception, the court finds that prior judicial approval of the Letter of Undertaking was proper.

*6 With respect to Mosquito's request for adjustment of the limitation fund under Rule F(7), the court finds that it does possess the authority to grant such relief and that such relief may be appropriate in this case. Rule F(7) provides that claimants may by motion demand that security be increased on the ground that it is less than the value of the plaintiff's interest in the casualty loss and that "[t]hereupon the court shall cause due appraisement to be made of the value of the plaintiff's interest in the vessel and pending freight." This language suggests that once a claimant has filed a motion under this section, the court has a non-discretionary duty to re-examine the sufficiency of the limitation fund.

In *Luhr Bros. Inc. V. Gagnard,* 765 F.Supp. 1264, 1269 (W.D.La.1991), the court elaborated on its role in such matters, observing that "[n]either the filing of a security bond nor the transfer to the court of the vessel and her freight precludes the court's independent evaluation of the adequacy of such security." Thus, the court's authority to entertain Mosquitto's request is clear.

The court wishes to set up a status conference with opposing counsel to resolve other issues that the Rule F(7) motion raises. Specifically, the court needs to select an appropriate method for the appraisement of A. & J.'s interest, determine the extent of such appraisement, and decide which party or parties shall bear the costs.

Accordingly, for the reasons stated,

IT IS ORDERED that the Motion for Summary Judgment and Alternative Reliefs, with the exception of the Request for Adjustment of the Limitation Fund, filed on behalf of Respondent Pearl Bodden de Mosquitto is hereby DENIED.

IT IS FURTHER ORDERED that a status conference be set up to resolve issues raised by Respondent's Request for Adjustment of the Limitation Fund.

E.D.La.,1997.
Matter of A. & J. Towing, Inc.
Not Reported in F.Supp., 1997 WL 289396 (E.D.La.)

Motions, Pleadings and Filings (Back to top)

- 2:97CV00548 (Docket) (Feb. 24, 1997)

END OF DOCUMENT

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713396 (E.D.La.)

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.
United States District Court, E.D. Louisiana.
Noor Begum KARIM, et al.
v.
FINCH SHIPPING COMPANY, et al.
No. Civ.A. 95-4169.
Oct. 6, 1998.

*ORDER AND REASONS*

FALLON, J.
    *1 Before the Court is the motion of plaintiffs, Noor Begum Karim, wife of/and Fazal Karim, to order defendant and complainant-in-limitation, Finch Shipping Co., Ltd. ("Finch"), to substitute a corporate surety bond in place of the letter of undertaking posted as surety for Finch by Ocean Marine Mutual Protection & Indemnity Association, Ltd. ("Ocean Marine"). Also pending before the Court is its Order that Finch Shipping show cause why it should not be directed to substitute bond or supplement Ocean Marine's letter of undertaking. For the following reasons, plaintiffs' motion to substitute a surety bond for the letter of undertaking is GRANTED, and Finch is HEREBY ORDERED to provide additional security to supplement or replace Ocean Marine's letter of undertaking.

I. BACKGROUND
    This case arose as a result of personal injuries suffered by plaintiff Fazal Karim on the high seas. After plaintiffs brought an action against Finch and others in Louisiana State Court, Finch filed an action in this Court seeking exoneration from or limitation of its liability. As security against an adverse judgment, Finch was allowed to post a letter of undertaking executed by Ocean Marine, in the amount of $3,500,000.00. Upon plaintiffs'/claimants' motion, the Court increased the required security to $5,700,000.00.

    Plaintiffs/claimants then moved the Court to require security in the form of a surety bond in lieu of Ocean Marine's letter of undertaking. They maintain, *inter alia,* that Ocean Marine cannot be trusted to honor its letter of undertaking. In addition to a troublesome Standard & Poor report, plaintiffs allege that Ocean Marine has a history of ignoring federal court judgments, and dishonoring its posted letters of undertaking. Particularly, plaintiffs cite *Deras v. M/V EL FRIO,* No. 86-2043, United States District Court, Southern District of Florida, as precedent for this behavior. Finch maintains that Ocean Marine's letter of undertaking is adequate security. In an Order and Reasons dated August 11, 1998, the Court directed Finch to show cause why it should not be required to substitute bond or supplement the letter of undertaking.

    On September 16, 1998 the Court heard oral argument on the plaintiffs' motion and on Finch's response to the Order to show cause. At that time, the parties indicated to the Court that they might be able to reach a mutually agreeable arrangement. The Court gave the parties two weeks, or until September 30, 1998, to negotiate an agreement or to inform the Court if one were not possible. On October 5, 1998 the Court received a letter from the plaintiffs, dated October 2, 1998, indicating that no resolution has occurred.

II. ANALYSIS

Supplemental Rule F of the Federal Rules of Civil Procedure provides that, in limitation of liability proceedings, "[t]he owner ... shall deposit with the court, for the benefit of claimants, a sum equal to the amount or value of the owner's interest in the vessel and pending freight, or approved security therefor, as the court may from time to time fix as necessary...." Supp. Fed.R.Civ.P. F(1)(a). The Court has an "absolute right to determine what constitutes approved security." *Matter of A & J Towing, Inc.,* 1997 WL 289396, *2 (E.D.La) (citations and internal quotations omitted).

***2** In this case, plaintiffs have raised questions as to the reliability of the security provided by Ocean Marine's letter of undertaking. Specifically, claimants question Ocean Marine's good faith in light of its alleged actions in the Florida litigation referenced above. Finch maintains that the cost of obtaining a surety bond is excessive, and would make this litigation unduly burdensome. The gravity of plaintiffs' allegations, coupled with the parties' failure to reach a mutual agreement, militates toward a requirement of substitute or additional security.

In view of the facts, the Court has concerns about the stability and reliability of the current letter of undertaking proffered by Ocean Marine. Consequently, the defendants are directed to provide additional security within 30 days of this Order.

III. CONCLUSION

For the above reasons, plaintiffs' motion to substitute surety is GRANTED, and Finch is HEREBY ORDERED to substitute or supplement Ocean Marine's letter of undertaking with an additional letter of undertaking, surety agreement, surety bond, or some other means of security which, though less economically burdensome, shall be equally secure, within a period of 30 days from the date of this Order.

E.D.La.,1998.
Karim v. Finch Shipping Co.
Not Reported in F.Supp.2d, 1998 WL 713396 (E.D.La.)

Motions, Pleadings and Filings (Back to top)

- 2002 WL 32999315 (Trial Motion, Memorandum and Affidavit) Affidavit (Sep. 30, 2002) Original Image of this Document (PDF)
- 2000 WL 34611024 (Trial Motion, Memorandum and Affidavit) Motion for New Trial and/or Reconsideration or, in the Aldternative, Amendment of Judgment (Apr. 28, 2000) Original Image of this Document (PDF)
- 2000 WL 34609371 (Expert Trial Transcript) Testimony of Bhiahma Kumar Agnihorti (Jan. 24, 2000)
- 2000 WL 34609372 (Expert Deposition) Videotaped Deposition of: Donald P. Maxwell, Jr., M.D. (Jan. 20, 2000)
- 2000 WL 34611025 (Trial Motion, Memorandum and Affidavit) Supplemental Memorandum Regarding the Issue of Choice of Law (Jan. 14, 2000) Original Image of this Document (PDF)
- 1999 WL 33997137 (Partial Expert Testimony) Deposition of: Donald J. Gordillo, M.D. (Nov. 8, 1999)
- 1996 WL 33689047 (Trial Pleading) Third Party Complaint (Oct. 8, 1996) Original Image of this Document (PDF)
- 1996 WL 33688853 (Expert Report and Affidavit) (Report or Affidavit of Donald P. Maxwell Jr., M.D., F.A.C.S.) (Jun. 20, 1996)
- 1995 WL 17223085 (Trial Pleading) Seaman's in Personam and in Rem Complaint for Damages (Dec. 15, 1995) Original Image of this Document (PDF)
- 1995 WL 17225886 (Expert Trial Transcript) (Transcript) (Dec. 15, 1995)
- 2:95CV04169 (Docket) (Dec. 15, 1995)
- 1995 WL 17222892 (Expert Report and Affidavit) (Report or Affidavit of Donald J. Gordillo, M.D.) (Dec. 8, 1995)
- 1995 WL 17222893 (Expert Report and Affidavit) (Report or Affidavit of John Watermeier, M.D.) (Sep. 13, 1995)

- 1995 WL 17222891 (Expert Report and Affidavit) (Report or Affidavit of Donald Maxwell, M.D.) (1995)
- 1995 WL 17223083 (Trial Pleading) Trial Pleading (1995) Original Image of this Document (PDF)
- 1995 WL 17223084 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Motion for New Trial and/or Reconsideration or, in the Alternative, Amendment of Judgement (1995) Original Image of this Document (PDF)
- 1995 WL 17223087 (Trial Motion, Memorandum and Affidavit) Affidavit (1995) Original Image of this Document (PDF)

END OF DOCUMENT

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

mashreq المشرق

# Mashreq Annual Report 2007



His Highness (Late) Sheikh Zayed Bin Sultan Al Nahyan

*May his soul rest in eternal paradise*



His Highness (Late) Sheikh Maktoum Bin Rashid Al Maktoum
*May his soul rest in eternal paradise*



His Highness Sheikh Khalifa Bin Zayed Al Nahyan
*President of the United Arab Emirates and Ruler of Abu Dhabi*



His Highness Sheikh Mohammed Bin Rashid Al Maktoum
*Vice President & Prime Minister of the United Arab Emirates and Ruler of Dubai*

# Contents

| | |
|---|---|
| Board of Directors | [illegible] |
| Chairman's Report | [illegible] |
| Chief Executive Officer's Review | [illegible] |
| Worldwide Presence | 16 |
| Financial Highlights | 18 |
| Independent Auditor's Report | 22 |
| Group Financial Statements | 24 |

Mashreqbank psc established in 1967
Head Office: P.O. Box 1250, Dubai, United Arab Emirates Tel: 2223333, 2737222, 2286947
Telefax: 2226061 Telex: 45429 MSHQHO EM Cable: MASHREQBNK SWIFT: BOMLAEAD, Website . www.mashreqbank.com



Board of Directors

**Chairman**
Mr. Abdulla Bin Ahmed Al Ghurair

**Vice-Chairman**
Mr. Ali Rashid Ahmed Lootah

**Director & Chief Executive Officer**
H.E. Abdul Aziz Abdulla Al Ghurair

**Directors**
H.E. Sheikh Hamad Suhaim Hamad Al Thani
Mr. Mohammed Abdulla Al Ghurair
Mr. Abdulla Mohamed Ibrahim Obaid-Ulleh





Chairman's
Report

Year 2007 marked the completion of four decades of achievements and growth for your Bank. In May 1967 Mashreqbank started its operations with a capital of AED 6.7 Million. Forty years later, market capitalization of the bank has reached AED 34.7 Billion. This extraordinary organic growth is a testimony to our ability to reposition in the wake of changes in the market place. In our forty years' journey, we have ridden the valleys and peaks that go with various economic cycles and witnessed historic events which led to significant geo-political changes in the region. I am proud to state that in the midst of all this, your Bank continued its march breaking its own records year after year.

Our abilities to understand and anticipate customer needs, providing them innovative solutions and delivering them with precision and care have enabled us to post another stellar performance during the year just concluded. The Group Operating Income has climbed from AED 2.8 Billion last year to an historic high of AED 3.8 Billion, an increase of 36%. The outstanding growth was a result of superior performance contributed by all revenue streams including Net Interest Income, Commission Fee Income and Investment Income. The Net Interest Income jumped by 42% from AED 1.1 Billion in 2006 to AED 1.6 Billion in 2007 and Fee Commission and Other Income went up by 32.5% from AED 1.7 Billion to AED 2.3 Billion. Our subsidiary, Oman Insurance Company handsomely contributed to the growth of Other Income.

The payoff of our strategy to diversify revenue streams and grow Non-Interest Income has been more than satisfying as our Other Income to Gross Income ratio remained high at 59%. We maintained a close watch on spiraling Operating Expenses and were able to restrict the growth to 37% notwithstanding significant increase in volumes and cost of Operations. In addition to specific provision, we added AED 100 Million to General Provision to maintain the General Provision to Advance ratio at 1.9%.



The Net Profit after Risk Cost, Tax and Minority Interest reached an all time high level of AED 1.9 Billion which is 21% higher than last year's figure of AED 1.57 Billion.

Total Assets of the Bank posted a hefty growth of 54% from AED 56.7 Billion to AED 87.6 Billion. However, the growth in Loans and Advances at 29% was slower than the growth in Customer Deposits which showed a healthy growth of 39%. Resultantly, the balance sheet structure improved with Liquid Assets to Total Assets ratio improving from 42% to 49% and Advances to Deposit ratio improving from 83% to 77%. Diversification of funding sources continued and Customer Deposits to Total Assets declined from 67% to 56%.

The Total Shareholders Equity increased by AED 2.5 Billion, a rise of 32%. However, qualifying capital for Capital Adequacy purpose went up by 58% to AED 11.9 Billion due to increase in Tier Two capital through a subordinated loan issued by the bank in 2007. Inspite of significant growth in Risk Assets, the Capital Adequacy ratio remained high at 17.70%.

The return on enhanced Average Shareholders Equity remained one of the best in the industry at 22% and ratio on Average Assets declined slightly due to the fast pace of growth in Assets.

Your Board recommends that, to meet aggressive organic and inorganic growth plans, we bolster equity base so that at all times we maintain comfortable Capital Adequacy ratio. Therefore, inspite of high profit your Board recommends a stock dividend of 30%.

## UAE Economic Environment

The upsurge in the UAE economy went unabated during 2007. The high oil prices, infrastructure spending by the Government and booming real estate and services sector contributed to this unprecedented growth. The stock market which went into a free fall in 2006 started showing signs of recovery and ended the year with a rally posting a healthy growth. The nominal GDP which grew by 23% in 2006 is estimated to have grown again by over 20% in year 2007. Recognizing the growing strength of the UAE economy, the international rating agencies Fitch and Standard and Poor's rated Abu Dhabi's Local and Foreign Currency Bonds AA, and Moody's Investor Services revised the country ceiling for Foreign Currency Bank Deposits to Aa2.

During the year, strategic plans for Dubai, Abu Dhabi and the Federal Government were released. The Government of Abu Dhabi is estimating US 200 Billion investment in infrastructure related projects in the next 8 years.

In order to regulate the growing property market, the Government of Dubai created Real Estate Regulatory Authority. Similarly, with an aim of securing Dubai's position as a global capital

**IMPORTANT INDICATORS**

| | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| ADVANCES TOTAL DEPOSITS | 79% | 83% | 74% | 83% | 77% |
| LIQUIDITY (LIQUID ASSETS TO TOTAL ASSETS) | 37% | 38% | 47% | 42% | 49% |
| EQUITY TO TOTAL ASSETS | 14.84% | 16.80% | 15.60% | 13.00% | 10.97% |
| RETURN ON AVERAGE EQUITY (PRE-TAX) | 10.25% | 17.09% | 20.84% | 21.55% | 22.45% |
| RETURN ON AVERAGE EQUITY (AFTER-TAX) | 16.32% | 16.99% | 26.73% | 21.46% | 22.37% |
| RETURN ON AVERAGE ASSETS (PRE-TAX) | 2.22% | 2.53% | 4.40% | 3.05% | 2.64% |
| RETURN ON AVERAGE ASSETS (AFTER-TAX) | 2.04% | 2.52% | 4.39% | 3.06% | 2.63% |
| EFFICIENCY RATIOS | 36.30% | 33.06% | 25.00% | 36.46% | 30.41% |

market hub, a holding company Borse Dubai was established under which DFM and DIFX were brought. Borse Dubai has ambitious plans to acquire stake in global exchanges to increase its profile and gaining access to their trading platform. The much awaited IPO of DP World launched in November was highly successful.

The Government of Dubai's investment in infrastructure, leisure and hospitality sectors gave an expected impetus to tourism. The passenger traffic at the Dubai International Airport went up by 20% and is estimated to reach 34 Million. The World Travel and Tourism Council had forecasted tourism in the UAE to generate US$33.9 Billion in 2007 contributing about 17% in the GDP.

The UAE Banking sector assets in June crossed the AED 1 Trillion mark and became the largest banking sector in the GCC. The Net Credit expansion during the first 6 months at 10% was slower than 38% seen in 2006 and 42% in 2005. The major growth areas had been the Manufacturing sector, Construction, Transport and Non-resident lending. The overall money supply in the first 6 months was up by 18% and the UAE dirhams peg which has been constant since 1980 came under lot of pressure due to the weak dollar and high inflation. However, Central Bank of the UAE has ruled out any possibility of depegging of the Dirham in the foreseeable future. The global credit market turmoil had little impact on UAE. Although the local banks' ability to access the global markets for funding came under strain due to widening credit spreads across the board. All in all, 2007 presented a boisterous economic environment with continuous growth in all sectors. We believe Mashreqbank was able to make the most of the opportunities that this presented without losing the balance of prudent risk-taking or slipping into complacency.

## Future Outlook

We have outlined our strategy for the next 5 years and developed a detailed plan for its deployment with precision and discipline. The new customer segments and products with potential for growth have been identified and responsibilities have been assigned. Besides, we will continue to pursue and grow our core business. Since all economic indications predict a healthy economy for the next plan period, we expect to maintain a growth rate of 20% per annum. Goals are set to achieve higher customer satisfaction, improved productivity and better efficiency. Technology upgrades needed to accomplish service quality and productivity improvements have been planned and are expected to be implemented in the next 2 years. The biggest challenge will continue to be recruitment and retention of quality people and managing risk in a spiraling growth scenario. We have, therefore, planned significant investments in the respective areas.

Finally, on behalf of the Board, I must place on record our thanks to Chief Executive Officer, his able management team, and all staff members of Mashreqbank who have worked relentlessly with dedication to accomplish these extraordinary results. We are also thankful to our customers for their continued support.

Thank you

**Abdulla Bin Ahmed Al Ghurair**
Chairman

# Chief Executive Officer's Review

The financial services landscape in the UAE has undergone a transformation during the last five years. Emergence of local capital markets, globalization of the financial services, positive regulatory changes, technology advancement and unprecedented expansion of the UAE economy have contributed to the establishment of the UAE banking sector as the strongest and most profitable one in this region. These profitable growth opportunities and development of new business/customer segments attracted new entrants, local and international, to the market establishing Dubai as a recognized international financial centre of the Middle East. We were prepared to take advantage of the emerging opportunities with our three-year Strategic Plan and identified areas of corresponding focus. Though the market provided virtually unlimited growth opportunity, prudence demanded that we stay on course and follow carefully chartered strategy. We maintained our focus on quality customer service, introduced new innovative products and improved efficiency and productivity. Risk management was strengthened and credit underwriting standards were tightened to ensure improved quality on Assets and Earnings.

I am delighted to state that we closed year 2007 by accomplishing most of our strategic goals set forth at the beginning of the plan period. Diversification of revenue



streams through new business/products line was accomplished as revenue contribution from investment banking, SME, residential mortgages, brokerage and asset management etc. went up significantly. Our geographic focus within GCC expanded with the opening of new branches in Doha and Bahrain. Risk management system and processes were revamped and new Risk Rating methodology was introduced. Operational Efficiency improved by centralizing overseas operations within UAE and integrating all operations and technology services under one roof.

The strategic review of technology platform initiated setting-up of a Project Management Unit to oversee the complete technology overhaul during the next 5 years. A bank-wide Service Quality Unit set up a uniform service quality monitoring mechanism. A number of key processes were reengineered in order to reduce the turnaround time and improve customer service. The Mashreq brand repositioning initiative led to the rebranding exercise with a monitoring system. A comprehensive Development Needs Analysis was conducted to identify the development needs of all employees and the same were addressed by arranging high quality internal and external programs.

The successful implementation of those initiatives manifested themselves through an all time high financial performance which exceeded our plans.

Our subsidiary, Oman Insurance Company also had an outstanding year and maintained its leadership in the Insurance sector of the UAE. Their premium revenue grew by 43% to AED 1.4 Billion reaffirming its position as the largest Insurance Company in the UAE. Standard & Poor's upgraded Oman Insurance Company's credit rating to BBB+. In the following paragraphs, I will briefly discuss development and achievements of this year in the key areas.

## Retail Banking

As the social and physical landscape of the UAE changes, customers' requirements are also evolving. Consumers are taking a longer term view of living in the UAE, purchasing property, and even considering retiring in the UAE. The population of the UAE is increasing at the highest rate





in the Arab world while still maintaining one of the highest per capita incomes globally. The Retail Banking Group had readied itself to be able to meet the financial & non financial needs of this new breed of customers. Our strategic change program has helped us achieve this by investing in training, customer service, processes, and business quality - all with a focus on improving the customer experience across all touch points.

In order to reshape our franchise on the new brand values of being bold, transparent, fair, relationship-driven, and individually responsible, we launched a comprehensive rebranding programme with a change in look and feel, in addition to, redefining our service strategy and product programmes.

The Credit Cards business continued its penetration into highly competitive category by introducing no annual fee both for Classic and Gold Credit Cards. Mashreq Credit Card spend continued to grow and we are now ranked as Number 1 among local banks by this measure. Merchant business leadership was maintained and Mashreq was the first bank in the region to have introduced wireless handheld 'Blade' POS terminal, and was also the first to launch Merchant Overdraft programme.

Our preferred banking proposition 'Mashreq Gold' completed its first year with a handsome growth in the number of customers and revenue. Mashreq Gold product offering was further strengthened with the launch of a range of investment products including tie ups with highly acclaimed international third party fund providers. Bank assurance business picked up steam and had a very successful year. Home Mortgage and Oseul Personal Loans finance are the other two products which are well received by the market and posted healthy growth.

The retail businesses in Bahrain and Qatar have established a strong footing in their respective markets. With the launch of personal loans and investment products in Bahrain scheduled for 2008, we look forward to further expanding our presence in these countries. Preparations are also underway to begin offering retail banking products and services in Egypt in early 2008, paving the way for Mashreq to become the leading provider of financial solutions for retail customers in the region.

## Corporate and Investment Banking

2007 has been another spectacular year for the Corporate and Investment Banking Group. The momentum built up over the years continued to expand our franchise and client base, generating revenue growth of over 40%.

Traditional areas of business, such as contracting and trade finance have continued to perform well, supporting our clients in their expansion and addressing their banking needs. We made further inroads in our relatively less penetrated markets of Abu Dhabi and Qatar by strengthening our presence there. In parallel, our business banking operation, focusing on the middle market segment of the economy, has shown tremendous growth fuelled by focused relationship management and market penetration.

Investment banking facilitated clients' access to debt and equity capital markets and saw a strong growth in Project Financing and Syndications, despite volatility in international markets owing to U.S. sub-prime crisis. The team played a leading role in a number of flagship transactions, such as US$ 925 million syndicated loan for Reliance Ports/Utilities, US$ 860 million for Egyptian Fertilizers and US$ 434 million for LMENA1 Pty Ltd, acting as regional book runner in all the transactions. Mashreq led the US$ 285 million long term syndication for Qatarcool as sole book runner. In addition, we were appointed Mandated Lead Arranger for several high profile project finance transactions in the region, including the US$ 5 billion facility for Dubai World, US$ 3 billion facility for DP World Limited, US$ 2.75 billion facility for Qatar Aluminium and US$ 2.8 billion facility for Union Properties PJSC. We were appointed as the Lead Collecting Bank for the DP World IPO, the first one to be offered to the retail market on DIFX. We believe that success of this IPO will provide significant opportunities of growth for the Bank.

To meet the ever increasing needs of our clients for more sophisticated investment solutions, we have restructured and remodeled our Wealth Management business, positioning it for quantum growth in coming years.

Strong demand for credit from our clientele resulted in a growth of over 30% in the corporate loan book. Group's continuous focus on robust credit risk management, supported by benign economy, allowed us to maintain a solid portfolio quality. To make sure that growth is not achieved at the



expense of quality, the Group has been striving to further improve on standard of service provided to our clients. A number of initiatives have been undertaken to monitor and improve on service delivery quality. A Customer Satisfaction survey of our corporate clients revealed very positive results (85% in top box of customer satisfaction measures) reflecting our continuous commitment of providing world class service to our clients.

## Correspondent Banking

The Correspondent Banking business has grown at a rapid pace throughout the year utilizing the opportunities available. We have consolidated our geographical coverage both in Asia and Middle East regions and are in the process of concentrating in African and Far East markets. Focused approach to business and market has been instrumental in meeting our goals of becoming the preferred correspondent bank in the region. Quality service has been the key in positioning ourselves as a first choice service provider of cross-border execution capabilities. Branches at money centers, such as, New York, Hong Kong, London and Mumbai have been adding to our offering by providing cross-border trade and payment facilities to the customers. The representative offices at Karachi and Dhaka at the same time are maintaining close relationships in their respective countries. During the year we expanded our reach by establishing a representative office in Khartoum. We have been able to exploit our technological and operational expertise to cover geographical areas even where we do not have physical presence. Plans are there to extend our network by having additional offices in the Far East.
The goals of the business in terms of market, risk and products has been met through introduction of new products, expanded target markets, close monitoring of credit risk and strategic addition of customized packaged products for target markets.

The payment business capabilities were reviewed and it was decided to install a more sophisticated payment system in New York linked with CHIPS. The new system will be available in 2008 and will be equipped to handle increased business volume and offer a wider range of products to meet the customer needs. London branch, a member of EBA, is capable of handling Euro & Sterling Payments, and will shortly be joining TARGET II for European payment business. The payment capabilities have also been enhanced for Indian rupee remittances. Our Indian branches are now connected to RTGS and NEFT payment systems.

Consistent efforts are made to meet regulatory compliance on a global basis. Automation of transaction screening system at London, Hong Kong and India branches is in progress and will be completed shortly. The newly developed KYC system which is currently available to our staff over the intranet will also be available over internet to facilitate them update / view KYC information at any point of time. Regular AML / KYC awareness programmes are conducted for staff as well as customers.
Our global operations in New York, London & Hong Kong have been centralized in Dubai for customized product offerings and providing a single point of contact for problems' resolution. In addition to improved control over branch operations, such centralization will allow for standardized delivery time and enhanced disaster recovery arrangements. Going forward, we intend to strengthen our presence in the international arena by positioning ourselves as an institution providing Quality Service.

## Treasury and Capital Markets

During 2007, the world capital markets were roiled by the US sub prime crises. The crisis led to widening of both investment and sub investment grade credit spreads, multi billion dollar write offs by major US and European financial institutions and a global liquidity crunch. Although rumblings of the crisis were also felt in the GCC economies, the region was spared the brunt of the impact of the crisis due to continued high liquidity and limited exposure to the affected asset classes. Adding to the challenges this year was speculation centered on a revaluation of the AED/USD peg which has been in place since 1980.

Mashreq's Treasury and Capital markets division helped the Bank in successfully negotiating all of the above challenges. The Bank's direct and indirect exposure to the affected asset classes was a minor percentage of its investment portfolio hence there are no extraordinary investments related write downs. The Bank also met its external debt funding targets for the year at a low cost. Treasury and Capital Markets continued to grow and invest in its business. Several key initiatives were undertaken during the year focusing on improving delivery of product to the customer.

The regional equity markets after a bearish 2006, rebounded this year. Mashreq Securities, the group's equity brokerage arm was restructured this year to create an even stronger focus on relationship management. A dedicated team was assigned to offer large institutional clients with a variety of products and services including equity derivatives, while our VIP lounges continued to focus on High Net Worth relationships. Almost one quarter of the trades were executed by our clients using the online trading platform which was introduced in 2006. Mashreq Securities also introduced trading on the DIFX to its retail client base.

Under Makaseb umbrella, Mashreq made significant progress in several key areas of Asset Management. In 2007, Standard and Poor's assigned 'AA' very high quality rating to Makaseb Arab Tigers Fund and its 'A' high quality rating to both Makaseb Qatar Equity Fund and Makaseb Emirates Equity Fund. The above funds were the only funds managed by a UAE Bank to be assigned ratings by S&P. We also added segregated Managed accounts to our range of products, providing greater flexibility to investors in accessing the rapidly growing Middle East and North African markets. Our aim for Makaseb is to become a top provider of investment management services in the region.

Mashreq Capital, our DIFC subsidiary was able to successfully navigate some of the most difficult credit markets ever, and both the fixed income funds that it manages achieved creditable results. It launched the Emerging Markets Credit Opportunities Fund in April which was the first fixed income hedge fund in the DIFC.

Rates and FX Units experienced phenomenal growth in 2007 both in terms of volume and profitability. Volume growth was primarily achieved on the back of an increased customer base and expanded product menu. The Units established new corporate relationships by providing innovative and profitable derivative strategies.

## Al-Badr Islamic

Al-Badr Islamic has a very unique structure of a finance company and an Islamic window embedded into one. Al-Badr Islamic Finance Private JSC and the Islamic banking division of Mashreq together form Al-Badr Islamic. This unique structure, backed by the strong brand of Mashreq, has allowed Al-Badr Islamic to capitalize on the opportunities in this new and growing area of banking.

Al Badr Islamic has an independent Sharia Supervisory Board which comprises of world renowned Sharia scholars from Saudi Arabia and Bahrain.

Al-Badr Islamic offers a wide range of Sharia compliant banking products and services. To cater the needs of retail customers, Al-Badr Islamic's home finance offers a variety of more than twenty financing options to the retail customer segment. Other retail products include auto finance for personal and commercial vehicles, share finance for stock market investors, and saving deposits under Mudaraba, Murabaha and Wakala arrangements for retail savers. On the corporate side, Al-Badr Islamic has introduced some innovative structures particularly in the area of investment banking and Sukuk advisory. Other corporate offerings include equipment ijaraha, Islamic trade finance

suite, including letters of credit under Musharaka and Murabaha arrangements. All Al-Badr Islamic products are distributed through dedicated corporate relationship managers and retail sales teams. For retail distribution, Al-Badr Islamic has pioneered the concept of Islamic banking kiosks. At present, four such kiosks are fully functional in Mashreq branches offering Sharia compliant products under the same roof. In addition, Al-Badr Islamic Finance Company operates with an independent branch set-up. As for retail banking services, Al-Badr Islamic ATM card and 'Badr online' (internet Islamic banking) ensures that Sharia compliant services remain fully aligned with conventional banking services.

Al-Badr Islamic was amongst the first financial institutions to sign-up with the Dubai Land & Revenue Department for the management of Developers Trust Accounts and since then has led the effort to ensure smooth delivery of this revolutionary concept strictly in accordance with the relevant laws and regulations.

The Islamic banking in the UAE promises a huge growth potential and Al-Badr Islamic has aggressive plans to participate in that.

## Risk Management

At its core, Risk Management in Mashreq operates independent of but in partnership with the Business. Within this construct, limits and approval authorities are exercised by risk officers with defined approval authorities which in turn are determined by experience, demonstrated judgement, balance and skills.

During 2007, the bank continued to evaluate and further refine its





risk management processes. The rating/scoring models were revalidated, new scoring models were developed and existing corporate rating models were updated. The bank considers its risk management process to be among the most demanding in its GCC peer group.

Mashreq's portfolio quality, given the high growth in assets, continues to remain stable and strong. The bank has a conservative policy for early recognition of impairment and for building up a sufficient cushion of reserves for non-performing assets.

The bank revamped its credit risk measurement through a combination of probability of default calculation, credit structure and security and support. The bank has developed a sophisticated risk rating/scoring tool to uniformly measure credit risk in its Corporate and Retail portfolios. Statistical techniques are used for estimating default probabilities, for calculating expected loss and for measuring customer/product profitability. While overall risk management is unified and independent for corporate and retail, the processes for managing corporate and retail credit are distinct and separate.

Corporate credit risk is managed through a series of fundamental principles, including a minimum of two signatures for any credit approval (a recommending signature from business and an approving signature from an empowered independent risk management officer), an obligor risk rating for every borrower, and adherence to bank policies, underwriting, and documentation standards.

Since the extension of credit across national borders to customers in foreign locations entails Country Risk, Mashreq has established country limits for managing transferability and convertibility risks. These limits are regularly reviewed by risk management and periodically by a senior Risk Committee.

The retail credit programmes specifying credit terms and criteria were reviewed and updated. Individual borrowers are nevertheless separately rated using statistically validated score of models where applicable.

We manage market risks within a framework of a limits setting, approval and monitoring process for all proprietary risk positions. During the year, a project was launched to completely overhaul the market risk policies and monitoring system. The value at risk model was further enhanced by extending the scope and coverage of the instruments.

## Risk Review

The internal audit and compliance function provides assurance to the Board of Directors, CEO and Senior Management on the adequacy of controls in the Bank and seeks to improve effectiveness as well as efficiencies through its interaction with all parts of the Bank.

Reporting to the Audit Committee of the Board of Directors it is totally independent of both business and line functions; it has the overall responsibility of carrying out independent audits and reviews of Mashreq's entire Credit Portfolio, all the Operating, Functional and Support areas to assess the adequacy and effectiveness of the control framework and the risk mitigation processes and initiatives. It continues to evolve through challenging its methods and by adopting best practices to deal with the changing business activities and complexities, risk profile, dimensions, policies and processes of the Bank.

The Compliance arm of the group provides ongoing critical support in ensuring that the Bank strictly observes all the regulatory and anti money laundering requirements it is subject to. Mashreq utilizes a world class automated AML transaction monitoring system coupled with a client screening solution that is second to none.

In addition the Fraud & Investigations Division provides a clear focus in this area and has acquired state of the art forensic skills.

The Group plays a prominent role in its consultative capacity and continually interacts with all the areas of the Bank to help in enhancing the control structure, while maximizing efficiencies and risk mitigation.

## Efficiency and Productivity

Our operational focus has been on People, Processes, Productivity and building Partnership. A large number of the processes have been re-engineered to ensure standardization and enhance focus on Operations Risk Management. All functions have re-looked and re-worked their Key Risk Indicators (KRI), put in robust self assessment metrics and have risk dashboards in place.

Setting up of an Operations Excellence function and increasing efficiency has resulted in enhanced productivity and optimal capitalization. A number of new technologies have been



14

initiated and executed during the course of the year resulting in a more automated environment. A strong Project Management Office has been put in placed to ensure efficient and timely translation of all business needs into technology solutions.

With a clear focus on better customer facilities with faster turn-around service, the bank has provided a more secure environment in using the on-line banking facility to its customers, with addition of bills payment options for new telecom company. The on-line trading system was enhanced to connect with KFIC (Kuwait Finance & Investment Company), which enabled the bank to handle any transaction from other countries in the GCC - another first in this region.
In order to have a smooth business without interruption a fully equipped state-of-the-art back-up Data Centre has been made operational at the Dubai Internet City, and a business continuity program has been initiated. At the same time a major Network upgrade was completed to improve the availability of IT services. IT played a key role in bank's international expansion in Bahrain and in launching new business initiative of Islamic banking.

Mashreqbank as a leader in the acquiring business have launched an integrated ECR (Electronic Cash Register) POS solution that offers merchants a future proof EMV cards acceptance solution called Nomad. The bank also feels proud to launch state of the art blade terminal, a GPRS POS device for credit cards acceptance which is the first of its kind in UAE. This machine is a key differentiator for the cards acquiring business.

In order to further enhance its position as a leading bank in the UAE, Mashreqbank has selected a new Switch system to replace its existing legacy applications. This migration will help in long-term cost savings and faster processing of ATM and POS transactions and creating a more robust development environment, one that supports the dynamic nature of our business by significantly reducing the time-to-market.

## Human Resource Development

Attraction and retention of talent remained one of the main HR challenges facing the banking industry. The phenomenal growth of the financial sector has further aggravated the situation. However, thanks to our policy of recruiting the right talent and investing in the development and training and providing them growth opportunities, we were able to hire and retain the best of talent in the market.

Mashreqbank takes its social responsibility very seriously and has consistently made efforts towards UAE Nationals' employment opportunities and grooming them for leadership positions. During the year, we recruited over 200 UAE Nationals in the bank taking the UAE National percentage of the Bank to 32.6%.

### CLASSIFICATION OF ASSETS/LIABILITIES - DECEMBER 31

| ASSETS | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| OTHER ASSETS | 5.1% | 5.6% | 6.1% | 5.5% | 6.7% |
| CASH AND BANK BALANCES | 27.5% | 23.5% | 23.0% | 19.3% | 32.1% |
| ADVANCES | 54.8% | 53.7% | 47.8% | 50.5% | 42.3% |
| INVESTMENTS | 12.6% | 17.2% | 24.3% | 24.7% | 18.9% |

| LIABILITIES | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| LONG TERM AND OTHER LIABILITIES | 6.6% | 11.4% | 12.4% | 13.4% | 14.3% |
| CUSTOMER DEPOSITS | 69.9% | 64.4% | 64.5% | 61.3% | 55.0% |
| BANK DEPOSITS | 8.5% | 9.4% | 7.5% | 12.3% | 19.7% |
| SHAREHOLDERS' EQUITY | 14.8% | 14.8% | 15.6% | 13.0% | 11.0% |

Various efforts are undertaken throughout the year to enhance and develop talent. A record of over 900 programs were held with over 22,000 training man days. In addition to the internal programs, we have also joined hands with many accredited external organizations to train our staff in specialized areas such as investments, compliance etc. Our training partners include Securities and Investments Training Institute-UK, Association of Certified Anti-Money Laundering Specialists, Queen's School of Business, as well as, the Institute for Leadership Management (ILM, UK). In order to supplement the classroom trainings, our e-learning efforts were also enhanced with over 115 internal and external courses covering over 8000 participants.

A UAE Nationals Training and Development unit has been established to develop and design customized development plans for graduate and high school batches which will integrate need based classroom training, e learning and on the job training/coaching. The courses take them through a variety of relevant topics such as banking, systems and soft skills training specific to their role. As a step to encourage development of UAE Nationals, the tertiary education policy was introduced to provide subsidy for education for Nationals who want to pursue higher education. The "Al Mawarid" program was designed for on boarding 100 UAE National school leavers. The aim of this three month development plan is to provide them with basic knowledge on the Business English, banking operations, IT and Customer Service.

We also believe in continuously strengthening our efforts to feel the pulse of our employees. As in prior years, the Employee Engagement survey was conducted to take in employee feedback in a more formal way. A detailed Action Planning is being conducted to work on factors that the survey has highlighted and efforts are under way to implement them.

The review of 2007 will not be complete without mentioning that this is the 40th year of Mashreqbank's successful operations. It is a matter of great satisfaction and pride that we are celebrating the occasion by posting an outstanding performance. The credit of Mashreqbank's 40 years of uninterrupted growth goes to our valued employees and customers. Our dedicated employees, some of them are with us for close to 40 years have worked with exemplary commitment to achieve the ambitious targets we set for ourselves. We are thankful to our customers, for many of them, we are the preferred bank for 40 years and with whom we have forged a mutually rewarding relationship.

While giving the final touches to our Strategic Plan for 2008-2010 period, we anticipate another three years' period of growth and development. To capitalize on the opportunities as they arise, we have identified strategic initiatives to work on during the next plan period and are confident that we would be able to outperform the plan for the next period too.

Thank you.

**Abdul-Aziz Abdulla Al-Ghurair**
Chief Executive Officer





Worldwide Presence

## UAE BRANCHES

| ABU DHABI | Tel | Fax |
|---|---|---|
| Abu Dhabi Main | 02 - 6037201 | 02 - 6268530 |
| Mushrif | 02 - 4079208 | 02 - 4431717 |
| Al Salam | 02 - 6067700 | 02 - 6742182 |
| Murour | 02 - 4196219 | 02 - 4461821 |
| Baniyas | 02 - 5846214 | 02 - 5832115 |
| Khalidia | 02 - 6957806 | 02 - 6673683 |
| Sh. Zayed 2nd Str. | 02 - 6178797 | 02 - 6214062 |
| Musaffah | 02 - 5553031 | 02 - 5538052 |
| Al Falah Street | 02 - 6116405 | 02 - 6412780 |
| Al Mina Center | 02 - 6735847 | 02 - 6734850 |
| **AL AIN** | | |
| Al Ain Main | 03 - 7077226 | 03 - 7616602 |
| Al Ain APT | 03 - 7077510 | 03 - 7668886 |
| **DUBAI** | | |
| Jumeirah | 04 - 4077628 | 04 - 3452170 |
| Souk Al Kabir | 04 - 2098105 | 04 - 2260783 |
| Sheikh Zayed Road | 04 - 3212570 | 04 - 3213574 |
| Jebel Ali | 04 - 8061310 | 04 - 8816628 |
| Aweer | 04 - 3333727 | 04 - 3533670 |
| Burjuman | 04 - 3097323 | 04 - 3967103 |
| Riqa | 04 - 2211120 | 04 - 2533785 |
| Ghusais | 04 - 2775101 | 04 - 2676317 |
| Mall Of Emirates | 04 - 3110107 | 04 - 3410075 |
| Zabeel | 04 - 3348313 | 04 - 3343730 |
| Rashidiya | 04 - 2637008 | 04 - 2860374 |
| Dubai Marina - Aref Tower | 04 - 3609944 | 04 - 3606815 |
| Muraqqabat | 04 - 3431458 | 04 - 3434704 |
| Dubai Health Care City | 04 - 5624760 | 04 - 3624750 |
| Port Saeed | 04 - 2967856 | 04 - 2950043 |
| Khor Dubai | 04 - 5584000 | 04 - 3537554 |
| Hor Al Anz | 04 - 2023100 | 04 - 2802887 |
| Al Khaleej | 04 - 7067750 | 04 - 2723788 |
| DIC | 04 - 3632000 | 04 - 3632265 |
| **SHARJAH** | | |
| Sharjah Main | 06 - 5118227 | 06 - 5688580 |
| King Abdul Aziz | 06 - 5077695 | 06 - 5740534 |
| Buhaira | 06 - 5743866 | 06 - 5744116 |
| Al Khan | 06 - 5772282 | 06 - 5772077 |
| Sharjah Ind. Area | 06 - 5344747 | 06 - 6540185 |
| Sharjah Gold Centre | 06 - 5000500 | 06 - 6668599 |
| **DHAID** | | |
| Dhaid | 06 - 8027419 | 06 - 8822416 |
| **FUJAIRAH** | | |
| Fujairah | 09 - 2221100 | 09 - 2220880 |
| **KHORFAKKAN** | | |
| Khorfakkan | 09 - 2385207 | 09 - 2387159 |
| **AJMAN** | | |
| Ajman Main | 06 - 7017839 | 06 - 7426090 |
| Grand Station | 06 - 7430800 | 06 - 7421135 |
| **KALBA** | | |
| Kalba | 09 - 2777450 | 09 - 2778080 |
| **DIBBA** | | |
| Dibba | 09 - 2444290 | 09 - 2443683 |
| **RAS AL KHAIMAH** | | |
| Ras Al Khaimah Main | 07 - 2281641 | 07 - 2363020 |
| Nakheel | 07 - 2291095 | 07 - 2321580 |
| **UMM AL QUWAIN** | | |
| Umm Al Quwain | 06 - 7665945 | 06 - 7664945 |





## CUSTOMER SERVICES UNIT

| ABU DHABI | Tel | Fax |
| --- | --- | --- |
| Madinat Zayed | 02-6812678 | 02-6810776 |
| **DUBAI** | | |
| Lamcy Plaza | 04-3346030 | 04-3356813 |
| DPTCo | 04-5985851 | 04-5980727 |
| **SHARJAH** | | |
| Sahara Mall | 06-5319658 | 06-5319651 |

## SUBSIDIARIES

| UAE - DUBAI | Tel | Fax |
| --- | --- | --- |
| Oman Insurance Co. P.s.c. (5 Branches in UAE) Tlx: 46036 OIC EM | 04-2024000 | 04-2000310 |
| Osool – A Finance Co. (10 Branches in UAE) | 04-2737000 | 04-7066966 |
| Mindscape Information Technology LLC | 04-2714538 | 04-2722085 |
| Mashreq Securities LLC | 04-2220333 | 04-2226061 |
| Injaz Services FZ LLC | 04-2220333 | 04-2226061 |
| Al Badr Islamic Finance (PJSC) | 04-2058208 | 04-2919851 |
| Mashreq Capital (DIFC) Ltd | 04-2228533 | 04-3285401 |
| Al Yamama Services FZ LLC | 04-2220530 | 04-2283491 |

| BAHRAIN | Tel | Fax |
| --- | --- | --- |
| Makaseb Funds Co. BSC | 973 17 551156 | 973 17 535106 |
| Makaseb Funds Co. BSC II | | |
| Makaseb Funds Co. BSC III | | |

**BRITISH VIRGIN ISLANDS**

Roya Executive Ltd.
Wickhams Cay, PO Box 662,
Road Town, Tortola

Oriston Limited
Drake Chambers PO Box 3321,
Road Town, Tortola

Beachridge Limited
Drake Chambers, PO Box 3321
Road Town, Tortola

## OVERSEAS BRANCHES

**AFRICA**

**Egypt**
Cairo
Tel: (202) 5710417-9
Fax: (202) 5710423
SWIFT: MSHQ EG CA

**MIDDLE EAST**

**Bahrain**
Tel: (973) 17-503444
Fax: (973) 17-215960

**QATAR**

**Doha Head office**
Tel: (974) 4413213
Fax: (974) 4413880
Tlx: 4335 MSHQ DH
SWIFT: MSQ QA QA

**Ramada**
Tel: (974) 4445103
Fax: (974) 4920285

**TV Roundabout**
Tel: (974) 4888522
Fax: (974) 4867207

**Rayan**
Tel: (974) 4803588
Fax: (974) 4803017

**C Ring Road**
Tel: (974) 4249566
Fax: (974) 4249617

**ASIA**

**Hong Kong**
Tel: 852 25212609/29056516
Fax: 852 28214280
SWIFT: MSHQ HK HH

**INDIA**

**Mumbai**
Tel: 91-22-66327200
Fax: 91-22-66301534
SWIFT: MSHQ IN BB
Tel: 91-22-66301556

**New Delhi**
Tel: 91-11-23350590
Fax: 91-11-23357348
SWIFT: MSHQ IN BB
Tel: 91-11-23350581
Fax: 91-11-23357348

**EUROPE**

**London**
Tel: 44-20 7382 4000
Fax: 44-20 7256 0717
SWIFT: MSHQ GB 2L

**AMERICA**

**New York**
Tel: 01-212-545 8200
Fax: 01-212-545 0878/79
SWIFT: MSHQ US 33

**REPRESENTATIVE OFFICES**

**Bangladesh**
Dhaka
Tel: 88 02 9558705
88 02 7126109/68
88 02 9560172/612
Fax: 88 02 7124195

**Pakistan**
Karachi
Tel: 92 21 566 0650/522251
Fax: 92 21 5650872/73
(MSHQ PK KA)

**Sudan**
Khartoum
Tel: 249 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/0192

[illegible]
2007

# Financial Highlights

TOTAL ASSETS
100000
80000
60000
40000
20000
0

TOTAL INCOME COMPOSITION
4000
3500
3000
2500
2000
1500
1000
500
0
2003
2004
2005
2006
2007
NET INTEREST INCOME
NET FEE AND COMISSION INCOME
OTHER INCOME

TOTAL DEPOSITS AND ADVANCES
50000
40000
30000
20000
10000
0
2003
2004
2005
2006
2007
ADVANCES

GROWTH PATTERN OF GROSS INCOME, OPERATING COSTS & NET PROFITS, AFTER TAX
4000
3500
3000
2500
2000
1500
1000
500
0
2003
2004
2005
2006
2007

BOOK VALUE PER SHARE
100
80
60
40
20
0

SHAREHOLDERS' EQUITY
10000
8000
6000
4000
2000
0

# Independent Auditor's Report



The Shareholders
Mashreqbank psc
Dubai
United Arab Emirates

### Report on the Consolidated Financial Statements

We have audited the accompanying consolidated financial statements of **Mashreqbank psc ("the Bank") and Subsidiaries** (collectively "the Group") (a Public Shareholding Company), which comprise the consolidated balance sheet as of December 31, 2007, and the consolidated income statement, consolidated statement of changes in equity and consolidated cash flow statement for the year then ended, and a summary of significant accounting policies and other explanatory notes.

### Management's Responsibility for the Consolidated Financial Statements

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with International Financial Reporting Standards. This responsibility includes: designing, implementing and maintaining internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error; selecting and applying appropriate accounting policies; and making accounting estimates that are reasonable in the circumstances.

### Auditor's Responsibility

Our responsibility is to express an opinion on these consolidated financial statements based on our audit. We conducted our audit in accordance with International Standards on Auditing. Those standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance whether the financial statements are free from material misstatement. An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### Opinion

In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Group as of December 31, 2007, and its financial performance and its cash flows for the year then ended in accordance with International Financial Reporting Standards and the Central Bank of the United Arab Emirates requirements.

### Report on Other Legal and Regulatory Requirements

Also, in our opinion, the Group has maintained proper books of accounts. We obtained all the information and explanations which we considered necessary for our audit. According to the information available to us, there were no contraventions during the year of the U.A.E. Federal Commercial Companies Law No. 8 of 1984, as amended, or the Bank's Articles of Association which might have materially affected the financial position of the Bank or its financial performance.

Deloitte & Touche

Anis Sadek (Reg. No. 521)

Dubai
January 22, 2008

# Group Financial Statements



## Consolidated Balance Sheet
as of December 31

| | Note | 2007 AED'000 | 2007 US$'000 Equivalent | 2006 AED'000 | 2006 US$'000 Equivalent |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash and balances with central banks | 5 | 20,200,123 | 5,499,625 | 2,405,685 | 654,965 |
| Deposits and balances due from banks | 6 | 7,959,847 | 2,167,124 | 8,556,912 | 2,329,679 |
| Trading investments | 7 | 10,023,141 | 2,728,870 | 10,094,456 | 2,748,256 |
| Loans and advances (net) | 8 | 35,994,974 | 9,799,885 | 28,572,239 | 7,778,991 |
| Islamic financing and investment products | 9 | 2,345,269 | 638,516 | 828,014 | 225,705 |
| Non-trading investments | 7 | 4,749,018 | 1,292,953 | 2,840,993 | 773,450 |
| Interest receivable and other assets | 10 | 5,472,924 | 1,490,042 | 2,751,805 | 749,306 |
| Investment property | 11 | 498,440 | 135,704 | 367,339 | 98,486 |
| Property and equipment | 12 | 383,661 | 104,454 | 302,276 | 82,296 |
| **Total assets** | | 87,627,397 | 23,857,173 | 56,745,116 | 15,449,254 |
| **Liabilities** | | | | | |
| Deposits and balances due to banks | 13 | 13,397,024 | 3,647,434 | 5,702,535 | 1,552,556 |
| Repurchase agreements with banks | 14 | 3,834,313 | 1,043,919 | 1,285,612 | 350,017 |
| Customers' deposits | 15 | 46,133,514 | 12,560,173 | 33,998,235 | 9,251,765 |
| Islamic customers' deposits | | 2,153,196 | 586,223 | 747,590 | 203,618 |
| Insurance and life assurance funds | 16 | 516,895 | 140,728 | 373,940 | 101,807 |
| Interest payable and other liabilities | 17 | 5,857,323 | 1,594,696 | 3,356,871 | 913,931 |
| Medium-term floating rate notes | 18 | 5,234,025 | 1,425,000 | 3,397,525 | 925,000 |
| Long-term loans | 19 | 16,707 | 4,549 | 23,541 | 6,409 |
| **Total liabilities** | | 77,142,999 | 21,002,722 | 48,796,152 | 13,285,009 |
| **Equity** | | | | | |
| **Capital and reserves** | | | | | |
| Share capital | 20(a) | 1,126,054 | 306,576 | 866,195 | 235,828 |
| Statutory and legal reserves | 20(b) | 599,009 | 163,085 | 468,453 | 127,812 |
| General reserve | 20(c) | 312,000 | 84,944 | 312,000 | 84,944 |
| Cumulative translation adjustment | | (2,155) | (587) | (11,449) | (3,117) |
| Investments revaluation reserve | | 510,678 | 139,009 | 184,220 | 50,156 |
| Retained earnings | | 7,068,366 | 1,924,412 | 5,567,149 | 1,515,873 |
| **Equity attributable to equity holders of the parent** | | 9,613,952 | 2,617,439 | 7,377,508 | 2,008,595 |
| **Minority interest** | 21 | 870,546 | 237,012 | 571,395 | 155,586 |
| **Total equity** | | 10,484,398 | 2,854,451 | 7,948,903 | 2,164,181 |
| **Total liabilities and equity** | | 87,627,397 | 23,857,173 | 56,745,116 | 15,449,254 |

The accompanying notes form an integral part of these consolidated financial statements.

The financial statements on pages 25 to 74 were approved by the Board of Directors and signed on its behalf by:

Abdulla Ahmed Al Ghurair
Chairman

Abdul Aziz Abdulla Al Ghurair
Chief Executive Officer



## Consolidated Income Statement
for the year ended December 31

| | Note | 2007 AED'000 | 2007 US$'000 Equivalent | 2006 AED'000 | 2006 US$'000 Equivalent |
|---|---|---|---|---|---|
| Interest income | 23 | 3,949,981 | 1,075,410 | 2,642,553 | 719,454 |
| Income from Islamic financing and investment products | 24 | 81,508 | 22,191 | 32,052 | 8,726 |
| Total interest income and income from Islamic financing and investment products | | 4,031,489 | 1,097,601 | 2,674,605 | 728,180 |
| Interest expense | 25 | (2,788,349) | (759,148) | (1,763,923) | (480,240) |
| Distributions to depositors – Islamic products | 26 | (42,682) | (11,620) | (28,505) | (7,762) |
| **Net interest income and income from Islamic products net of distributions to depositors** | | 1,200,458 | 326,833 | 882,177 | 240,178 |
| Fee and commission income | 27 | 2,804,829 | 763,634 | 1,626,457 | 442,542 |
| Fee and commission expense | 27 | (1,713,625) | (466,546) | (918,034) | (249,941) |
| **Net fee and commission income** | | 1,091,204 | 297,088 | 707,423 | 192,601 |
| Net investment income | 28 | 873,759 | 237,887 | 768,407 | 209,204 |
| Other income | 29 | 685,065 | 186,615 | 469,431 | 127,806 |
| **Operating income** | | 3,850,486 | 1,048,223 | 2,827,438 | 769,790 |
| General and administrative expenses | 30 | (1,409,787) | (383,824) | (1,031,470) | (280,825) |
| Allowances for loans and advances and other financial assets | 31 | (308,385) | (83,960) | (146,604) | (39,914) |
| **Income before taxes** | | 2,132,314 | 580,539 | 1,649,364 | 449,051 |
| Overseas income tax expense | | (6,319) | (1,720) | (6,622) | (1,803) |
| **Net income for the year** | | 2,125,995 | 578,819 | 1,642,742 | 447,248 |
| **Attributed to:** | | | | | |
| Equity holders of the parent | | 1,900,632 | 517,461 | 1,570,640 | 427,618 |
| Minority interest | 21 | 225,363 | 61,358 | 72,102 | 19,630 |
| | | 2,125,995 | 578,819 | 1,642,742 | 447,248 |
| **Earnings per share** | 32 | AED 16.88 | US$ 4.60 | AED 13.95 | US$ 3.80 |

The accompanying notes form an integral part of these consolidated financial statements.



## Consolidated Statement of Changes in Equity
for the year ended December 31, 2007

| | Share capital AED'000 | Statutory and legal reserves AED'000 | General reserve AED'000 | Cumulative translation adjustment AED'000 | Investments revaluation reserve AED'000 | Retained earnings AED'000 | Attributable to equity holders of the parent AED'000 | Minority interest AED'000 | Total AED'000 |
|---|---|---|---|---|---|---|---|---|---|
| At December 31, 2005 | 566,395 | 458,539 | 312,000 | (16,005) | 1,467,341 | 4,160,362 | 7,256,732 | 895,087 | 8,151,819 |
| Changes in fair value of investments during the year | - | - | - | - | (1,283,121) | | (1,283,121) | (353,851) | (1,636,972) |
| Overseas entities' translation adjustment | - | - | - | 4,556 | - | - | 4,556 | 3 | 4,559 |
| Total income/(expense) recognized directly in equity | - | - | - | 4,556 | (1,283,121) | - | (1,278,565) | (353,848) | (1,632,413) |
| Net income for the year | - | - | - | - | - | 1,570,640 | 1,570,640 | 73,102 | 1,643,742 |
| Total income for the year | - | - | - | 4,556 | (1,283,121) | 1,570,640 | 292,075 | (280,746) | 11,329 |
| Transfer to statutory and legal reserves | - | 614 | - | - | - | (614) | - | - | - |
| Dividend paid | - | - | - | - | - | (173,239) | (173,239) | (33,941) | (207,180) |
| Share of minority in newly formed subsidiaries | - | - | - | | - | - | - | 1,500 | 1,500 |
| Reduction in minorities' share capital | - | - | - | - | - | - | - | (10,505) | (10,505) |
| At December 31, 2006 | 566,395 | 459,153 | 312,000 | (11,449) | 184,220 | 5,557,149 | 7,077,568 | 571,395 | 7,648,963 |
| Changes in fair value of investments during the year | - | - | - | - | 326,358 | - | 326,358 | 149,531 | 475,889 |
| Overseas entities' translation adjustment | - | - | - | 9,294 | - | | 9,294 | 31 | 9,325 |
| Total income recognized directly in equity | - | - | - | 9,294 | 326,358 | - | 335,652 | 149,556 | 485,208 |
| Net income for the year | - | - | - | | - | 1,900,632 | 1,900,632 | 225,360 | 2,125,992 |
| Total income for the year | - | - | - | 9,294 | 326,358 | 1,900,632 | 2,236,284 | 374,916 | 2,611,199 |
| Transfer to statutory and legal reserves | - | 139,856 | - | - | - | (139,856) | - | - | - |
| Dividend paid | - | - | - | - | - | - | - | (31,013) | (31,013) |
| Bonus shares issued | 559,659 | - | - | - | - | (559,659) | - | - | - |
| Reduction in minorities' share capital | - | - | - | - | - | - | - | (64,753) | (64,753) |
| At December 31, 2007 | 1,126,054 | 599,009 | 312,000 | (2,155) | 510,578 | 7,068,066 | 9,613,552 | 850,446 | 10,464,098 |

The accompanying notes form an integral part of these consolidated financial statements



## Consolidated Cash Flow Statement
for the year ended December 31

| | 2007 | | 2006 | |
|---|---|---|---|---|
| | AED'000 | US$'000 Equivalent | AED'000 | US$'000 Equivalent |
| **Cash flows from operating activities** | | | | |
| Net income for the year | 2,125,995 | 578,810 | 1,642,742 | 447,248 |
| **Adjustments to reconcile net income to net cash provided by operating activities:** | | | | |
| Depreciation of property and equipment | 67,400 | 18,350 | 53,949 | 14,687 |
| Fair value adjustment - trading investments | (136) | (37) | (63,283) | (17,229) |
| Translation adjustment for the year | 9,294 | 2,530 | 4,553 | 1,240 |
| Allowance for impairment of loans and advances | 193,536 | 52,691 | 83,124 | 22,651 |
| Fair value adjustment - property investment | (152,732) | (41,588) | (64,157) | (17,467) |
| Loss/(gain) on sale of property and equipment | 67 | 18 | (327) | (89) |
| **Changes in operating assets and liabilities:** | | | | |
| Increase in deposits with central banks for regulatory purposes | (417,507) | (113,669) | (217,136) | (59,117) |
| Increase in bank deposits maturing after three months | (1,830,958) | (498,491) | (623,710) | (169,841) |
| Increase in customers' loans and advances | (7,616,277) | (2,073,585) | (6,385,925) | (1,738,814) |
| Increase in Islamic financing and investing products | (1,516,255) | (412,811) | (829,014) | (225,705) |
| Increase in interest receivable and other assets | (2,691,119) | (732,676) | (730,622) | (198,940) |
| Decrease/(increase) in trading investments - net | 71,451 | 19,453 | (3,163,929) | (861,402) |
| Increase in repurchase agreements with banks | 2,548,701 | 693,901 | 918,312 | 250,017 |
| Increase in customers' deposits | 12,225,279 | 3,328,418 | 3,903,448 | 1,062,880 |
| Increase in Islamic customer deposits | 1,405,308 | 382,605 | 747,890 | 203,615 |
| Increase in medium-term floating rate notes | 1,836,500 | 500,000 | 1,101,750 | 300,000 |
| Decrease in long term loans | (6,834) | (1,861) | (7,324) | (1,989) |
| Increase in deposits and balances due to banks | 7,694,486 | 2,094,878 | 2,569,607 | 699,593 |
| Increase in insurance and life assurance funds | 142,955 | 38,920 | 113,492 | 30,890 |
| Increase in interest payable and other liabilities | 2,500,452 | 680,765 | 703,349 | 191,492 |
| **Net cash provided by/(used in) operating activities** | 16,580,006 | 4,516,695 | (242,872) | (66,124) |
| **Cash flows from investing activities** | | | | |
| Purchase of property and equipment | (149,880) | (40,806) | (162,807) | (44,325) |
| Proceeds from sale of property and equipment | 1,027 | 279 | 737 | 201 |
| Purchase of non-trading investments, net | (1,416,115) | (385,547) | (327,550) | (89,190) |
| **Net cash used in investing activities** | (1,564,968) | (426,074) | (489,620) | (133,320) |
| **Cash flows from financing activities** | | | | |
| Dividend paid to shareholders | - | - | (173,239) | (47,166) |
| Dividend paid to minority | (31,011) | (8,443) | (35,441) | (9,649) |
| Net capital withdrawn by minority | (44,722) | (12,176) | (8,504) | (2,315) |
| **Net cash used in financing activities** | (75,733) | (20,619) | (217,184) | (59,138) |
| **Increase/(decrease) in cash and cash equivalents (Note 34)** | 14,948,906 | 4,069,942 | (949,082) | (258,457) |

The accompanying notes form an integral part of these consolidated financial statements



## 1. General information

Mashreqbank psc (the "Bank") was incorporated in the Emirate of Dubai in 1967 under a decree issued by The Ruler of Dubai. The Bank operates through its branches in the United Arab Emirates, Bahrain, Egypt, Hong Kong, India, Qatar, the United Kingdom and the United States of America.

At December 31, 2007, Mashreqbank psc Group (the "Group") comprises the Bank and its subsidiaries as follows:

| Name of subsidiary | Place of incorporation (or registration) and operation | Proportion of ownership interest % | Proportion of voting power held % | Principal activity |
|---|---|---|---|---|
| Oseel - a Finance Company (PJSC) | United Arab Emirates | 98 | 98 | Finance company. |
| Oman Insurance Company (PSC) | United Arab Emirates | 63.65 | 63.65 | Insurance company. |
| Mindscape Information Technology L.L.C. | United Arab Emirates | 99 | 99 | Software/Application provider. |
| Mashreq Securities LLC | United Arab Emirates | 99.98 | 99.98 | Brokerage. |
| Injaz Services FZ LLC | United Arab Emirates | 100 | 100 | Service provider. |
| Al-Badr Islamic Finance (PJSC) | United Arab Emirates | 99.70 | 99.70 | Islamic finance co. |
| Mashreq Capital (DIFC) Limited | United Arab Emirates | 100 | 100 | Brokerage, asset management & fund management. |
| Al Yamama Services FZ LLC | United Arab Emirates | 100 | 100 | Service provider. |
| Makaseb Funds Company BSC | Kingdom of Bahrain | 99.90 | 99.90 | Managing funds. |
| Makaseb Funds Company BSC II | Kingdom of Bahrain | 99.90 | 99.90 | Managing funds. |
| Makaseb Funds Company BSC III | Kingdom of Bahrain | 99.90 | 99.90 | Managing funds. |
| Roya Executive Ltd. | British Virgin Islands | * | 100 | General activities. |
| Bracebridge Limited | British Virgin Islands | * | 100 | General activities. |
| Orriston Limited | British Virgin Islands | * | 100 | General activities. |

* Bank participation in capital is nominal, however the above subsidiaries are considered to be subsidiaries by virtue of 100% control.

**2. Adoption of new and revised International Financial Reporting Standards**

In the current year, the Group has adopted IFRS 7 Financial Instruments: Disclosure which is effective for annual reporting periods beginning on or after January 1, 2007, and the consequential amendments to IAS 1: Presentation of Financial Statements.

The impact of adoption of IFRS 7 and the changes to IAS 1 has been to expand the disclosures provided in these financial statements regarding the Group's financial instruments and management of capital (Note 40). Four Interpretations issued by the International Financial Reporting Interpretations Committee (IFRIC) are effective for the current year. These are: IFRIC 7: Applying the Restatement Approach under IAS 29, Financial Reporting in Hyperinflationary Economies; IFRIC 8: Scope of IFRS 2; IFRIC 9: Reassessment of Embedded Derivatives; and IFRIC 10: Interim Financial Reporting and Impairment. The adoption of these Interpretations has not led to any changes in the Group's accounting policies.

At the date of authorization of these financial statements, the following Standards and Interpretations were in issue but not yet effective:

| | |
|---|---|
| IAS 23 | IAS 23 (Revised) Borrowing Costs (effective for accounting periods beginning on or after January 1, 2009) |
| IFRS 8 | Operating Segments (effective January 1, 2009)<br><br>IFRS 8 replaces IAS 14 Segment Reporting. It extends the scope of segment reporting to include entities that hold assets in a fiduciary capacity for a broad group of outsiders as well as entities whose equity or debt securities are publicly traded and entities that are in the process of issuing equity or debt securities in public securities markets. |
| IFRIC 11 | IFRS-2: Group Treasury Shares Transactions (effective for periods beginning March 1, 2007) |
| IFRIC 12 | Service Concession Arrangements (effective for periods beginning January 1, 2008). |
| IFRIC 13 | Customer Loyalty Programmes (effective for periods beginning July 1, 2008) |
| IFRIC 14 | IAS 19 - The Limit on a Defined Benefit Asset, Minimum Funding Requirements and their Interaction (effective for periods beginning January 1, 2008) |

**3. Significant accounting policies**

**(a) Statement of compliance**

(i) The consolidated financial statements of Mashreqbank psc Group are prepared under the historical cost convension, except for certain financial instruments and investment property which are carried at fair value, in accordance with International Financial Reporting Standards (IFRS) and Central Bank of the U.A.E. requirements as relates to the measurement and classification of properties acquired in settlement of debts and impairment of loans and advances.

(ii) **Basis of consolidation**

The consolidated financial statements incorporate the financial statements of Mashreqbank psc and entities controlled by the bank (its subsidiaries). Control is achieved where the Bank has the power to govern the financial and operating policies of an entity so as to obtain benefits from its activities. The financial statements of subsidiaries are prepared for the same reporting period as that of the Bank, using consistent accounting policies.

All significant intra-group transactions, balances, income and expenses are eliminated.

Minority interests in the net assets of consolidated subsidiaries are identified separately from the Group's equity therein. Minority interests consist of the amount of those interests at the date of the original business combination and the minority's share of changes in equity since the date of the combination. Losses applicable to the minority in excess of the minority's interest in the subsidiary's equity are allocated against the interests of the Group except to the extent that the minority has a binding obligation and is able to make an additional investment to cover the losses.



3. **Significant accounting policies** (continued)

**(h) Derivative financial instruments and hedge accounting**

The Group uses derivative financial instruments, including forward foreign exchange contracts, interest rate futures, forward rate agreements, currency and interest rate swaps, currency and interest rate options (both written and purchased) to hedge the related associated risk.

Derivative financial instruments are initially measured at cost, being the fair value at contract date, and are subsequently re-measured at fair value. All derivatives are carried at their fair values as assets where the fair values are positive and as liabilities where the fair values are negative.

Fair values are generally obtained by reference to quoted market prices, discounted cash flow models and recognized pricing models as appropriate.

Changes in the fair value of derivative financial instruments that do not qualify for hedge accounting are recognized in the income statement as they arise.

For the purpose of hedge accounting, hedges are classified into two categories: (a) fair value hedges which hedge the exposure to changes in the fair value of a recognized asset or liability; and (b) cash flow hedges which hedge exposure to variability in cash flows that are either attributable to a particular risk associated with a recognized asset or liability, or a forecasted transaction that will affect future reported net income.

In order to qualify for hedge accounting, it is required that the hedge should be expected to be highly effective, i.e. the changes in fair value or cash flows of the hedging instrument should effectively offset corresponding changes in the hedged item and should be reliably measurable. At inception of the hedge, the risk management objective and strategy is documented including the identification of the hedging instrument, the related hedged item, the nature of risk being hedged, and how the Bank will assess the effectiveness of hedging relationship. Subsequently, the hedge is required to be assessed and determined to be an effective hedge on an ongoing basis.

*Fair value hedge*

Gains and losses from re-measuring derivatives, which meet the criteria for fair value hedge accounting, to their fair value are recognized in the consolidated income statement.

Hedge accounting is discontinued when the Group revokes the hedging relationship, the hedging instrument expires or is sold, terminated, or exercised, or no longer qualifies for hedge accounting. The adjustment to the carrying amount of the hedged item arising from the hedged risk is amortised to profit or loss from that date.

*Cash flow hedge*

In relation to cash flow hedges which meet the criteria for hedge accounting, the portion of the gain or loss on the hedging instrument that is determined to be an effective hedge is recognized initially in other reserves under shareholders' equity and the ineffective portion, if any, is recognized in the income statement. For cash flow hedges affecting future transactions, the gains or losses recognized in other reserves, are transferred to the income statement in the same period in which the hedged transaction affects the income statement. Where the hedged forecasted transaction results in the recognition of an asset or a liability, then, at the time the asset or liability is recognized, the associated gains or losses that had previously been recognized in other reserves are included in the initial measurement of the acquisition cost or other carrying amount of the asset or liability.

Hedge accounting is discontinued when the hedging instrument expires or is sold, terminated or exercised, or no longer qualifies for hedge accounting. At that point of time, any cumulative gain or loss on the cash flow hedging instrument that was recognized in other reserves is retained in shareholders' equity until the forecasted transaction occurs. Where the hedged forecasted transaction is no longer expected to occur, the net cumulative gain or loss recognized in equity is transferred to the income statement for the year.

3. **Significant accounting policies** (continued)

**(b) Derivative financial instruments and hedge accounting** (continued)

***Embedded derivatives***

Derivatives embedded in other financial instruments or other host contracts are treated as separate derivatives when their risks and characteristics are not closely related to those of the host contract and the host contract is not carried at fair value with unrealized gains or losses reported in the income statement.

**(c) Revenue recognition**

Interest income and expense are recognized on a time proportion basis, taking account of the principal outstanding and the rate applicable. Interest income and expense include the amortization of discount or premium using the effective interest rate method. When there is doubt in the collection of the principal or the interest, the recognition of income ceases. Commission and fee income are generally accounted for on the date the transaction arises. Recoveries in respect of loans fully provided are accounted for on a cash receipt basis.

Dividend revenue from investments is recognized when the Group's right to receive payment has been established.

Premiums on general insurance policies are accounted for on the date of writing of policies except premium income on marine cargo policies which is accounted for on the expected date of voyage. Premiums are adjusted for unearned premium.

Premium on life assurance policies are accounted for on the date of writing of policies and on subsequent due dates.

Commissions and other costs directly related to the acquisition and renewal of insurance contracts are charged to the income statement when incurred.

**(d) Foreign currency transactions**

The individual financial statements of each group entity are presented in the currency of the primary economic environment in which the entity operates (its functional currency). For the purpose of the consolidated financial statements, the results and financial position of each entity are expressed in U.A.E Dirham (AED), which is the functional currency of the Bank, and the presentation currency for the consolidated financial statements.

The reporting currency of the Group is the U.A.E. Dirham (AED). However, for presentation purposes only, additional columns for US Dollar equivalent amounts have been presented in the consolidated Balance Sheet, Income Statement and Statement of Cash Flow and certain notes to the financial statements using a conversion rate of US$ 1.00 = AED 3.673.

Transactions denominated in foreign currencies are recorded in their respective local currencies at the rates of exchange prevailing at the time of the transactions. Monetary assets and liabilities denominated in foreign currencies at the balance sheet date are translated at the exchange rates prevailing at that date. Gains and losses are reflected in net income for the year.

Assets and liabilities of foreign branches are translated into U.A.E. Dirham at the rates of exchange ruling at year end. Income and expenses are translated at average rates of exchange during the year. The resulting differences are included under shareholders' equity as cumulative translation adjustment and are written off to the income statement on closure or disposal of the related branch.

**(e) Impairment of tangible and intangible assets**

At each balance sheet date, the Group reviews the carrying amounts of its tangible and intangible assets to determine whether there is any indication that those assets have suffered an impairment loss. If any such indication exists, the recoverable amount of the assets is estimated in order to determine the extent of the impairment loss (if any). Where it is not possible to estimate the recoverable amount of an individual asset, the Group estimates the recoverable amount of the cash-generating unit to which the asset belongs.





3. **Significant accounting policies** (continued)

**(e) Impairment of tangible and intangible assets** (continued)

Recoverable amount is the higher of fair value less costs to sell and value in use. In assessing value in use, the estimated future cash flows are discounted to their present value using a pre-tax discount rate that reflects current market assessments of the time value of money and the risks specific to the asset.

If the recoverable amount of an asset (or cash-generating unit) is estimated to be less than its carrying amount, the carrying amount of the asset (cash-generating unit) is reduced to its recoverable amount. An impairment loss is recognized in the income statement, unless the relevant asset is carried at a revalued amount, in which case the impairment loss is treated as a revaluation decrease.

Where an impairment loss subsequently reverses, the carrying amount of the asset (cash-generating unit) is increased to the revised estimate of its recoverable amount, such that the increased carrying amount does not exceed the carrying amount that would have been determined had no impairment loss been recognized for the asset (cash-generating unit) in prior years. A reversal of an impairment loss is recognized in the income statement, unless the relevant asset is carried at revalued amount, in which case the reversal of the impairment loss is treated as a revaluation increase.

**(f) Investment property**

Investment property comprises investment in buildings and freehold land held for capital appreciation and to earn rentals. These are initially stated at cost comprising purchase price and any directly attributable expenditure. For subsequent measurement purposes, the Group has chosen the fair value model as permitted by IAS 40, "Investment property", under which the investment property is carried at fair value with any revaluation gains or losses recognized in the income statement.

**(g) Property and equipment**

Property and equipment are stated at cost less accumulated depreciation and any accumulated impairment losses.

Depreciation is charged so as to write off the cost of assets, other than land and properties under construction, using the straight-line method, over the estimated useful lives of the respective assets, as follows:

| | Years |
|---|---|
| Group buildings | 20 - 25 |
| Office equipment (including computers) and vehicles | 3 - 5 |
| Furniture, fixtures and computer mainframe hardware | 6 - 7 |
| Improvements to freehold properties and others | 5 - 10 |

The estimated useful lives, residual values and depreciation method are reviewed at each year end, with the effect of any changes in estimate accounted for on a prospective basis.

The gain or loss arising on the disposal or retirement of an item of property and equipment is determined as the difference between the sales proceeds and the carrying amount of the asset and is recognised in profit or loss.

One year after property and equipment are fully depreciated, they are maintained at a net book value of one currency unit by setting off accumulated depreciation against cost.

Properties in the course of construction are carried at cost, less any recognised impairment loss. Cost includes professional fees and, for qualifying assets, borrowing costs capitalised in accordance with the Group's accounting policy. Depreciation of these assets commences when the assets are ready for their intended use.

**(h) Financial assets**

Investments are recognised and derecognised on the settlement date where the purchase or sale of an investment is under a contract whose terms require delivery of the investment within the timeframe established by the market concerned, and are initially measured at fair value, net of transaction costs, except for those financial assets classified as at fair value through profit or loss, which are initially measured at fair value.



3. **Significant accounting policies** (continued)

**(h) Financial assets** (continued)

Financial assets are classified into the following specified categories: financial assets as 'at fair value through profit or loss' (FVTPL), 'held-to-maturity investments', 'available-for sale' (AFS) financial assets and 'loans and advances'. The classification depends on the nature and purpose of the financial assets and is determined at the time of initial recognition.

***Effective interest method***

The effective interest method is a method of calculating the amortised cost of a financial asset and of allocating interest income over the relevant period. The effective interest rate is the rate that exactly discounts estimated future cash receipts through the expected life of the financial asset, or, where appropriate, a shorter period.

Income is recognised on an effective interest rate basis for debt instruments other than those financial assets designated as at FVTPL.

***Financial assets at FVTPL***

Financial assets are classified as at FVTPL where the financial asset is either held for trading or it is designated as at FVTPL.

A financial asset is classified as held for trading if:

- it has been acquired principally for the purpose of selling in the near future; or
- it is a part of an identified portfolio of financial instruments that the Group manages together and has a recent actual pattern of short-term profit-taking; or
- it is a derivative that is not designated and effective as a hedging instrument.

A financial asset other than a financial asset held for trading may be designated as at FVTPL upon initial recognition if:

- such designation eliminates or significantly reduces a measurement or recognition inconsistency that would otherwise arise; or
- the financial asset forms part of a group of financial assets or financial liabilities or both, which is managed and its performance is evaluated on a fair value basis, in accordance with the Group's documented risk management or investment strategy, and information about the grouping is provided internally on that basis; or
- it forms part of a contract containing one or more embedded derivatives, and IAS 39 permits the entire combined contract (asset or liability) to be designated as at FVTPL.

Financial assets at FVTPL are stated at fair value, with any resultant gain or loss recognised in profit or loss. The net gain or loss incorporates any dividend or interest earned on the financial asset. Fair value is determined in the manner described in Note 41.

***Held-to-maturity investments***

Bills of exchange and debentures with fixed or determinable payments and fixed maturity dates that the Group has the positive intent and ability to hold to maturity are classified as held-to-maturity investments. Held-to-maturity investments are recorded at amortised cost using the effective interest method less impairment, with revenue recognized on an effective yield basis.

***AFS financial assets***

Listed shares and listed redeemable notes held by the Group that are traded in an active market are classified as being AFS and are stated at fair value. Fair value is determined in the manner described in Note 41. Gains and losses arising from changes in fair value are recognised directly in equity in the investments revaluation reserve with the exception of impairment losses, interest calculated using the



3. **Significant accounting policies** (continued)

**(h) Financial assets** (continued)

effective interest rate method and foreign exchange gains and losses on monetary assets, which are recognised directly in profit or loss. Where the investment is disposed of or is determined to be impaired, the cumulative gain or loss previously recognised in the investments revaluation reserve is included in profit or loss for the period.

Dividends on AFS equity instruments are recognised in profit or loss when the Group's right to receive payments is established.

The fair value of AFS monetary assets denominated in a foreign currency is determined in that foreign currency and translated at the spot rate at the balance sheet date. The change in fair value attributable to translation differences that result from a change in amortised cost of the asset is recognised in profit or loss, and other changes are recognised in equity.

***Loans and advances***

Loans and advances are non-derivative financial assets originated or acquired by the Group with fixed or determinable payments.

All loans and advances are initially measured at cost, being the fair value of the consideration given

Following the initial recognition, subsequent transfers between the various classes of loans and advances is not ordinarily permissible. The subsequent period end reporting values for various classes of loans and advances are determined on the basis as set out in the following paragraphs:

***(i) Loans and advances held at amortised cost***

Loans and advances originated or acquired by the Group that are not quoted in an active market and for which fair value has not been hedged, and those that are to be held to maturity, are stated at amortised cost less any amount written off and provisions for impairment.

For loans and advances which are hedged, the related portion of the hedged fair value is adjusted against the carrying amount.

Allowance for impairment is made against loans and advances when their full recovery as per contracted terms is in doubt taking into consideration IFRS requirements for fair value measurement and Central Bank of the U.A.E. guidelines.

***(ii) Held as FVIS***

Loans and advances in this category are classified as either held for trading or those designated as FVIS (Fair Value through Income Statement). Loans and advances classified as trading are acquired principally for the purpose of selling or repurchasing in short term. Loans and advances may be designated as FVIS by the management if it satisfies the criteria laid down by IAS 39. After initial recognition, such loans and advances are measured at fair value and any change in the fair value is recognized in the consolidated statement of income for the period in which it arises.

***(iii) Available for sale***

Loans and advances classified as available for sale are subsequently measured at fair value. Any changes in fair value, other than those relating to hedged risks, are recognized directly in "other reserves" under "shareholders' equity" until these are derecognized or impaired, at which time the cumulative gain or loss previously recognized in shareholders' equity is included in the consolidated statement of income for the period.

For presentation purposes, provision for credit losses is deducted from loans and advances.

***Impairment of financial assets***

Financial assets, other than those at FVTPL, are assessed for indicators of impairment at each balance sheet date. Financial assets are impaired where there is objective evidence that, as a result of one or more events that occurred after the initial recognition of the financial asset, the estimated future cash flows of the investment have been impacted. For financial assets carried at amortised cost, the amount

**(h) Financial assets** (continued)

of the impairment is the difference between the asset's carrying amount and the present value of estimated future cash flows discounted at the original effective interest rate.

The carrying amount of the financial asset is reduced by the impairment loss directly for all financial assets with the exception of loans and advances where the carrying amount is reduced through the use of an allowance account. When advance receivable is uncollectible, it is written off against the allowance account. Subsequent recoveries of amounts previously written off are credited against the allowance account. Changes in the carrying amount of the allowance account are recognized in profit or loss

With the exception of AFS equity instruments, if, in a subsequent period, the amount of the impairment loss decreases and the decrease can be related objectively to an event occurring after the impairment was recognized, the previously recognized impairment loss is reversed through profit or loss to the extent that the carrying amount of the investment at the date the impairment is reversed does not exceed what the amortized cost would have been had the impairment not been recognized.

In respect of AFS equity securities, any increase in fair value subsequent to an impairment loss is recognized directly in equity.

*Impairment of loans and advances*

*Impairment of loans and advances are assessed as follows:*

(i) *Individually assessed loans*

Represent mainly, corporate loans which are assessed individually by Credit Risk Unit in order to determine whether there exists any objective evidence that a loan is impaired.

Impaired loans are measured based on the present value of expected future cash flows discounted at the loan's effective interest rate or at the loan's observable market price, if available, or at the fair value of the collateral if the recovery is entirely collateral dependent.

Impairment loss is calculated as the difference between the loan's carrying value and its present value calculated as above.

(ii) *Collectively assessed loans*

Impairment losses of collectively assessed loans include the allowances on:

a) Performing loans
b) Retail loans with common features which are rated on a portfolio basis and where individual loan amounts are not significant.

***(a) Performing loans***

Where individually assessed loans are evaluated and no evidence of loss is present or has been identified, there may be losses based upon risk rating and expected migrations, product or industry characteristics.

Impairment covers losses which may arise from individual performing loans that are impaired at the balance sheet date but were not specifically identified as such until some time in the future.

The estimated impairment is calculated by the Bank's management for each identified portfolio as per the requirements of the Central Bank of the U.A.E. and based on historical experience, credit rating and expected migrations in addition to the assessed inherent losses which are reflected by the economic and credit conditions.

***(b) Retail loans with common features which are rated on a portfolio basis and where individual loan amounts are not significant***

Impairment of retail loans is calculated by applying formulaic approach and loans are written off between 150-180 days past their due date based on products features.



3. **Significant accounting policies** (continued)

**(i) Customers' deposits and medium term floating rate notes**

Customers' deposits and medium-term floating rate notes are initially measured at fair value which is normally consideration received net of directly attributable transaction costs incurred, and subsequently measured at their amortised cost using the effective interest method.

**(j) Repurchase transactions**

Securities sold under agreements to repurchase ("repo") continue to be recognized in the balance sheet and are measured in accordance with the accounting policies for FVTPL or for non-trading investments. The counter party liability for amounts received under these agreements is included in due to banks.

The difference between sale and repurchase price is treated as interest expense and expensed over the life of each agreement.

**(k) Financial liabilities instruments issued by the Group**

***Classification as debt or equity***

Debt and equity instruments are classified as either financial liabilities or as equity in accordance with the substance of the contractual arrangement.

***Financial liabilities***

Financial liabilities are classified as either financial liabilities 'at FVTPL' or 'other financial liabilities'.

***Financial liabilities at FVTPL***

Financial liabilities are classified as at FVTPL where the financial liability is either held for trading or it is designated as at FVTPL.

A financial liability is classified as held for trading if:

- it has been incurred principally for the purpose of repurchasing in the near future; or
- it is a part of an identified portfolio of financial instruments that the Group manages together and has a recent actual pattern of short-term profit-taking; or
- it is a derivative that is not designated and effective as hedging instrument.

A financial liability other than a financial liability held for trading may be designated as at FVTPL upon initial recognition if:

- such designation eliminates or significantly reduces a measurement or recognition inconsistency that would otherwise arise; or
- the financial liability forms part of a group of financial assets or financial liabilities or both, which is managed and its performance is evaluated on a fair value basis, in accordance with the Group's documented risk management or investment strategy, and information about the grouping is provided internally on that basis; or
- it forms part of a contract containing one or more embedded derivatives, and IAS 39 *Financial Instruments: Recognition and Measurement* permits the entire combined contract (asset or liability) to be designated as at FVTPL.

Financial liabilities at FVTPL are stated at fair value, with any resultant gain or loss recognised in profit or loss. The net gain or loss recognised in profit or loss incorporates any interest paid on the financial liability. Fair value is determined in the manner described in Note 31.

***Other financial liabilities***

Other financial liabilities, including borrowings, are initially measured at fair value, net of transaction costs.

Other financial liabilities are subsequently measured at amortised cost using the effective interest method, with interest expense recognised on an effective yield basis.

3. Significant accounting policies (continued)

**(k) Financial liabilities instruments issued by the Group (continued)**

The effective interest method is a method of calculating the amortised cost of a financial liability and of allocating interest expense over the relevant period. The effective interest rate is the rate that exactly discounts estimated future cash payments through the expected life of the financial liability, or, where appropriate, a shorter period.

**(l) Employees' end-of-service indemnity**

Provision is made for estimated amounts required to cover employees' end-of-service indemnity at the balance sheet date as per U.A.E. Labour Law. In the opinion of management, the provision would not have been materially different had it been calculated on an actuarial basis.

**(m) Pension and national insurance**

Pension and national insurance contributions for U.A.E. citizens are made by the Group in accordance with Federal Law No.7 of 1999.

**(n) Taxes on income**

Where applicable, provision is made for current and deferred taxes arising from the operating results of overseas branches that are operating in taxable jurisdictions.

**(o) Offsetting of financial assets and liabilities**

Financial assets and liabilities are offset and reported net in the balance sheet only when there is a legally enforceable right to set off the recognized amounts or when the Group intends to settle on a net basis, or to realize the asset and settle the liability simultaneously.

**(p) Cash and cash equivalents**

Cash and cash equivalents comprise cash on hand, demand deposits, and other short-term liquid investments that are readily convertible to a known amount of cash and are subject to an insignificant risk of changes in value.

**(q) De-recognition of financial instruments**

A financial asset (or a part of a financial asset, or a part of a Group of similar financial assets) is derecognized, when the contractual rights to the cash flows from the financial asset expires.

In instances where the Group is assessed to have transferred a financial asset, the asset is derecognized if the Group has transferred substantially all the risks and rewards of ownership. Where the Group has neither transferred nor retained substantially all the risks and rewards of ownership, the financial asset is derecognized only if the Group has not retained control of the financial asset. The Group recognizes separately as assets or liabilities any rights and obligations created or retained in the process.

A financial liability (or a part of a financial liability) can only be derecognized when it is extinguished, that is when the obligation specified in the contract is either discharged, cancelled or expires.

**(r) Islamic financing and investment products**

In addition to the conventional banking, the Bank offers its customers certain non-interest based banking products, which are approved by its Shariah Board.

All non interest based banking products are accounted for in conformity with the accounting policies described in these consolidated financial statements.

3. **Significant accounting policies** (continued)

(r) **Islamic financing and investment products** (continued)

(i) The following terms are used in Islamic financing:

*Murabaha*

An agreement whereby the Bank sells to a customer a commodity or an asset, which the Bank has purchased and acquired, based on a promise received from the customer to buy the item purchased according to specific terms and conditions. The selling price comprises the cost of the commodity and an agreed profit margin.

*Istisna'a*

An agreement between the Bank and a customer whereby the Bank would sell to the customer a developed property according to agreed upon specifications. The Bank would develop the property either on its own or through a subcontractor and then hand it over to the customer on fixed date at an agreed price.

*Ijara*

An agreement whereby the Bank acting as a lessor, purchases or constructs an asset for lease according to the customer's request (lessee), based on his promise to lease the asset for an agreed rent and a specific period that could end by transferring the ownership of the leased asset to the lessee.

*Musharaka*

An agreement between the Bank and a customer to contribute to a certain investment enterprise or the ownership of a certain property ending up with the acquisition by the customer of the full ownership. The profit or loss is shared as per the terms of the agreement.

*Mudaraba*

An agreement between the Bank and a customer whereby the Bank would provide a certain amount of funds, which the customer would then invest in a specific enterprise or activity against a specific share in the profit. The customer would bear the loss in case of default, negligence or violation of any of the terms and conditions of the Mudaraba.

*Wakala*

An agreement whereby the Bank provides a certain sum of money to an agent who invests it according to specific conditions in return for a certain fee (a lump sum of money or a percentage of the amount invested). The agent is obliged to return the invested amount in case of default, negligence or violation of any of the terms and conditions of the Wakala.

(ii) Revenue recognition

Revenue is recognized on the above Islamic products as follows:

*Murabaha*

Where the income is quantifiable and contractually determined at the commencement of the contract, income is recognized on a time proportion basis over the period of the contract based on the principal amounts outstanding.



3. **Significant accounting policies** (continued)

**(r) Islamic financing and investment products** (continued)

*Istisna'a*

Istisna'a revenue and the associated profit margin (difference between the cash price to the customer and the Bank's total Istisna'a cost) are accounted for on a time proportion basis.

*Ijara*

Ijara income is recognized on a time proportion basis over the lease term.

*Musharaka*

Income is accounted for on the basis of the reducing balance on a time proportion basis that reflects the effective yield on the asset.

*Mudaraba*

Income on mudaraba financing is recognized on distribution by the mudarib, whereas the losses are charged to income on their declaration by the mudarib.

*Wakala*

Estimated income from Wakala is recognized on an accrual basis over the period, adjusted by actual income when received. Losses are accounted for on the date of declaration by the agent.

**(s) Provisions**

Provisions are recognised when a reliable estimate can be made by the Group for a present legal or constructive obligation as a result of past events and it is more likely than not that an outflow of resources will be required to settle the obligation.

**(t) Operating leases**

Payments made under operating leases are recognised in profit or loss on a straight-line basis over the term of the lease. Lease incentives received are recognised as an integral part of the total lease expense, over the term of the lease.

4. **Critical accounting judgements and key sources of estimation uncertainty**

The preparation of financial statements in conformity with IFRS requires the use of certain critical accounting estimates and assumptions that affect the reported amounts of assets and liabilities. It also requires management to exercise its judgement in the process of applying the Group's accounting polices, which are described in Note 3. Such estimates, assumptions and judgements are continually evaluated and are based on historical experience and other factors, including obtaining professional advices and expectations of future events that are believed to be reasonable under the circumstances. Significant areas where management has used estimates, assumptions or exercised judgements are as follows:

**(i) Impairment of loans**

The Group's accounting policy for allowances in relation to impaired loans and advances is described in Note 3(h). Impairment is calculated on the basis of discounted estimated future cash flows or by applying a certain percentage on the performing unclassified loan book based on market trend and historical pattern of defaults.



4.  **Critical accounting judgements and key sources of estimation uncertainty** (continued)

  (i)  **Impairment of loans** (continued)

The allowance for loan losses is established through charges to income in the form of an allowance for loan loss. Increases and decreases in the allowance due to changes in the measurement of the impaired loans are included in the allowance for loan losses and affect the income statement accordingly.

**Individually assessed loans**

Impairment losses for individually assessed loans are determined by an evaluation of exposure on a case-by-case basis. This procedure is applied to all classified corporate loans and advances which are individually significant accounts or are not subject to the portfolio-based approach.

The following factors are considered when determining impairment losses on individually assessed accounts.

1.  The customer's aggregate borrowings.
2.  The customer's risk rating, i.e. ability to perform profitable business and generate sufficient cash to repay the borrowed amount.
3.  The value of the collateral and the probability of successful repossession.
4.  The cost involved to recover the debts.

The Bank's policy requires regular review of the level of impairment allowances on individual facilities.

Impaired loans continue to be classified as impaired unless they are brought fully current and the collection of scheduled interest and principal is considered probable.

**Collectively assessed loans**

Collectively assessed allowances are made in respect of losses incurred in portfolios of retail loans with common features and where individual loan amounts are not significant and incorporate accounts, as follows:

The portfolio approach is applied to accounts in the following portfolios:

1.  Personal loans,
2.  Credit cards,
3.  Auto loans, and
4.  Mortgage loans

The management of the Bank assess, based on historical experience and the prevailing economical and credit conditions, the magnitude of loans which may be impaired but not identified as of the balance sheet date.

These portfolio allowances are reassessed on a periodical basis and allowances are adjusted accordingly.

  (ii)  **Property and equipment**

The cost of property and equipment is depreciated over the estimated useful life, which is based on expected usage of the asset, expected physical wear and tear, which depends on operational factors. The management has not considered any residual value as it is deemed immaterial.

**4. Critical accounting judgements and key sources of estimation uncertainty** (continued)

**(iii) Fair value of unquoted financial instruments**

The fair values of financial instruments that are not quoted in active markets are determined by using valuation techniques. Where valuation techniques (for example, models) are used to determine fair values, they are validated and periodically reviewed by qualified personnel independent of the area that created them. All models are certified before they are used, and models are calibrated to ensure that outputs reflect actual data and comparative market prices. To the extent practical, models use only observable data, however areas such as credit risk (both own and counter party), volatilities and correlations require management to make estimates. Changes in assumptions about these factors could affect reported fair value of financial instruments.

**(iv) Impairment of available-for-sale equity investments**

The Group exercises judgement to consider impairment on the available-for-sale equity investments. This includes determination of a significant or prolonged decline in the fair value below its cost. In making this judgement, the Group evaluates among other factors, the normal volatility in share price. In addition, the Group considers impairment to be appropriate when there is evidence of deterioration in the financial health of the investee, industry and sector performance, changes in technology, and operational and financing cash flows.

**(v) Derivative financial instruments**

Subsequent to initial recognition, the fair values of derivative financial instruments measured at fair value are generally obtained by reference to quoted market prices, discounted cash flow models and recognized pricing models as appropriate. When independent prices are not available, fair values are determined by using valuation techniques which refer to observable market data. These include comparison with similar instruments where market observable prices exist, discounted cash flow analysis, option pricing models and other valuation techniques commonly used by market participants. The main factors which management considers when applying a model are:

(a) The likelihood and expected timing of future cash flows on the instrument. These cash flows are usually governed by the terms of the instrument, although management judgment may be required in situations where the ability of the counterparty to service the instrument in accordance with the contractual terms is in doubt; and

(b) An appropriate discount rate of the instrument. Management determines this rate, based on its assessment of the appropriate spread of the rate for the instrument over the risk-free rate. When valuing instruments by reference to comparable instruments, management takes into account the maturity, structure and rating of the instrument with which the position held is being compared. When valuing instruments on a model basis using the fair value of underlying components, management considers, in addition, the need for adjustments to take account of a number of factors such as bid-offer spread, credit profile, servicing costs of portfolios and model uncertainty.



## 5. Cash and balances with central banks

| | December 31, | |
|---|---|---|
| | 2007 | 2006 |
| | AED '000 | AED '000 |
| Cash on hand | 231,137 | 274,351 |
| Balances with central banks: | | |
| Current accounts and other balances | 1,574,196 | 521,466 |
| Statutory cash ratio requirements | 1,597,378 | 1,179,871 |
| Certificates of deposit/placements with the Central Banks | 16,797,412 | 430,000 |
| | 20,200,123 | 2,405,688 |

The Bank is required to maintain statutory deposits with various central banks on demand, time and other deposits as per the statutory requirements.

## 6. Deposits and balances due from banks

| | December 31, | |
|---|---|---|
| | 2007 | 2006 |
| | AED '000 | AED '000 |
| Demand | 1,417,089 | 792,598 |
| Overnight | 1,452,975 | 453,849 |
| Time | 5,089,783 | 7,310,465 |
| | 7,050,847 | 8,556,912 |

The above represent balances due from:

| | 2007 | 2006 |
|---|---|---|
| Banks abroad | 7,192,177 | 8,190,249 |
| Banks in the U.A.E. | 767,670 | 366,663 |
| | 7,959,847 | 8,556,912 |

## 7. Investments

| | | December 31, | |
|---|---|---|---|
| | | 2007 | 2006 |
| | | AED '000 | AED '000 |
| (a) | **Trading investments** | | |
| | **Held for trading** | | |
| | Debt securities | 7,323,222 | 7,065,331 |
| | Equities | 523,136 | 501,945 |
| | Discretionary managed fund | 1,301,249 | 1,552,963 |
| | Other investments | 1,075,534 | 974,217 |
| | | 10,023,141 | 10,094,456 |
| (b) | **Non trading investments** | | |
| | **(i) Available-for-sale** | | |
| | Debt securities | 1,687,851 | 426,201 |
| | Equities | 2,709,398 | 2,313,082 |
| | Others | 156,700 | 82,751 |
| | | 4,553,949 | 2,821,044 |

7. **Investments** (continued)

| | December 31, | |
|---|---|---|
| | 2007 | 2006 |
| | AED '000 | AED '000 |
| **(ii) Held-to-maturity** | | |
| Debt securities | 196,959 | 34,235 |
| | 4,750,908 | 2,855,279 |
| Less: Provision for impairment | (1,890) | (14,286) |
| | 4,749,018 | 2,840,993 |
| **Total investments** | 14,772,159 | 12,935,449 |

(c) The analysis of investments by industry sector is as follows:

| | December 31, | |
|---|---|---|
| | 2007 | 2006 |
| | AED '000 | AED '000 |
| Government and Public Sector | 3,243,075 | 3,444,876 |
| Commercial and Business | 1,569,456 | 939,769 |
| Financial Institutions | 7,170,354 | 5,524,766 |
| Other | 2,789,274 | 3,026,038 |
| **Total** | 14,772,159 | 12,935,449 |

(d) The movements in the provision for the impairment of investment in securities during the year were as follows:

| | December 31, | |
|---|---|---|
| | 2007 | 2006 |
| | AED '000 | AED '000 |
| **Balance at the beginning of the year** | 14,286 | 14,286 |
| Write-back during the year | (12,396) | - |
| **Balance at the end of the year** | 1,890 | 14,286 |

(e) "Held-for-trading" and "Available-for-sale" investments at December 31, 2007 included AED 219.69 million held in the names of "related parties" nominees for the account and for the benefit of the Bank (2006: AED 189.27 million).

(f) The fair value of investments classified under held-to-maturity amounted to AED 193.572 million as of December 31, 2007 (2006: AED 34.790 million).

(g) The above investments include debt securities aggregating to AED 4,631.404 million (2006: AED 1,332.540 million) (held-for-trading at fair value of AED 3,960.904 million (2006: AED 1,134.132 million) and available-for-sale at fair value of AED 670.500 million (2006: AED 198.408 million)) sold under repurchase agreements ("repo") and which are fully substitutable (Note 14).

## 8. Loans and advances (net)

(a)

| | December 31, 2007 AED '000 | 2006 AED '000 |
|---|---|---|
| Overdrafts | 5,164,711 | 4,481,428 |
| Loans | 30,374,216 | 23,780,624 |
| Credit Cards | 1,367,155 | 1,000,454 |
| Others | 179,447 | 143,581 |
| | 37,085,529 | 29,496,087 |
| Less: Allowance for impairment | (1,090,555) | (923,854) |
| | 35,994,974 | 28,572,233 |

(b) **Analysis by industry sector**

| | 2007 | 2006 |
|---|---|---|
| Manufacturing | 3,405,263 | 3,251,605 |
| Construction | 2,403,216 | 1,513,268 |
| Trade | 7,658,305 | 5,923,022 |
| Transport and communication | 1,702,992 | 1,118,034 |
| Services | 3,910,876 | 2,307,072 |
| Banks and financial institutions | 3,744,117 | 3,795,477 |
| Personal | 9,091,102 | 8,405,769 |
| Government/public sector | 5,161,787 | 2,881,650 |
| Others | 17,871 | 299,270 |
| | 37,085,529 | 29,496,087 |
| Less: Allowance for impairment | (1,090,555) | (923,854) |
| | 35,994,974 | 28,572,233 |

The performing loans and advances include AED 377 million (2006: AED 284 million) of loans and advances that are past due but not impaired.

(c) In certain cases, the Bank continues to carry classified doubtful debts and delinquent accounts on its books even after making 100% allowance for impairment. Interest is accrued on most of these accounts for litigation purposes only and accordingly not taken to income. Accounts are written off only when all legal and other avenues for recovery or settlement are exhausted. The value of loans and advances, including fully provided accounts on which interest is not taken to income amounted to AED 383 million at December 31, 2007 (2006: AED 379 million).

(d) The movements in the allowance for impairment of loans and advances during the year were as follows:

| | December 31, 2007 AED '000 | 2006 AED '000 |
|---|---|---|
| **Balance at the beginning of the year** | 923,854 | 627,553 |
| Impairment allowance for the year | 231,066 | 126,241 |
| Amount written off during the year | (15,627) | (10,892) |
| Recoveries during the year | (48,738) | (18,848) |
| **Balance at the end of the year** | 1,090,555 | 923,854 |

The amount of impairment allowance for the year includes AED 38 million (2006: AED 40 million) of interest accrued on impaired loans and advances for litigation purposes which is not taken to income.



9. Islamic financing and investment products

| | December 31, 2007 AED '000 | December 31, 2006 AED '000 |
|---|---|---|
| (a) **Financing** | | |
| Murabaha | 336,118 | 20,072 |
| Ijara | 761,199 | 75,595 |
| | 1,097,317 | 95,667 |
| **Investing** | | |
| Musharakah | 614,190 | 128,969 |
| Wakala | 292,892 | 606,391 |
| Sukuk and funds | 343,189 | - |
| | 1,250,271 | 735,360 |
| **Total** | 2,347,588 | 831,027 |
| Less: Unearned income | (1,825) | (2,013) |
| Provision for impairment | (494) | - |
| | 2,345,269 | 829,014 |

(b) **Analysis by economic activities:**

| | 2007 | 2006 |
|---|---|---|
| Construction | 586,223 | - |
| Trade | 752 | 1,598 |
| Transport and communication | 3,010 | - |
| Services | 485,934 | - |
| Banks and financial institutions | 876,214 | 735,360 |
| Personal | 191,791 | 18,474 |
| Government/public sector | 203,664 | 75,595 |
| | 2,347,588 | 831,027 |
| Less: Unearned income | (1,825) | (2,013) |
| Provision for impairment | (494) | - |
| | 2,345,269 | 829,014 |



## 10. Interest receivable and other assets

| | December 31, 2007 | December 31, 2006 |
|---|---|---|
| | AED '000 | AED '000 |
| Interest receivable | 317,208 | 334,454 |
| Prepaid interest and expenses | 66,802 | 49,775 |
| Taxes paid in advance | 33,300 | 26,922 |
| Clearing suspense | 9,298 | 8,770 |
| Positive fair value of derivatives - Note 39 | 2,433,377 | 838,808 |
| Insurance related receivables | 497,293 | 370,226 |
| Credit Cards interchange receivables | 59,848 | 44,568 |
| Inter-group transaction | - | 43,183 |
| Customer acceptance | 1,337,223 | 1,157,685 |
| Others | 718,575 | 107,408 |
| | 5,472,924 | 2,781,805 |

## 11. Investment property

| | 2007 | 2006 |
|---|---|---|
| Interest in buildings and freehold land - January 1, | 361,739 | 234,103 |
| Additions during the year | 15,770 | 74,347 |
| Sold during the year | (31,801) | - |
| Write off during the year | - | (668) |
| Change in fair value during the year | 152,732 | 64,157 |
| | 498,440 | 363,739 |

The fair value of investment property as of December 31, 2007 has been arrived at on the basis of a valuation carried out on November 29, 2007 and on October 31, 2007 by independent valuers.



## 12. Property and equipment

| | Property for own use | Property acquired in settlement of debts | Furniture, fixtures, equipment & vehicles | Improvements to freehold properties and others | Capital work-in-progress | Total |
|---|---|---|---|---|---|---|
| | AED '000 | AED '000 | AED '000 | AED '000 | AED '000 | AED '000 |
| **Cost** | | | | | | |
| At December 31, 2005 | 158,057 | 21,525 | 142,069 | 76,920 | - | 398,571 |
| Additions | 4,209 | 29 | 59,984 | 66,419 | 32,166 | 162,807 |
| Disposals/write offs | (202) | (3) | (4,897) | (12,055) | - | |
| (17,157) | | | | | | |
| At December 31, 2006 | 162,064 | 21,551 | 197,156 | 131,284 | 32,166 | 544,521 |
| Additions | 3,033 | 176 | 44,071 | 42,223 | 60,377 | 149,880 |
| Disposals/write-offs | - | - | (34,156) | (6,704) | - | |
| (41,160) | | | | | | |
| **At December 31, 2007** | **165,097** | **21,727** | **207,071** | **166,803** | **92,543** | **653,241** |
| **Accumulated depreciation** | | | | | | |
| At December 31, 2005 | 73,213 | 3 | 97,637 | 34,191 | - | 205,044 |
| Charge for the year | 6,036 | | 24,985 | 22,928 | - | 53,949 |
| Disposals/write-offs | (197) | (3) | (4,519) | (12,028) | - | |
| (16,747) | | | | | | |
| At December 31, 2006 | 79,052 | - | 118,103 | 45,091 | - | 242,246 |
| Charge for the year | 5,769 | - | 31,506 | 30,125 | - | 67,400 |
| Disposals/write-offs | - | - | (33,442) | (6,624) | | |
| (40,066) | | | | | | |
| **At December 31, 2007** | **84,821** | **-** | **116,167** | **68,592** | **-** | **269,580** |
| **Carrying amount** | | | | | | |
| **At December 31, 2007** | **80,276** | **21,727** | **90,904** | **98,211** | **92,543** | **383,661** |
| At December 31, 2006 | 83,012 | 21,551 | 79,053 | 86,193 | 32,166 | 302,275 |

At the balance sheet date, the fair value of properties acquired in settlement of debts was AED 285.24 million (2006 AED 285.24 million).

## 13. Deposits and balances due to banks

| | December 31, | |
|---|---|---|
| | **2007** | 2006 |
| | **AED '000** | AED '000 |
| Demand | **1,550,649** | 1,218,496 |
| Overnight | **1,330,848** | 658,106 |
| Time | **10,515,527** | 3,825,936 |
| | **13,397,024** | 5,702,538 |
| The above represent borrowings from: | | |
| Banks in the U.A.E. | **4,300,553** | 551,706 |
| Banks abroad | **9,095,490** | 5,148,957 |
| Overseas central banks | **981** | 1,875 |
| | **13,397,024** | 5,702,538 |

Borrowings from banks abroad include an amount of AED 1,836.5 million (US$ 500 million) [2006: AED 918.25 million (US$ 250 million)] being a 5 years loan obtained through a syndicate of banks maturing in July 2012. The loan carries a floating rate of interest which is fixed by reference to 6 months LIBOR.



## 14. Repurchase agreements with banks

Repo borrowing

| Tenure | Due date | Interest rate | December 31, 2007 AED '000 | 2006 AED '000 |
|---|---|---|---|---|
| 5 year | October 2011 | 3 months USD Libor | 183,650 | 183,650 |
| 1 year | December 2007 | 12 months USD Libor | - | 1,101,962 |
| 6 months | June 2008 | 6 months USD Libor | 768,032 | - |
| 6 months | June 2008 | 6 months USD Libor | 1,070,763 | - |
| 3 months | March 2008 | 3 months USD Libor | 919,136 | - |
| 3 months | June 2008 | 3 months USD Libor | 892,732 | - |
| | | | 3,834,313 | 1,285,612 |

## 15. Customers' deposits

| | December 31, 2007 AED '000 | 2006 AED '000 |
|---|---|---|
| Current and other accounts | 10,506,336 | 6,570,427 |
| Saving accounts | 659,141 | 437,126 |
| Time deposits | 34,968,037 | 26,900,682 |
| | 46,133,514 | 33,908,235 |

## 16. Insurance and life assurance funds

| | Outstanding claims AED'000 | Unearned premium reserve AED'000 | Additional reserve AED'000 | Life assurance fund AED'000 | December 31, 2007 Total AED'000 | 2006 Total AED'000 |
|---|---|---|---|---|---|---|
| January 1, | 103,156 | 180,600 | 32,747 | 57,437 | 373,940 | 260,448 |
| Increase/(decrease) | 41,406 | 97,096 | 19,003 | (14,550) | 142,955 | 113,492 |
| **December 31,** | 144,562 | 277,696 | 51,750 | 42,887 | 516,895 | 373,940 |

Unearned premium reserve is calculated as a percentage of annual premiums earned, net of reinsurance. Additional reserves are also made for the estimated excess of potential claims and claims incurred but not reported at the balance sheet date.

Life assurance fund is determined by independent actuarial valuation of future policy benefits.



## 17. Interest payable and other liabilities

| | December 31, 2007 AED '000 | December 31, 2006 AED '000 |
|---|---|---|
| Accrued interest payable | **442,334** | 256,727 |
| Income received in advance - discounted bills | **205,985** | 133,829 |
| Provision for end-of-service indemnity | **104,070** | 89,768 |
| Provision for taxation | **32,704** | 29,800 |
| Pay orders issued | **157,091** | 120,403 |
| Negative fair value of derivatives - Note 39 | **2,482,251** | 790,409 |
| Credit Cards interchange fee income | **38,610** | 37,320 |
| Insurance premium collected in advance | **381,542** | 258,322 |
| Accrued expenses | **376,186** | 223,170 |
| Acceptances | **1,337,223** | 1,157,635 |
| Inter-group transactions | **60,122** | - |
| Others | **238,605** | 234,334 |
| | **5,857,323** | 3,356,871 |

## 18. Medium-term floating rate notes

During 2003, the Bank established a Euro Medium Term Note (EMTN) programme for US$ 750 million (AED 2,754.75 million) under fiscal agency agreement dated February 4, 2004. The EMTN programme was increased to US$ 2,000 million (AED 7,346 million) under fiscal agency agreement dated March 23, 2006.

The maturities of the bonds (FRN) issued under the programme are as follows:

| Due date | Interest rate | December 31, 2007 AED '000 | December 31, 2006 AED '000 |
|---|---|---|---|
| February 27, 2009 | 3 months Libor + 0.55% | **1,101,900** | 1,101,900 |
| March 23, 2010 | 3 months Libor + 0.40% | **1,193,725** | 1,193,725 |
| April 6, 2011 | 3 months Libor + 0.38% | **1,101,900** | 1,101,900 |
| January 24, 2017 | 3 months Libor + 0.625% | **1,836,500** | - |
| | | **5,234,025** | 3,397,525 |

The US$ 500 Million (AED 1,836 Million) tranche issued during January 2007 is a subordinated floating rate note and qualifies for Tier 2 subordinated loan capital for first 5 years till 2012 and thereafter it will be amortized at the rate of 20% per annum for next five years until 2017 for capital adequacy calculations. However, FRN is callable in 5 years i.e. in 2012 if not redeemed on completion of 5 years, there is provision of step up in coupon rate for 0.5% for next 5 years. This subordinated FRN has been approved by UAE Central Bank for recognition of Tier 2 capital.

## 19. Long-term loans

These represent long-term loans provided by the Real Estate Committee of the U.A.E. to refinance real estate loans made by the Bank to various U.A.E. citizens, which are included in loans and advances.

## 20. Capital and reserves

### (a) Share capital

During 2007, a proposed bonus share distribution, of 3 shares for each 10 shares was approved by the Board of Directors and ratified by the shareholders at the Annual General Meeting.

As of December 31, 2007, 112,605,360 ordinary shares of AED 10 each (2006: 86,619,520 ordinary shares of AED 10 each) were issued and are fully paid up.



20. Capital and reserves (continued)

(b) **Statutory and legal reserves**

In accordance with Union Law 1080 of U.A.E., 10% of the net income for the year is to be transferred to statutory reserve. Such transfers to reserves may cease when they reach the levels established by the respective regulatory authorities (in the U.A.E. this level is 50% of the issued share capital). The legal reserve relates to the Bank's foreign operations. Neither the statutory reserve nor the legal reserve is available for distribution.

(c) General reserve

The general reserve is computed pursuant to the Bank's Articles of Association and can be used for the purposes determined by the Ordinary General Meeting.

21. Minority interest

| | December 31, | |
|---|---|---|
| | **2007** | 2006 |
| | **AED '000** | AED '000 |
| Balance, January 1, | **571,395** | 896,097 |
| Dividends | **(31,011)** | (35,441) |
| Share in cumulative changes in fair values | **149,521** | (352,840) |
| Share in translation adjustments | **31** | 2 |
| Share of net income for the year | **225,369** | 72,102 |
| Share of minority in newly formed subsidiaries | - | 1,509 |
| Reduction in minority's capital | (44,759) | (10,095) |
| | **870,546** | 571,395 |

22. Contra accounts and commitments

| | | December 31, | |
|---|---|---|---|
| | | **2007** | 2006 |
| | | AED '000 | AED '000 |
| (a) | **Contra accounts (memoranda)** | | |
| | Guarantees | 30,920,961 | 19,800,484 |
| | Letters of credit | 7,242,966 | 4,621,188 |
| | | 38,163,927 | 24,421,672 |
| (b) | **Derivative financial instruments (Note 39)** | 213,069,614 | 153,833,802 |
| | **Total contra account and commitments (a + b)** | 251,233,541 | 178,255,474 |

The outstanding unutilised facilities as of December 31, 2007 amounted to AED 26.836 million, committed AED 9.097 and un-committed AED 17.739 million (2006: AED 23.937 million, committed AED 6.394 and un-committed AED 17.543 million).

The outstanding unused portion of commitments as at December 31, 2007, which can be revoked unilaterally at any time by the Bank, amounts to AED 17.739 million (2006: AED 17.543 million).

22. Contra accounts and commitments (continued)

(c) **Contra accounts - maturity profile**

The maturity profile of the Bank's contra accounts were as follows:

| | 2007 | | | | | |
|---|---|---|---|---|---|---|
| | Within 3 months | Over 3 to 6 months | Over 6 to 12 months | Over 1 to 5 years | Over 5 years | Total |
| | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 |
| Guarantees | 23,609,921 | 2,216,863 | 1,983,095 | 2,751,731 | 359,351 | 30,920,961 |
| Letters of credit | 4,289,203 | 849,599 | 691,823 | 1,411,375 | 966 | 7,242,966 |
| Total | 27,899,124 | 3,066,462 | 2,674,918 | 4,163,106 | 360,317 | 38,163,927 |

| | 2006 | | | | | |
|---|---|---|---|---|---|---|
| | Within 3 months | Over 3 to 6 months | Over 6 to 12 months | Over 1 to 5 years | Over 5 years | Total |
| | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 |
| Guarantees | 13,482,826 | 2,277,760 | 1,737,622 | 1,636,787 | 465,489 | 19,600,484 |
| Letters of credit | 3,472,539 | 688,318 | 507,618 | 152,713 | - | 4,821,188 |
| Total | 16,955,365 | 2,966,078 | 2,245,240 | 1,789,500 | 465,489 | 24,421,672 |

The analysis of commitments and contingencies by industry sector is shown in Note 36.

(d) **Operating lease commitments**

The future minimum lease payments under non-cancellable operating leases where the Bank is the lessee are as follows:

| | December 31, | |
|---|---|---|
| | **2007** | 2006 |
| | **AED '000** | AED '000 |
| Less than 1 year | **41,274** | 40,467 |
| 1 to 5 years | **32,668** | 31,676 |
| Over 5 years | **102** | 679 |
| Total | **74,044** | 72,822 |

23. Interest income

| | Year ended December 31, | |
|---|---|---|
| | **2007** | 2006 |
| | **AED '000** | AED '000 |
| Loans and advances | **2,716,282** | 2,055,460 |
| Central Banks | **373,456** | 65,202 |
| Banks | **796,878** | 473,315 |
| Non-trading Investments | **63,365** | 48,576 |
| | **3,949,981** | 2,642,553 |



## 24. Income from Islamic financing and investment products

| | Year ended December 31, | |
|---|---|---|
| | 2007 | 2006 |
| | AED '000 | AED '000 |
| Financing | | |
| Murabaha | 8,640 | 1,580 |
| Ijara | 22,020 | 2,205 |
| | 30,660 | 3,785 |
| Investing | | |
| Musharakah | 26,733 | 415 |
| Wakala | 14,298 | 27,852 |
| Sukuk and Funds | 9,817 | - |
| | 50,848 | 28,267 |
| Total | 81,508 | 32,052 |

## 25. Interest expense

| | Year ended December 31, | |
|---|---|---|
| | 2007 | 2006 |
| | AED '000 | AED '000 |
| Customers' deposits | 1,827,052 | 1,174,598 |
| Central Banks | 3 | 270 |
| Banks | 656,320 | 411,064 |
| Medium term loans | 304,974 | 177,991 |
| | 2,788,349 | 1,763,923 |

## 26. Distribution to depositors - Islamic products

This represents the share of income allocated due to depositors of the Bank. The allocation and distribution to depositors is approved by Sharia Board.

## 27. Net fee and commission income / expense

| | Year ended December 31, | |
|---|---|---|
| | 2007 | 2006 |
| | AED '000 | AED '000 |
| **Fee and commission income** | | |
| Commission income | 1,686,713 | 877,356 |
| Brokerage and asset management | 40,107 | 35,833 |
| Re-insurance commission | 117,039 | 85,568 |
| Fees and charges on banking services | 455,556 | 243,767 |
| Credit Card related fee | 413,609 | 304,779 |
| Others | 91,805 | 78,154 |
| Total fee and commission income | 2,804,829 | 1,625,457 |
| **Fee and commission expenses** | | |
| Commission expense | 1,356,052 | 627,293 |
| Brokerage and asset management | 146,284 | 100,442 |
| Credit Card related expenses | 189,853 | 141,011 |
| Others | 21,436 | 49,288 |
| Total fee and commission expenses | 1,713,625 | 918,034 |
| **Net fee and commission income** | 1,091,204 | 707,423 |



## 28. Net investment income

| | Year ended December 31, | |
|---|---|---|
| | **2007** | 2006 |
| | **AED '000** | AED '000 |
| **(a) Trading investment income** | | |
| Net realised investment gain/(loss) | **252,767** | (52,738) |
| Fair value adjustments | **136** | 63,289 |
| Interest income | **385,846** | 235,803 |
| Dividends income | **88** | 77 |
| | **638,837** | 246,423 |
| **(b) Non trading investment income** | | |
| Net realized investment gain | **139,316** | 466,062 |
| Dividends income | **95,606** | 55,922 |
| | **234,922** | 521,984 |
| Total (a + b) | **873,759** | 768,407 |

## 29. Other income

| | Year ended December 31, | |
|---|---|---|
| | **2007** | 2006 |
| | **AED '000** | AED '000 |
| Fair value adjustments of investment property | **152,732** | 64,157 |
| Income from investment property | **405** | 371 |
| Foreign exchange gains (net) | **161,425** | 125,051 |
| Insurance underwriting profit | **315,249** | 233,640 |
| (Loss)/gain on sale of property and equipment | **(67)** | 327 |
| Rental income from properties | **6,127** | 6,585 |
| Others | **50,194** | 38,297 |
| | **685,065** | 469,431 |

## 30. General and administrative expenses

| | Year ended December 31, | |
|---|---|---|
| | **2007** | 2006 |
| | **AED '000** | AED '000 |
| Salaries and employee related expenses | **828,036** | 605,226 |
| Depreciation on property and equipment | **67,400** | 53,949 |
| Other general and administration expenses | **514,351** | 372,295 |
| | **1,400,787** | 1,031,470 |

Compensation of key management (included above under "salaries and employee related expenses") comprise salaries, bonuses and other benefits amounting in total to AED 116.09 million (AED 94.94 million in 2006) - Note 35.



## 31. Allowances for loans and advances and other financial assets

| | 2007 | | | |
|---|---|---|---|---|
| | Retail | Corporate and others | Non-specific | Total |
| | AED'000 | AED'000 | AED'000 | AED'000 |
| Provision for impaired loans and advances | 10,640 | 82,896 | 100,000 | 193,536 |
| Provision for investments and others | - | 17,815 | - | 17,815 |
| Provision for other debtors | - | (8,513) | - | (8,513) |
| Write-off of impaired loans to income statement | 247,601 | 11,596 | - | 259,197 |
| Recovery of loans previously written off | (97,607) | (56,043) | - | (153,650) |
| Total | 160,634 | 47,751 | 100,000 | 308,385 |

| | 2006 | | | |
|---|---|---|---|---|
| | Retail | Corporate and others | Non-specific | Total |
| | AED'000 | AED'000 | AED'000 | AED'000 |
| Provision for impaired loans and advances | 11,013 | 9,334 | 62,777 | 83,124 |
| Provision for investments and others | - | 2,336 | - | 2,336 |
| Provision for other debtors | - | (945) | - | (945) |
| Write-off of impaired loans to income statement | 175,798 | 2,787 | - | 178,585 |
| Recovery of loans previously written off | (69,963) | (46,533) | - | (116,496) |
| Total | 116,848 | (33,021) | 62,777 | 146,604 |

## 32. Earnings per share

Earnings per share are calculated by dividing the net profit for the year by the number of shares outstanding during the year as follows:

| | Year ended December 31, | |
|---|---|---|
| | 2007 | 2006 |
| | AED '000 | AED '000 |
| Net income for the year (AED'000) (Attributed to equity holders of the parent) | 1,900,632 | 1,570,640 |
| Number of ordinary shares outstanding | 112,605,380 | 112,605,380 |
| Earnings per share (AED) | 16.88 | 13.95 |

The number of ordinary shares outstanding as of December 31, 2006 has been adjusted to reflect the bonus shares issued during 2007 [Note 20(a)].

## 33. Foreign restricted assets

Net assets equivalent to AED 76.736 million as of December 31, 2007 (2006: AED 57.852 million) maintained by certain branches of the Bank, operating outside the United Arab Emirates, are subject to exchange control regulations of the countries in which these branches operate.



## 34. Cash and cash equivalents

Cash and cash equivalents consist of cash on hand, central bank certificates of deposits, balances with banks and money market placements, as follows:

| | December 31, | |
|---|---|---|
| | 2007 | 2006 |
| | AED '000 | AED '000 |
| **Cash on hand, current accounts and deposits with central banks** | 26,200,123 | 2,405,688 |
| **Deposits and balances due from banks** | 7,959,847 | 8,556,912 |
| | 28,159,970 | 10,962,600 |
| **Less: Deposits with central banks for regulatory purposes** | (1,597,378) | (1,179,871) |
| **Less: Deposits maturing after 3 months** | (4,406,824) | (2,575,866) |
| | 22,155,768 (a) | 7,206,863 (b) |
| **Increase in cash and cash equivalents - 2007 [(a) - (b)]** | 14,948,905 | |

| | December 31, | |
|---|---|---|
| | 2006 | 2005 |
| | AED '000 | AED '000 |
| Cash on hand, current accounts and deposits with central banks | 2,405,688 | 4,001,935 |
| Deposits and balances due from banks | 8,556,912 | 7,069,495 |
| | 10,962,600 | 11,071,430 |
| Less: Deposits with central banks for regulatory purposes | (1,179,871) | (962,735) |
| Less: Deposits maturing after 3 months | (2,575,866) | (1,952,150) |
| | 7,206,863 (a) | 8,156,545 (b) |
| Decrease in cash and cash equivalents - 2006 [(a) - (b)] | (949,682) | |

## 35. Related party transactions

a) Certain "related parties" (such as, directors and major shareholders of the Bank and companies of which they are principal owners) are customers of the Bank and its subsidiaries in the ordinary course of business. Transactions with such related parties are made on substantially the same terms, including interest rates and collateral, as those prevailing at the same time for comparable transactions with unrelated parties. Such related party transactions are disclosed below. Other "related party transactions" are disclosed in Notes 7 and 36 to these financial statements.

b) Year-end related party balances included in the balance sheet are as follows:

| | December 31, | |
|---|---|---|
| | 2007 | 2006 |
| | AED '000 | AED '000 |
| Advances to customers | 864,140 | 640,675 |
| Deposits from customers | 931,563 | 685,763 |
| Letters of credit, guarantees and acceptances | 2,109,951 | 1,562,830 |



**35. Related party transactions** (continued)

c) Net income for the year includes related party transactions as follows:

| | Year ended December 31, | |
|---|---|---|
| | **2007** | 2006 |
| | **AED '000** | AED '000 |
| Interest income | **66,008** | 52,250 |
| Interest expense | **29,097** | 18,052 |
| Other income | **52,434** | 49,524 |

**36. Concentrations of assets, liabilities and off balance sheet items**

**Geographic regions**

| | December 31, 2007 | | | December 31, 2006 | | |
|---|---|---|---|---|---|---|
| | **Assets** | **Liabilities and Equity** | **Off Balance Sheet items** | Assets | Liabilities and Equity | Off Balance Sheet items |
| | **AED'000** | **AED'000** | **AED'000** | AED'000 | AED'000 | AED'000 |
| U.A.E. | **60,329,702** | **70,817,322** | **30,861,253** | 38,970,239 | 49,241,540 | 23,322,276 |
| Other Middle East countries | **12,682,229** | **7,878,676** | **1,737,246** | 3,974,922 | 2,360,888 | 600,522 |
| O.E.C.D. | **5,897,036** | **6,895,237** | **3,379,336** | 6,553,102 | 3,404,040 | 364,198 |
| Others | **8,718,430** | **2,036,162** | **2,186,092** | 5,246,861 | 1,738,647 | 234,677 |
| **Total** | **87,627,397** | **87,627,397** | **38,163,927** | 56,745,115 | 56,745,115 | 24,421,672 |

**Industry Sector**

| | December 31, 2007 | | | December 31, 2006 | | |
|---|---|---|---|---|---|---|
| | **Assets** | **Liabilities and Equity** | **Off Balance Sheet items** | Assets | Liabilities and Equity | Off Balance Sheet items |
| | **AED'000** | **AED'000** | **AED'000** | AED'000 | AED'000 | AED'000 |
| Government and Public Sector | **8,941,234** | **8,686,841** | **121,853** | 5,661,378 | 5,017,829 | 116,544 |
| Commercial & Business | **22,020,799** | **21,886,896** | **33,647,659** | 16,171,977 | 15,874,470 | 18,145,773 |
| Personal | **8,972,076** | **13,774,971** | **21,180** | 8,054,468 | 11,280,445 | 434,754 |
| Financial institutions | **40,024,733** | **39,219,309** | **4,266,701** | 21,110,651 | 18,544,362 | 4,835,349 |
| Others | **7,668,555** | **4,059,380** | **106,534** | 5,738,641 | 6,028,018 | 889,253 |
| **Total** | **87,627,397** | **87,627,397** | **38,163,927** | 56,745,115 | 56,745,115 | 24,421,672 |

## 37. Segmental information

| | 2007 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Retail | Corporate | Financial Institutions | Islamic Banking | Treasury & Capital Markets | Insurance | Head Office and Others | Total |
| | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 |
| Net interest income and earnings from Islamic products | 808,490 | 652,903 | 92,725 | 38,625 | (543,995) | 17,971 | 133,523 | 1,200,458 |
| Other income | 421,674 | 508,622 | 129,534 | 3,549 | 762,404 | 738,764 | 85,651 | 2,650,028 |
| Total operating income | 1,230,164 | 1,161,525 | 222,259 | 42,174 | 218,409 | 756,735 | 219,220 | 3,850,486 |
| General and administrative expenses | | | | | | | | (1,409,757) |
| Allowances for loans and advances and other financial assets | | | | | | | | (308,415) |
| Income before taxes and minority interest | | | | | | | | 2,132,314 |
| Taxation | | | | | | | | (6,319) |
| Net income for the year | | | | | | | | 2,125,995 |
| Attributed to: | | | | | | | | |
| Equity holders of the parent | | | | | | | | 1,900,532 |
| Minority interest | | | | | | | | 225,463 |
| | | | | | | | | 2,125,995 |
| Segment Assets | 6,962,692 | 26,049,346 | 5,254,896 | 2,700,200 | 31,363,300 | 3,767,182 | 6,529,835 | 87,627,397 |
| Segment Liabilities | 6,873,700 | 38,634,121 | 4,191,806 | 2,159,127 | 7,920,409 | 1,644,512 | 13,760,339 | 77,148,909 |



**37. Segmental information** (continued)

| | 2006 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Retail | Corporate | Financial Institutions | Islamic Banking | Treasury & Capital Markets | Insurance | Head Office and Others | Total |
| | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 |
| Net interest income and earnings from Islamic products | 616,037 | 456,099 | 80,712 | 3,546 | (378,694) | 6,656 | 67,618 | 882,177 |
| Other income | 316,701 | 337,617 | 101,356 | 529 | 610,737 | 280,382 | 298,056 | 1,945,261 |
| Total operating income | 932,738 | 834,216 | 182,068 | 4,075 | 232,043 | 286,221 | 366,007 | 2,827,438 |
| General and administrative expenses | | | | | | | | (1,031,473) |
| Allowances for loans and advances and other financial assets | | | | | | | | (146,621) |
| Income before taxes and minority interest | | | | | | | | 1,649,364 |
| Taxation | | | | | | | | (6,622) |
| Net income for the year | | | | | | | | 1,642,742 |
| Attributed to: | | | | | | | | |
| Equity holders of the parent | | | | | | | | 1,570,640 |
| Minority interest | | | | | | | | 72,102 |
| | | | | | | | | 1,642,742 |
| Segment Assets | 7,056,139 | 19,424,968 | 6,511,768 | 918,876 | 26,744,255 | 2,712,904 | 6,378,145 | 56,745,115 |
| Segment Liabilities | 7,580,600 | 38,567,839 | 3,868,065 | 774,158 | 2,413,068 | 1,404,584 | 6,203,112 | 48,799,452 |

## 38. Classification of financial assets and liabilities

The table below sets out the Group's classification of each class of financial assets and liabilities and their carrying amounts as at December 31, 2007:

| | At fair value through profit or loss | Available-for-sale | Loans and advances | Other amortised cost | Carrying amount |
|---|---|---|---|---|---|
| | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 |
| Cash and balances with central banks | - | - | - | 20,300,125 | 20,300,125 |
| Deposits and balances due from banks | - | - | - | 7,859,847 | 7,859,847 |
| Trading investment | 10,023,141 | - | - | - | 10,023,141 |
| Loans and advances - net | - | - | 35,994,974 | - | 35,994,974 |
| Islamic Financing and Investing Products | - | - | 2,345,269 | - | 2,345,269 |
| Non-trading investments | - | 4,553,949 | - | 195,069 | 4,749,018 |
| Interest receivable and other assets | 2,433,377 | - | - | 3,039,547 | 5,472,924 |
| Investment property | 498,440 | - | - | - | 498,440 |
| **Total** | **12,954,958** | **4,553,949** | **38,340,243** | **31,394,586** | **87,243,756** |
| | | | | | |
| Deposits and balances due to banks | - | - | - | 13,397,024 | 13,397,024 |
| Repurchase agreements with banks | - | - | - | 3,834,313 | 3,834,313 |
| Customers' deposits | - | - | - | 46,135,514 | 46,135,514 |
| Islamic customers' deposits | - | - | - | 2,153,198 | 2,153,198 |
| Insurance and life assurance funds | - | - | - | 516,895 | 516,895 |
| Interest payable and other liabilities | 2,482,251 | - | - | 3,342,368 | 5,824,619 |
| Medium-term floating rate notes | - | - | - | 5,234,025 | 5,234,025 |
| Long-term loans | - | - | - | 16,707 | 16,707 |
| **Total** | **2,482,251** | **-** | **-** | **74,628,044** | **77,110,295** |

The table below sets out the Group's classification of each class of financial assets and liabilities and their carrying amounts as at December 31, 2006:

| | At fair value through profit or loss | Available-for-sale | Loans and advances | Other amortised cost | Carrying amount |
|---|---|---|---|---|---|
| | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 |
| Cash and balances with central banks | - | - | - | 2,405,688 | 2,405,688 |
| Deposits and balances due from banks | - | | - | 8,558,912 | 8,558,912 |
| Trading investment | 10,094,456 | - | - | - | 10,094,456 |
| Loans and advances - net | - | - | 28,572,233 | - | 28,572,233 |
| Islamic Financing and Investing Products | - | - | 829,014 | - | 829,014 |
| Non-trading investments | - | 2,821,044 | - | 19,949 | 2,840,993 |
| Interest receivable and other assets | 838,808 | - | - | 1,942,997 | 2,781,805 |
| Investment property | 361,739 | - | - | - | 361,739 |
| **Total** | **11,295,003** | **2,821,044** | **29,401,247** | **12,925,546** | **56,442,840** |
| Deposits and balances due to banks | - | - | - | 5,702,538 | 5,702,538 |
| Repurchase agreements with banks | - | - | - | 1,285,612 | 1,285,612 |
| Customers' deposits | - | - | - | 33,908,235 | 33,908,235 |
| Islamic customers' deposits | - | | - | 747,890 | 747,890 |
| Insurance and life assurance funds | - | - | - | 575,940 | 575,940 |
| Interest payable and other liabilities | 790,409 | - | - | 2,536,563 | 3,326,972 |
| Medium-term floating rate notes | - | - | - | 3,397,525 | 3,397,525 |
| Long-term loans | - | - | - | 23,541 | 23,541 |
| **Total** | **790,409** | **-** | **-** | **47,975,844** | **48,766,253** |



## 39. Derivatives

In the ordinary course of business, the Bank utilizes the following derivative financial instruments for both trading and hedging purposes:

Swaps are commitments to exchange one set of cash flows for another. For interest rate swaps, counter-parties generally exchange fixed and floating rate interest payments in a single currency without exchanging principal. For currency swaps, fixed interest payments and principal are exchanged in different currencies. For cross-currency rate swaps, principal, fixed and floating interest payments are exchanged in different currencies.

Forwards and futures are contractual agreements to either buy or sell a specified currency, commodity or financial instrument at a specified price and date in the future. Forwards are customized contracts transacted in the over-the-counter market. Foreign currency and interest rate futures are transacted in standardized amounts on regulated exchanges and changes in futures contract values are marked to market daily.

Forward rate agreements are similar to interest rate futures, but are individually negotiated. They call for a cash settlement for the difference between a contracted interest rate and the market rate on a specified future date, on a notional principal for an agreed period of time.

Options are contractual agreements under which the seller (writer) grants the purchaser (holder) the right, but not the obligation, to either buy or sell at fixed future date or at any time during a specified period, a specified amount of a currency, commodity or financial instrument at a pre-determined price.

### Derivatives held for hedging purposes

The Bank deals in derivatives including forward exchange contracts, swaps, options and futures on behalf of its customers. Those dealings with and exposure to financial markets are matched by equal and opposite dealings and exposure to corporate customers.

The Bank uses forward foreign exchange contracts and currency swaps to hedge against currency risks and interest rate swaps to hedge against the interest rate risk arising from interest rate exposures. In all such cases, the hedging relationship and objective, including details of the hedged items and hedging instrument are formally documented.

The following table shows the positive and negative fair values of derivative financial instruments, together with the notional amounts analyzed by the term to maturity. The notional amounts, which provide an indication of the volumes of the transactions outstanding at the year end, do not necessarily reflect the amounts of future cash flows involved. These notional amounts, therefore, are neither indicative of the Bank's exposure to credit risk, which is generally limited to the positive fair value of the derivatives, nor market risk.



**39. Derivatives** (continued)

**Statement of Derivatives as at December 31, 2007**

| Off-Balance Sheet Financial instruments | Positive fair value | Negative fair value | Notional amount | Notional amount by term of maturity: Up to 3 months | 3 months to 6 months | 6 months to 1 year | 1 year to 5 years | Over 5 years |
|---|---|---|---|---|---|---|---|---|
| | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 |
| Held for Trading | | | | | | | | |
| Forward foreign exchange contract | 288,839 | 209,906 | 45,502,465 | 43,585,153 | 2,200,864 | 1,003,218 | 4,517,733 | - |
| Foreign exchange options (bought) | - | 1,850,008 | 76,809,959 | 14,870,008 | 26,385,959 | 27,038,240 | 7,359,438 | 350,238 |
| Foreign exchange options (sold) | 1,850,008 | - | 76,809,959 | 14,870,008 | 26,385,959 | 27,038,240 | 7,359,438 | 350,238 |
| Interest rate swaps | 293,047 | 348,206 | 9,690,241 | 19,274 | 3,073 | 192,785 | 7,608,476 | 1,850,033 |
| Cap bought | | 4 | 104,500 | | - | - | 104,500 | - |
| Cap sold | 4 | - | 104,500 | - | - | - | 104,500 | - |
| Credit default swaps | 935 | 3,547 | 144,782 | - | - | - | 122,727 | 92,055 |
| Equity derivatives | - | 5,656 | 15,370 | - | - | - | 15,370 | - |
| Futures contracts purchased (Customer) | - | 1,640 | 236,734 | 154,261 | - | 65,703 | 16,770 | - |
| Futures contracts sold (Customer) | 3,257 | - | 77,075 | 77,075 | - | - | - | - |
| Futures contracts sold (Bank) | 1,640 | - | 236,734 | 154,261 | - | 65,703 | 16,770 | |
| Futures contracts purchased (Bank) | - | 3,257 | 77,075 | 77,075 | - | | - | - |
| | 2,436,837 | 2,482,351 | 213,069,614 | 71,057,108 | 54,975,937 | 57,217,069 | 27,225,922 | 2,593,564 |

**Statement of Derivatives as at December 31, 2006**

| Off-Balance Sheet Financial instruments | Positive fair value | Negative fair value | Notional amount | Notional amount by term of maturity: Up to 3 months | 3 months to 6 months | 6 months to 1 year | 1 year to 5 years | Over 5 years |
|---|---|---|---|---|---|---|---|---|
| | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 |
| Held for Trading | | | | | | | | |
| Forward foreign exchange contract | 128,769 | 76,444 | 20,365,031 | 18,858,709 | 520,278 | 311,056 | 774,988 | - |
| Foreign exchange options (bought) | - | 510,840 | 64,966,405 | 10,083,867 | 10,415,829 | 26,847,696 | 17,618,853 | - |
| Foreign exchange options (sold) | 510,758 | - | 64,966,405 | 10,083,867 | 10,415,829 | 26,847,696 | 17,618,853 | - |
| Interest rate swaps | 196,518 | 201,582 | 2,954,215 | 7,046 | 86,831 | 91,504 | 1,393,334 | 1,364,740 |
| Cap bought | - | 36 | 146,300 | | - | - | 146,300 | - |
| Cap sold | 36 | | 146,300 | - | - | - | 146,300 | |
| Futures contracts purchased (Customer) | 40 | - | 25,464 | 25,464 | - | | - | - |
| Futures contracts sold (Customer) | - | 1,087 | 29,109 | 26,668 | - | 2,441 | - | - |
| Futures contracts sold (Bank) | - | 40 | 25,464 | 25,464 | - | - | - | - |
| Futures contracts purchased (Bank) | 1,087 | - | 29,109 | 26,668 | - | 2,441 | - | - |
| | 838,805 | 796,409 | 153,633,802 | 39,246,041 | 21,428,527 | 54,103,693 | 37,658,708 | 1,364,740 |



## 40. Capital management

**Regulatory capital**

The Central Bank of the UAE sets and monitors capital requirements for the Group as a whole. The parent company and overseas banking operations are directly supervised by their local regulators.

The Central Bank of the UAE adopted Basel One capital regime in 1993. Mashreqbank calculates its Capital Adequacy Ratio in line with guidelines issued by the Central Bank of the UAE. The minimum capital ratio prescribed by the Central Bank is 10% of RWA calculated as per the guidelines issued by them.

The Group's regulatory capital is analysed into two tiers:

- Tier 1 capital, which includes ordinary share capital, share premium, retained earnings, translation reserve and minority interests after deductions for goodwill and intangible assets, if any.

- Tier 2 capital, which includes qualifying subordinated liabilities and the element of the fair value reserve (45%) relating to unrealised gains on investments classified as available-for-sale.

Various limits are applied to elements of the capital base. The qualifying tier 2 capital cannot exceed tier 1 capital; and qualifying term subordinated loan capital may not exceed 50 percent of tier 1 capital. The Central Bank of the UAE does not allow collective impairment allowances to be included as part of tier 2 capital. Other deductions from capital include the carrying amounts of investments in subsidiaries that are not included in the regulatory consolidation, investments in the capital of banks and certain other regulatory items. The Tier One Capital must be 6% of RWA and Tier 2 Capital cannot be more than 66.6% of Tier One Capital.

The Group's policy is to maintain a strong capital base so as to maintain market confidence and to sustain future development of the business. The impact of the level of capital on shareholders' return is also recognised and the Group recognises the need to maintain a balance between the higher returns that might be possible with greater gearing and the advantages and security afforded by a sound capital position. Historically Group has followed conservative dividend policy to increase capital from internal resources to meet the future growth.

The Group and its individually regulated operations have complied with all externally imposed capital requirements throughout the period.

There have been no material changes in the Group's management of capital during the period.



Case 1:08-cv-06882-JFK Document 21-3 Filed 09/05/2008 Page 71 of 82

## 40. Capital management (continued)

The Group's regulatory capital position at December 31 was as follows:

| | December 31, | |
|---|---|---|
| | 2007 | 2006 |
| | AED '000 | AED '000 |
| ***Tier 1 capital*** | | |
| Ordinary share capital | 1,126,054 | 866,596 |
| Statutory & Legal Reserve | 599,009 | 469,458 |
| General Reserve | 312,000 | 312,000 |
| Retained earnings | 7,068,366 | 5,557,149 |
| Minority interests | 721,025 | 531,729 |
| Foreign currency translation reserve | (2,155) | (13,449) |
| Total | 9,824,299 | 7,725,077 |
| ***Tier 2 capital*** | | |
| Asset revaluation reserve | 297,045 | 100,749 |
| Qualifying subordinated liabilities | 1,836,500 | - |
| Total | 2,133,545 | 100,749 |
| **Total capital base** | 11,957,844 | 7,825,826 |
| ***Risk-weighted assets*** | | |
| On balance sheet | 47,683,537 | 33,158,257 |
| Off balance sheet | 19,661,810 | 11,519,476 |
| Total risk-weighted assets | 67,345,347 | 44,677,733 |
| ***Risk asset ratio*** | 17.76% | 17.52% |

The Central Bank of the UAE has proposed to adopt Basel 2 for implementation effective January 1, 2008. For credit and market risk Central Bank has issued draft guidelines for the implementation of Standardised approach. For operational risk the Central Bank has given option to use Basic Indicator approach or the standardised approach.

### Capital allocation

The allocation of capital between specific operations and activities is, to a large extent, driven by optimisation of the return achieved on the capital allocated. The amount of capital allocated to each operation or activity is based on the inherent risk it carries. The process of allocating capital to specific operations and activities is undertaken independently of those responsible for the operation, by Finance and Risk Groups, and is subject to review by ALCO as appropriate.

Although maximisation of the return on risk-adjusted capital is the principal basis used in determining how capital is allocated within the Group to particular operations or activities, it is not the sole basis used for decision making. Account also is taken of synergies with other operations and activities, the availability of management and other resources, and the fit of the activity with the Group's longer term strategic objectives. The Group's policies in respect of capital management and allocation are reviewed regularly by the Board of Directors.



41. Risk management

The Group has set up a strong risk management infrastructure supported by adoption of best practices in the field of risk management to manage and monitor the following major risks arising out of its day to day operations:

- Credit Risk
- Liquidity Risk
- Market Risk
- Interest Rate Risk
- Operational Risk

The board has overall responsibility for the oversight of the risk management frame work. It has established detailed policies and procedures in this regard along with high powered senior management committees to ensure adherence to the approved policies and close monitoring of different risks within the Bank.

The Credit Policy Committee, Assets and Liabilities Committee and Investment Committee work under the mandate of the board to set up risk limits and manage the overall risk in the Bank. These committees approve risk management policies of the bank developed by the Risk Management Group.

The Risk Management function is independent of the business and led by a qualified Risk Management Head. This group is responsible for developing credit, market and operational risk policies. Highly experienced and trained Risk Managers have delegated authority within the risk management framework to approve credit risk transactions and monitor market and operational risk. The risk analytic unit within Risk Management Group is responsible to develop and validate financial risk models for risk rating and calculation of PD, LGD and EAD.

The Audit, Review and Compliance Group (ARCG) is an independent Group which is responsible to review the risk policies, risk exposures and the risk managing and monitoring framework. The Board Audit Committee is assisted by ARCG in this regard.

**Credit Risk Management**

Policies relating to credit are reviewed and approved by the Bank's Credit Policy Committee. All credit lines are approved centrally for UAE branches, and for overseas branches by the Bank's Credit Risk Management Division in accordance with the Bank's credit policy set out in the Credit Policy Manual. Credit and Marketing functions are segregated. In addition, whenever possible, loans are secured by acceptable forms of collateral in order to mitigate credit risk. The Bank further limits risk through diversification of its assets by geography and industry sectors.

All credit facilities are administered and monitored by the Credit Administration Department. Periodic reviews are conducted by Credit Examination teams from the Audit, Review and Compliance Group and facilities are risk graded based on criterion established in the Credit Policy Manual.

Cross border exposure and financial institutions exposure limits for money market and treasury activities are approved as per guidelines established by the Bank's Credit Policy Committee and are monitored by the Credit Risk Management Division.

The Credit Policy Committee is responsible for setting credit policy of the Bank. It also establishes industry caps, approves policy exceptions and conducts periodic portfolio reviews to ascertain portfolio quality.

Different credit underwriting procedures are followed for retail and commercial/ institutional lending as described below.

***Retail lending***

Each retail credit application is considered for approval according to a product program, which is devised in accordance with guidelines set out in the product policy approved by the Bank's Credit Policy Committee (CPC). All approval authorities are delegated by the CPC or by the Chief Executive Officer acting on behalf of the CPC. Different authority levels are specified for approving product programs and exceptions thereto, and individual loans/credits under product programs. Each product program contains detailed credit criteria (such as customer demographics and income eligibility) and regulatory, compliance and documentation requirements, as well as other operating requirements. Credit authority levels range from Level 1 (approval of a credit application meeting all the criteria of an already approved product program) to Level 5 (the highest level where CPC approval of the specific credit application is necessary).

***Commercial/Institutional lending***

All credit applications for commercial and institutional lending are subject to the Bank's credit policies, underwriting standards and industry caps (if any) and to regulatory requirements, as applicable from time to time. The Bank does not lend to companies operating in industries that are considered by the Bank inherently risky and where specialized industry knowledge is required. In addition, Mashreqbank sets credit limits for all customers based on an evaluation of their creditworthiness.



41. Risk management (continued)

All credit lines or facilities extended by the Bank are made subject to prior approval pursuant to a set of delegated credit authority limits as recommended by the Risk Management Head and approved by the Bank's Chief Executive Officer. At least two signatures are required to approve any commercial or international credit application. However, depending on factors such as the size of the applicant, its risk rating, the client type or a specific policy issue, a third concurring signature may sometimes be required.

The Bank has established country limits for cross border risk. Individual country limits are defined based on a detailed credit policy defining acceptable country credit risk exposure and evaluating and controlling cross border risk. These limits are regularly reviewed by the Bank's credit risk management and periodically by the CPC.

**Credit review procedures and loan classification**

The Bank's Credit Review Division (the CRD) which is part of Audit, Review and Compliance Group, subjects the Bank's risk assets to an independent quality evaluation on a regular basis in conformity with the guidelines of the Central Bank of the U.A.E. and Bank's internal policies in order to assist in the early identification of accrual and potential performance problems. The CRD validates the risk ratings of all commercial clients, provides an assessment of portfolio risk by product and segment for retail customers and monitors observance of all approved credit policies, guidelines and operating procedures across the Bank.

All commercial/institutional loan facilities of Bank are assigned one of twenty five risk ratings of the performing grades where grades 23, 24 and 25 are for OAEM, with more severely classified exposures graded 60, 70 and 80. Mashreq's internal rating system, which has been developed using historical loss data and customer behavioral scores, is also continually updated and strengthened in order to provide a statistically validated underpinning to customer ratings consistent with Basel II IRB guidelines.

If a credit is overdue for 90 days or more, interest is suspended and is not credited to income. Specific allowance for impairment of classified assets is made based on recoverability of outstanding and risk ratings of the assets.

The Bank writes off retail advances once they are between 150 to 180 days past their due date based on the underlying product

The Bank also complies with IAS 39, in accordance with which it assesses the need for any impairment losses on its loan portfolio by calculating the net present value of the expected future cash flows for each loan or its recoverability based either on collateral value or the market value of the asset where such price is available. As required by Central Bank of the U.A.E. guidelines, the Bank takes the higher of the loan loss provisions required under IAS 39 and Central Bank regulations.

**Impaired loans and securities**

Impaired loans and securities are loans and securities for which the Group determines that it is probable that it will be unable to collect all principal and interest due according to the contractual terms of the loan / securities agreement(s). These loans are graded 60, 70 or 80 in the Group's internal credit risk grading system.

**Past due but not impaired loans**

Loans and securities where contractual interest or principal payments are past due but the Group believes that impairment is not appropriate on the basis of the level of security / collateral available and / or the stage of collection of amounts owed to the Group.

**Allowances for impairment**

The Group establishes an allowance for impairment losses that represents its estimate of incurred losses in its loan portfolio. The main components of this allowance are a specific loss component that relates to individually significant exposures, and a collective loan loss allowance established for groups of homogeneous assets in respect of losses that have been incurred but have not been identified on loans subject to individual assessment for impairment.

**Write-off policy**

The Group writes off a loan or security (and any related allowances for impairment losses) when Group Credit determines that the loans / securities are uncollectible in whole or in part. This determination is reached after considering information such as the occurrence of significant changes in the borrower / issuer's financial position such that the borrower / issuer can no longer pay its obligation in full, or that proceeds from collateral will not be sufficient to pay back the entire exposure. For smaller balance standardised loans, charge off decisions generally are based on a product specific past due status.



**41. Risk management** (continued)

Set out below is an analysis of the gross and net (of allowances for impairment) amounts of impaired assets by risk grade.

| | Due from banks | | Loans and advances | | Non trading investments | |
|---|---|---|---|---|---|---|
| | **2007** | 2006 | **2007** | 2006 | **2007** | 2006 |
| | **AED'000** | AED'000 | **AED'000** | AED'000 | **AED'000** | AED'000 |
| Impaired | | | | | | |
| Substandard | - | - | 10,688 | 94,556 | - | - |
| Doubtful | - | - | 59,448 | 45,322 | - | - |
| Loss | - | - | 313,001 | 259,708 | - | - |
| Gross amount | - | | 383,137 | 399,566 | - | - |
| Interest suspended | - | - | (97,779) | (100,008) | - | - |
| Specific allowance for impairment | - | - | (338,753) | (268,504) | - | - |
| | - | - | (53,395) | 31,059 | - | - |
| Past due but not impaired | | | | | | |
| Commercial loans by less than 90 days | - | - | 61,770 | 66,209 | - | - |
| Post due retail loans beyond 30 days over | - | - | 315,567 | 228,145 | - | - |
| | - | - | 377,337 | 294,354 | - | - |
| Neither past due nor impaired | | | | | | |
| Gross amount | 7,959,847 | 8,556,912 | 36,325,055 | 28,802,167 | 4,750,908 | 2,855,279 |
| Collective allowance for impairment | - | - | (654,023) | (555,347) | (1,890) | (14,286) |
| | 7,959,847 | 8,556,912 | 35,671,032 | 28,246,820 | 4,749,018 | 2,840,993 |
| **Carrying amount** | 7,959,847 | 8,556,912 | 35,994,974 | 28,572,233 | 4,749,018 | 2,840,993 |



**41. Risk management** (continued)

The Group holds collateral against loans and advances to customers in the form of mortgage interests over property, other registered securities over assets, and guarantees. Estimates of fair value are based on the value of collateral assessed at the time of borrowing, and generally are not updated except when a loan is individually assessed as impaired. Collateral generally is not held over loans and advances to banks, except when securities are held as part of reverse repurchase and securities borrowing activity. Collateral usually is not held against investment securities, and no such collateral was held at December 31, 2007 or 2006.

At December 31, 2007 the fair value of collaterals held were as follows:

| | Loans and advances to customers | | Loans and advances to banks | |
|---|---|---|---|---|
| | **2007** | 2006 | **2007** | 2006 |
| | **AED'000** | AED'000 | **AED'000** | AED'000 |
| **Against individually impaired advances:** | | | | |
| Property | **57,180** | 169,371 | - | - |
| Debt securities | - | - | - | - |
| Equities | - | 4,013 | | - |
| Cash | **45,876** | 1,960 | - | |
| Others | **38,862** | 101,708 | - | - |
| **Against collectively impaired advances:** | | | | |
| Property | **8,564,999** | 1,620,702 | - | - |
| Debt securities | **45,472** | - | - | |
| Equities | **2,781,675** | 2,068,004 | - | - |
| Cash | **2,646,642** | 3,789,236 | **1,314,523** | 360,745 |
| Others | **2,815,409** | 2,426,715 | - | - |
| Total | **16,996,115** | 10,377,857 | **1,314,523** | 360,745 |

The distributions by geographical concentration of impaired loans and advances and impairment allowance for credit losses are as follows:

| **2007** | **UAE** | **Middle East countries** | **O.E.C.D** | **Other countries** | **Total** |
|---|---|---|---|---|---|
| | **AED'000** | **AED'000** | **AED'000** | **AED'000** | **AED'000** |
| **Non performing loans** | **291,354** | **69,629** | - | **21,928** | **382,911** |
| **Impairment allowance for credit losses** | **285,441** | **34,124** | - | **19,188** | **338,753** |

| 2006 | UAE | Middle East countries | O.E.C.D | Other countries | Total |
|---|---|---|---|---|---|
| | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 |
| Non performing loans | 287,476 | 50,121 | - | 41,500 | 379,097 |
| Impairment allowance for credit losses | 234,194 | 28,494 | - | 25,816 | 288,504 |

**Liquidity Risk**

Liquidity risk is the risk that the Group will encounter difficulty in meeting obligations from its financial liabilities at a point of time.

**Management of liquidity risk**

The Group's approach to managing liquidity is to ensure, as far as possible, that it will always have sufficient liquidity to meet its liabilities when due, under both normal and stressed conditions, without incurring unacceptable losses or risking damage to the Group's reputation.



41. **Risk management (continued)**

**Management of liquidity risk (continued)**

Central Treasury receives information from other business units regarding the liquidity profile of their financial assets and liabilities and details of other projected cash flows arising from projected future business. Central Treasury then maintains a portfolio of short term liquid assets, largely made up of short-term liquid investment securities, loans and advances to banks and other inter-bank facilities, to ensure that sufficient liquidity is maintained within the Group as a whole. The liquidity requirements of business units and subsidiaries are met through short-term loans from Central Treasury to cover any short-term fluctuations and longer term funding to address any structural liquidity requirements.

When an operating subsidiary or branch is subject to a liquidity limit imposed by its local regulator, the subsidiary or branch is responsible for managing its overall liquidity within the regulatory limit in co-ordination with Central Treasury. Central Treasury monitors compliance of all operating subsidiaries and foreign branches with local regulatory limits on a daily basis.

The daily liquidity position is monitored and regular liquidity stress testing is conducted under a variety of scenarios covering both normal and more severe market conditions. All liquidity policies and procedures are subject to review and approval by ALCO. Daily reports cover the liquidity position of both the Group and operating subsidiaries and foreign branches. A summary report, including any exceptions and remedial action taken, is submitted regularly to ALCO.

ALCO has a broad range of authority delegated by the Board of Directors to manage the Bank's asset and liability structure and funding strategy. ALCO meets on a monthly basis or more often as circumstances dictate to review liquidity ratios, asset and liability structure, interest rate and foreign exchange exposures, internal and statutory ratio requirements, funding gaps and general domestic and international economic and financial market conditions. ALCO formulates liquidity risk management guidelines for the Bank's operation on the basis of such review.

The members of ALCO are the Chief Executive Officer, the Head of Corporate & Investment Banking Group, the Head of Retail Banking, the Head of Treasury & Capital Markets, the Head of Risk Management Group and the Chief Financial Officer of the Bank.

The key measure used by the Group for managing liquidity risk is the ratio of net liquid assets to deposits from customers. For this purpose net liquid assets are considered as including cash and cash equivalents and investment grade debt securities for which there is an active and liquid market less any deposits from banks, debt securities issued, other borrowings and commitments maturing within the next month. A similar, but not identical, calculation is used to measure the Group's compliance with the liquidity limit established by the Group's local regulator. The other indicators closely monitored on regular basis are Advances to Deposit Ratio, Utilisation of funds to stable resources and stress testing of liquid funds vs unexpected withdrawal of liabilities. For all the measures, benchmarks are set and same are reviewed by ALCO on regular basis.



41. **Risk management (continued)**

**Liquidity Profile:**

The liquidity profile of assets and liabilities as at December 31, 2007 were as follows:

| | Within 3 months AED'000 | Over 3 to 6 months AED'000 | Over 6 to 12 months AED'000 | Over 1 to 5 years AED'000 | Over 5 years AED'000 | Total AED'000 |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Cash and balances with central banks | 17,333,123 | 2,367,000 | 500,000 | - | | 20,200,123 |
| Deposits and balances due from banks | 3,553,023 | 853,682 | 1,436,123 | 2,117,019 | - | 7,959,847 |
| Trading investments | 10,023,141 | - | - | - | - | 10,023,141 |
| Loans and advances - net | 13,302,618 | 4,569,473 | 2,780,064 | 11,573,372 | 3,769,017 | 35,994,574 |
| Islamic financing and investing products | 653,327 | 69,631 | 17,659 | 1,461,990 | 159,675 | 2,345,268 |
| Non-trading investments | 185,119 | 81,348 | 3,062,915 | 758,426 | 661,210 | 4,749,018 |
| Interest receivable and other assets | 1,304,402 | 4,061,186 | 59,017 | 28,229 | - | 5,472,924 |
| Investment property | - | - | - | - | 498,440 | 498,440 |
| Property and equipment | - | - | - | - | 383,661 | 383,661 |
| **Total assets** | **46,156,867** | **12,223,323** | **7,836,378** | **15,938,826** | **5,472,003** | **87,627,397** |
| **Liabilities and equity** | | | | | | |
| Deposits and balances due to banks | 8,464,731 | 2,958,096 | 147,707 | 1,826,600 | - | 13,397,034 |
| Repurchase agreements with banks | 816,160 | 2,731,593 | - | 183,650 | | 3,834,515 |
| Customers' deposits | 40,778,312 | 1,604,760 | 2,446,472 | 737,111 | 946,820 | 46,135,514 |
| Islamic customers' deposits | 2,092,482 | 585 | 60,131 | | - | 2,153,198 |
| Insurance and life assurance funds | - | - | | - | 516,886 | 516,895 |
| Interest payable and other liabilities | 4,768,267 | 699,993 | 243,557 | 60,196 | 68,313 | 5,857,525 |
| Medium-term floating rate notes | - | - | - | 3,397,526 | 1,836,500 | 5,234,025 |
| Long-term loans | - | - | - | - | 16,707 | 16,707 |
| Minority interest | - | - | - | - | 870,546 | 870,546 |
| Equity attributable to equity holders of the parent | - | - | - | - | 9,615,852 | 9,615,852 |
| **Total liabilities and shareholders' funds** | **57,019,956** | **8,164,961** | **2,897,867** | **6,254,982** | **13,269,642** | **87,627,397** |

**Liquidity profile 2006:**

| | Within 3 months AED'000 | Over 3 to 6 months AED'000 | Over 6 to 12 months AED'000 | Over 1 to 5 years AED'000 | Over 5 years AED'000 | Total AED'000 |
|---|---|---|---|---|---|---|
| Total assets | 25,808,821 | 5,827,399 | 7,893,720 | 24,778,587 | 2,941,588 | 56,745,115 |
| Total liabilities and equity | 35,032,018 | 2,577,852 | 4,588,726 | 5,078,972 | 8,866,647 | 56,745,115 |

41. **Risk management (continued)**

**Market risk management**

Market Risk is the risk that the fair value or future cash flows of the financial instruments will fluctuate due to changes in market variables such as interest rates, foreign exchange rates, and equity prices. The Bank classifies exposures to market risk into either trading or non-trading or banking-book.

The market risk for the trading book is managed and monitored using VAR methodology. Market risk for non-trading book is managed and monitored using a combination of VAR, stress testing and sensitivity analysis.

The Bank carries a limited amount of market risk as a policy preference and it is continuously monitored. Foreign exchange and derivatives trading for the account of the Bank is managed by a proprietary trading limit with a stop loss limit set by the Assets and Liabilities Committee.

**a) Market Risk - Trading Book**

The Board has set limits for the acceptable level of risks in managing the trading book. In order to manage the market risk in trading book, the Bank periodically applies a VAR methodology to assess the market risk positions held and also to estimate the potential economic loss based on a set of assumptions and changes in market conditions.

A VAR methodology estimates the potential negative change in market value of a portfolio at a given confidence level and over a specified time horizon. The Bank uses simulation models to assess the possible changes in the market value of the trading book based on historical data. VAR models are usually designed to measure the market risk in a normal market environment and therefore the use of VAR has limitations because it is based on historical correlations and volatilities in market prices and assumes that the future movements will follow a statistical distribution.

The VAR that the bank measures is an estimate, using a confidence level of 99% of the potential loss that is not expected to be exceeded if the current market positions were to be held unchanged for one day. The use of 99% confidence level depicts that within a one-day horizon, losses exceeding VAR figure should occur, on average, not more than once every hundred days.

The VAR represents the risk of portfolios at the close of a business day, and it does not account for any losses that may occur beyond the defined confidence interval. The actual trading results however, may differ from the VAR calculations and, in particular, the calculation does not provide a meaningful indication of profits and losses in stressed market conditions.

In 2007, VAR was calculated daily and as of December 31, 2007 the 99% VAR was US$ 3.412 million (2006: US$ 2.447 million).

**b) Market Risk - Non Trading or Banking Book**

Market risk on non-trading or banking positions mainly arises from the interest rate, foreign currency exposures.

**i) Interest rate risk management**

Interest rate risk arises from the possibility that changes in interest rates will affect the value of financial instruments. The Bank is exposed to interest rate risk as a result of mismatches or gaps in the amounts of assets and liabilities.

The Bank uses simulation-modeling tools to periodically measure and monitor interest rate sensitivity. The results are analyzed and monitored by ALCO. Since most of the Bank's assets and liabilities are floating rate, deposits and loans generally reprice simultaneously providing a natural hedge, which reduces interest rate exposure. Moreover, the majority of the Bank's assets and liabilities reprice within one year, thereby further limiting interest rate risk. The following table depicts the sensitivity to a reasonable possible change in interest rates, with other variables held constant, on the Bank's statement of income or equity. The sensitivity of the income is the effect of the assumed changes in interest rates on the net interest income for one year, based on the floating rate non trading financial assets and financial liabilities held as at December 31, 2007, including the effect of hedging instruments. The sensitivity of equity is analyzed by maturity of the asset or swap. All the banking book exposures are monitored and analyzed in currency concentrations and relevant sensitivities are disclosed in AED million.



41. **Risk management (continued)**

**Interest Rate Sensitivity Gap:**

| | Within 3 months | Over 3 to 6 months | Over 6 to 12 months | Over 1 to 5 years | Over 5 years | Non-interest sensitive | Total |
|---|---|---|---|---|---|---|---|
| | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 | AED'000 |
| **Assets** | | | | | | | |
| Cash and balances with central banks | 14,145,374 | 2,367,000 | 600,000 | - | - | 3,187,749 | 20,200,123 |
| Deposits and balances due from banks | 2,770,419 | 418,517 | 4,277,180 | 250,058 | - | 237,080 | 7,950,847 |
| Trading investments | 4,454,947 | 2,421,980 | 153,959 | 185,734 | - | 2,816,641 | 10,028,161 |
| Loans and advances - net | 21,051,270 | 3,610,847 | 10,888,297 | 9,120,352 | 645,859 | 85,853 | 35,094,974 |
| Islamic financing and investing products | 643,860 | 52,423 | 127,330 | 1,323,206 | 84,445 | - | 2,846,260 |
| Non-trading investments | 787,549 | 518,761 | 673,336 | 3,092 | - | 2,805,385 | 4,749,018 |
| Interest receivable and other assets | - | - | | - | - | 5,472,924 | 5,472,924 |
| Investment property | - | - | - | - | - | 398,440 | 398,440 |
| Property and equipment | - | - | - | - | - | 385,601 | 380,601 |
| **Total assets** | **34,341,713** | **9,389,528** | **16,515,052** | **11,695,624** | **740,307** | **15,546,149** | **87,627,397** |
| Liabilities and equity | | | | | | | |
| Deposits and balances due to banks | 11,139,863 | 669,216 | 18,203 | - | - | 1,376,243 | 13,207,024 |
| Repurchase agreements with banks | 1,102,816 | 2,731,500 | - | | - | | 3,834,219 |
| Customers' deposits | 30,638,891 | 1,770,200 | 2,327,149 | 750,452 | 340,829 | 10,294,064 | 46,133,314 |
| Islamic customers' deposits | 1,857,070 | 555 | 60,131 | - | - | 256,472 | 2,165,105 |
| Insurance and life assurance funds | | - | - | | - | 516,895 | 516,805 |
| Interest payable and other liabilities | - | - | - | - | - | 3,857,320 | 3,837,325 |
| Medium-term floating rate notes | 5,234,025 | - | - | - | - | - | 5,234,025 |
| Long-term loans | | - | - | - | - | 16,707 | 16,707 |
| Minority interest | - | - | - | - | - | 870,546 | 870,546 |
| Equity attributable to equity holders of the parent | - | - | - | - | - | 9,613,852 | 9,613,852 |
| **Total liabilities and equity** | **49,971,931** | **5,371,507** | **2,400,576** | **756,452** | **340,829** | **28,780,122** | **87,627,397** |
| On Balance Sheet gap | (15,630,195) | 4,018,021 | 14,114,606 | 10,939,250 | 399,309 | (13,234,879) | - |
| Off Balance Sheet gap | (21,365) | - | (210,459) | 237,545 | - | - | - |
| **Cumulative interest rate sensitivity gap - 2007** | **(15,651,593)** | **(11,633,572)** | **2,264,481** | **13,501,679** | **13,834,979** | | |
| Cumulative interest rate sensitivity gap - 2006 | 1,000,786 | 4,367,958 | 4,371,944 | 7,775,608 | 7,662,149 | | |



41. **Risk management (continued)**

**Interest Rate Sensitivity Gap:**

The impact of 1% sudden movement in benchmark interest rate on net income over a 12 months period as on December 31, 2007 would have been a decrease in net income by 2.2% (in case of decrease of interest rate) and would have been an increase in net income by 1.5% (in case of increase of interest rate) [2006: -0.60% and +0.70%] respectively.

The effective interest rate on bank placements and certificates of deposits with central bank was 5.33% (2006: 4.82%), on loans and advances 7.96% (2006: 7.61%), on customer deposits 4.07% (2006: 3.71%) and on bank borrowings 6.12% (2006: 5.37%).

**ii) Currency Risk**

Currency risk represents the risk of change in the value of financial instruments due to changes in foreign exchange rates. The Board has set limits on positions by currencies, which are monitored daily, and hedging strategies are also used to ensure that positions are maintained within the limits.

The Bank's assets are typically funded in the same currency as that of the business transacted in order to eliminate foreign exchange exposure. The Bank manages exposure to the effects of fluctuations in prevailing foreign currency exchange rates on its financial position and cash flows. The Board of Directors sets limits on the level of exposure by currency and in total for both overnight and intra-day positions, which are monitored daily. At the end of the year, the Bank had the following significant net exposures denominated in foreign currencies:

| | Net spot position AED'000 | Forward position AED'000 | Total 2007 AED'000 | Total 2006 AED'000 |
|---|---|---|---|---|
| Euro | 1,288,420 | (1,298,406) | (9,986) | (2,134) |
| Qatari Riyals | (31,422) | - | (31,422) | (79,177) |
| Pakistani Rupees | 22,267 | - | 22,267 | 22,439 |
| Indian Rupees | 57,436 | 15,528 | 72,964 | 64,353 |
| Egyptian Pound | 18,639 | - | 18,639 | 19,066 |
| Bahrain Dinar | 30,132 | 17,659 | 47,791 | 48,946 |
| Japanese Yen | 106,611 | (102,802) | 3,809 | 33,757 |
| Pound Sterling | 62,673 | (29,871) | 32,802 | 33,870 |
| **Total** | **1,565,756** | **(1,397,892)** | **157,864** | **131,100** |

The exchange rate of AED against US Dollar is pegged since November 1980 and the Group's exposure to currency risk is limited to that extent.

**Operational risk**

The operational risk results from failure of systems, internal processes, people and external interventions in terms of frauds and forgeries. Severity of loss due to operational risk factors is highly dependent on the nature and frequency of failure. Mashreqbank gives high priority to the management of operational risk. All back office processing units are centralised under Operations Division which has a operational control unit which reviews all policies, procedures and internal controls on regular basis. The foundation of credible operational risk discipline is a robust risk and control self assessment process which ensures that:

- All transactions are properly authorised
- All transactions are properly recorded
- Assets are safeguarded
- Continuity of business plan are well defined and tested
- Sound ethical standards are adhered to
- Full compliance to all laws regulations and corporate policies.

The Audit and Compliance Group conducts risk based audits of all units in the bank on a regular basis. The findings are shared with the Audit Committee of the board and the Audit and Compliance Committee of the Management.



**41. Risk management (continued)**

Bank maintains a detailed record of operational risk events and resultant losses and ensures proper control mechanism is put in place to avoid recurrence. Zero tolerance for unethical behaviour is part of the overall risk framework.

**Fair value of financial instruments**

The fair value of financial assets and financial liabilities are determined as follows:

- the fair value of financial assets and financial liabilities with standard terms and conditions and traded on active liquid markets is determined with reference to quoted market prices;
- the fair value of other financial assets and financial liabilities (excluding derivative instruments) is determined in accordance with generally accepted pricing models based on discounted cash flow analysis using prices from observable current market transactions and dealer quotes for similar instruments;
- the fair value of derivative instruments is calculated using quoted prices. Where such prices are not available, use is made of discounted cash flow analysis using the applicable yield curve for the duration of the instruments for non-optional derivatives, and option pricing models for optional derivatives; and
- the fair value of financial guarantee contracts is determined using option pricing models where the main assumptions are the probability of default by the specified counterparty extrapolated from market-based credit information and the amount of loss, given the default.

**Quoted prices**

The directors consider that the carrying amounts of financial assets and financial liabilities in the financial statements approximate their fair values.

**42. Fiduciary activities**

Assets held by the Bank in trust, in a fiduciary and custodial capacity on behalf of its customers, are not included in these financial statements. These include assets held in a fiduciary capacity for a related party as of December 31, 2007 of AED 546.29 million (2006: AED 415.05 million).

**43. Proposed dividends**

| | December 31, 2007 AED '000 | 2006 AED '000 |
|---|---|---|
| Bonus shares - 3 shares for each 10 shares | **337,816** | 259,859 |
| Dividends per share (AED) | **3.0** | 3.0 |

The bonus shares were proposed by the Board of Directors at their meeting held on January 22, 2008.

**44. Fund management**

Makaseb Funds Company BSC (subsidiary - Note 1) manages a number of equity funds which are not consolidated in the financial statements. The funds have no recourse to the general assets of the Group; further the Group has no recourse to the assets of the funds.

**45. Comparative figures**

Certain amounts for the prior year were reclassified to conform to current year presentation.

## AFFIDAVIT OF SERVICE BY ELECTRONIC MAIL

STATE OF NEW YORK )
: ss.:
COUNTY OF NEW YORK )

Christopher Carlsen, being duly sworn, deposes and says that deponent is not a party of this action, is over 18 years of age and resides in Rockville Centre, New York. On September 2, 2008 deponent served the within **DEFENDANT OMAN INSURANCE COMPANY'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL PLAINTIFF TO ACCEPT AN IRREVOCABLE LETTER OF CREDIT AS SUBSTITUTE SECURITY PURSUANT TO RULE E(5) OF THE SUPPLEMENTAL RULES FOR ADMIRALTY OR MARITIME CLAIMS AND ASSET FORFEITURE ACTIONS** upon:

Kevin J. Lennon, Esq.
Lennon, Murphy & Lennon, LLC
420 Lexington Avenue, Suite 300
New York, New York 10170
(212) 490-6050
Email: klennon@lenmur.com

Christopher Carlsen

Sworn to before me this
2nd day of September, 2008

Notary Public

DANIEL CORRELL
Notary Public, State of New York
No. 02CO6103892
Qualified in Nassau County
Commission Expires Dec. 8, 2011